IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00097-PAB-KLM

TIMOTHY McGETTIGAN,

     Plaintiff,

v.

LESLEY Di MARE, President of the Colorado State University - Pueblo, in her individual and official capacities and
BOARD OF GOVERNORS OF THE COLORADO STATE UNIVERSITY SYSTEM, by and on behalf of COLORADO STATE UNIVERSITY,

     Defendants.

---

## ORDER

---

This matter is before the Court on the Motion to Dismiss [Docket No. 16] filed by defendants Lesley Di Mare and the Board of Governors of the Colorado State University System.[1] This case arises out of an email sent by plaintiff Timothy McGettigan, a sociology professor at Colorado State University - Pueblo ("CSU-P") and CSU-P President Di Mare's ensuing limitation of plaintiff's university email and computer access. Docket No. 1 at 1, 3, ¶¶ 1, 7. This Court has subject matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

---

[1] Since defendants filed the instant motion to dismiss, the parties have conferred and agree that the only remaining claims are against President Di Mare in her individual capacity. *See* Docket No. 25 at 1 n.1. Accordingly, the Court treats plaintiff's claims against the Board of Governors of the Colorado State University System and President Di Mare in her official capacity as abandoned.

## I. BACKGROUND[2]

In December 2013, Colorado State University System Chancellor Michael Martin announced a budget shortfall for 2015. *Id.* at 4, ¶ 10. After CSU-P President Di Mare announced a plan to address the budget shortfall that could eliminate up to fifty CSU-P positions, Professor McGettigan sent a series of mass emails in December 2013 and January 2014 to members of the CSU-P community expressing his opposition to the CSU-P plan. *Id.*, ¶¶ 10, 12. Chancellor Martin announced that he would visit CSU-P on January 17, 2014 to hold a public meeting to discuss the budget and termination plan. *Id.*, ¶ 14.[3]

On December 23, 2013, Professor McGettigan sent an email to faculty, staff, and students challenging CSU-P's determination that there was a budget shortfall and arguing that the termination plan would be detrimental to CSU-P students. *Id.* at 5, ¶ 16. On December 23, 2013, Professor McGettigan also circulated to faculty members a report from an independent analyst concluding that termination of staff was not

---

[2]The following facts are taken from plaintiff's complaint and are presumed true for purposes of resolving this motion. Plaintiff's factual allegations are presumed true unless, as noted herein, they are legal conclusions, conclusory, or contradicted by other allegations of plaintiff. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) ("conclusory and formulaic recitations" of the elements "are insufficient to survive a motion to dismiss"); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 152 (2d Cir. 2014) (holding that "general allegations that are contradicted by more specific allegations in the Complaint" need not be accepted as true (quotation omitted)).

[3]Although plaintiff does not directly acknowledge it, the emails that he sent in this case were sent through CSU-P's email system. This fact is implied through the action that he alleges President Di Mare took – suspending his access to CSU-P's email and electronic resources, Docket No. 1 at 9, ¶ 28. His use of CSU-P's email system to send the emails in question is also the predicate to his challenge to the university's Computer Resource Access Policy. *See id.* at 11, ¶¶ 39-41.

necessary to resolve the budget shortfall.  *Id*., ¶ 17.  Professor McGettigan encouraged

students to attend Chancellor Martin's January 17, 2014 meeting.  *Id*., ¶ 15.

On January 14, 2014, Professor McGettigan sent an email to all students

regarding comments made by Chancellor Martin at a January 6, 2014 meeting about

the termination plan.  *Id*. at 5-6, ¶ 18.  Professor McGettigan summarized the meeting

as follows:

> According to Chancellor Martin, here's what CSU-Pueblo must do to dig
> itself out of the ugly mess it's in and achieve its grandest and most
> glorious aspirations:
>
> 1.  Quit wasting money on CSU-Pueblo students.  They are losers who
> live in a worthless corner of Colorado.
> 2.  Divert money that would otherwise be wasted on CSU-Pueblo students
> to Chancellor Martin's brainchild, CSU-Denver.
> 3.  Subsidize higher education for wealthier, more populous and (let's face
> it) altogether superior students in Denver.
> 4.  Since CSU-Pueblo students are going to fail anyway, they won't really
> miss out on the educational opportunities that their brainier CSU System
> administrators are stealing from them.  Anyway, CSU-Pueblo-types are
> going to be much happier working for minimum wage at McDonald's than
> in professions that (let's face it) would overtax their limited mental
> faculties.
>
> So there it is.  The future in a nutshell.  Chancellor Martin is committed to
> transferring educational resources that would be wasted on CSU-Pueblo
> students to create more and better educational opportunities for rich kids
> who can (let's face it) make better use of them.

*Id*. at 6, ¶ 18.

The next day, on January 15, 2014, Professor McGettigan sent an email

encouraging faculty, staff, and friends of CSU-P to gather at the university's central

fountain on January 17, 2014, demonstrate against the termination decision, and call

for a "no confidence" vote in Chancellor Martin.  *Id*., ¶ 19.

The next day, on January 16, 2014, Professor McGettigan sent an email to "members of the university community" notifying them of a lunch hour protest that same day against the termination plan and reminding them of the January 17, 2014 demonstration. *Id*. at 7, ¶ 20.

On January 17, 2014, Professor McGettigan sent an email to members of the CSU-P community titled "Children of Ludlow."  In that message, he drew an analogy between Chancellor Martin's termination decision and the actions of the militia and camp guards who massacred striking coal miners and their families in Ludlow, Colorado in 1914. *Id*., ¶ 21.  Professor McGettigan's email states in part:

> The hitmen massacred those people.  Coldly and methodically, the hitmen turned their guns on women and children.  The hitmen riddled the little tent village in Ludlow with bullets, and then they set that village alight.  Amidst the screams of helpless, defenseless souls, the hitmen stood back and watched in satisfaction as the hopes and dreams of southern Coloradoans went up in smoke.
>
> **
>
> Today, the people of southern Colorado are still struggling to get their own little piece of the American Dream. They aren't looking for handouts or special treatment.  They just want to make a decent living and give their kids a chance at a brighter future.
>
> In recompense for this unpardonable sin, CSU Chancellor Michael Martin has assembled a hit list.  Today, Michael Martin is traveling to CSU-Pueblo to terminate the 50 people who are on his hit list.  In his own way, Michael Martin is putting a gun to the head of those 50 hard-working people while he also throws a burning match on the hopes and dreams of their helpless, defenseless families.
>
> **
>
> When the hitman returns today, the Children of Ludlow will once again be called upon to withstand the onslaught of a merciless enemy.  I can't roll back the clock to help children who died at the hands of pitiless hitmen a hundred years ago.  But I swear to God, I will not abandon the Children of

4

Ludlow when they face the latest in a long history of hitmen who have terrorized southern Colorado.

Docket No. 16-1 at 1.

Less than an hour after reading Professor McGettigan's "Children of Ludlow" email, and before Chancellor Martin's public meeting, President Di Mare terminated Professor McGettigan's access to electronic resources at CSU-P, including his email account, without any notice to him.  Docket No. 1 at 9, ¶ 28.  Professor McGettigan's ability to send group emails has not been restored.  *Id*. at 10, ¶ 33.  Less than two weeks after Professor McGettigan sent his "Children of Ludlow" email, President Di Mare rescinded approval of a one-term sabbatical for which Professor McGettigan had previously been approved.  *Id*., ¶ 34.

A few days after the suspension of Professor McGettigan's access to CSU-P electronic resources, a spokeswoman for CSU-P sent an email to *Inside Higher Ed*, a national news publication, indicating that plaintiff had violated a university policy, and which attached a statement from President Di Mare.  *Id*. at 11-12, ¶ 42; *see also* Docket No. 16-2.  *Inside Higher Ed* published this information on January 20, 2014 as follows:

> UPDATE: On Monday afternoon, a spokeswoman for Colorado State-Pueblo sent an email to *Inside Higher Ed* saying that McGettigan had violated the policy on use of electronic communications.  Further, she released a statement from President Lesley Di Mare, in which she invoked recent incidents of violence in education. "Considering the lessons we've all learned from Columbine, Virginia Tech, and more recently Arapahoe High School, I can only say that the security of our students, faculty, and staff are our top priority," Di Mare said.  "CSU-Pueblo is facing some budget challenges right now, which has sparked impassioned criticism and debate across our campus community.  That's entirely appropriate, and everyone on campus–no matter how you feel about the challenges at hand–should be able to engage in that activity in an environment that is free of intimidation, harassment and threats.  CSU-Pueblo has a

wonderful and vibrant community, and the university has a bright future. I'm confident that we can solve our challenges with respectful debate and creative problem-solving so that we can focus on building that future together."

Docket No. 17-1 at 2-3.

On January 14, 2015, Professor McGettigan filed his complaint.  Docket No. 1. Professor McGettigan asserts a 42 U.S.C. § 1983 claim for alleged violations of his First Amendment rights and a state common law defamation claim against President Di Mare.  *Id*. at 2, ¶ 4.[4]  On March 17, 2015, President Di Mare moved to dismiss plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Docket No. 16.  President Di Mare argues that she is entitled to qualified immunity on Professor McGettigan's First Amendment claims,  Docket No. 16 at 4, and that Professor McGettigan's defamation claim fails as a matter of law because her statement was not libel *per se*.  *Id*. at 11.

## II.  STANDARD OF REVIEW

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to

---

[4]Plaintiff also challenged the CSU-P Computer Resource Access Policy under the First Amendment and the Due Process Clause of the Fourteenth Amendment, seeking a declaration of its unconstitutionality and an injunction against its enforcement. Docket No. 1 at 11, ¶ 41.  President Di Mare states that CSU-P has revised the Computer Resource Access Policy and the newly revised policy does not include the language referenced in the complaint.  Docket No. 16 at 11 n.3.  Plaintiff does not dispute this assertion.  *See* Docket No. 17 at 5 n.1.  "[A] superseding statute or regulation moots a case. . . to the extent that it removes challenged features of the prior law."  *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1173, 1182 (10th Cir. 2000) (quoting *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000)).  Accordingly, plaintiff's challenges have been mooted by CSU-P's implementation of a new Computer Resources Access Policy.

plausibly state a claim.  Fed. R. Civ. P. 12(b)(6); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).  In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted).  At the same time, however, a court need not accept conclusory allegations.  *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 (quoting *Twombly*, 550 U.S. at 570) ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss.").  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to

sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

## III. ANALYSIS

### A.  Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008).  Under the first prong of the analysis, a plaintiff is required to "establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001)).  The determination of whether a violation occurs under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007).

Under the second prong, the plaintiff must show that the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth

8

Circuit, or the weight of authority from other circuits." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).  A plaintiff need not identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011).  "[C]ontrary authority from other circuits does not preclude a finding that the law in this circuit was clearly established, if the contrary authority can be distinguished." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).  "If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995).  A court may exercise its discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson,* 555 U.S. at 236.

Defendant argues that the proper test for determining whether a government employee's First Amendment rights have been violated is the *"Garcetti/Pickering"* test. Docket No. 16 at 6.  *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).  Plaintiff disagrees and asserts that *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), provides the relevant test because defendant is not plaintiff's employer and she is sued only in her individual capacity.  The Court agrees with defendant.  A state statute establishes that the CSU-P president is the "chief executive officer" whose "duty [is] to see that the rules and regulations of the board of governors of the Colorado state university system and the faculty are observed and executed."  Colo. Rev. Stat. § 23-31.5-105.  Moreover, plaintiff alleges that defendant

9

had the authority to curtail his access to CSU-P's electronic resources and to cancel his sabbatical. Accordingly, the *Garcetti/Pickering* test is the proper standard for evaluating President Di Mare's assertion of qualified immunity for suspending and limiting Professor McGettigan's access to CSU-P's electronic resources. *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 728 (10th Cir. 2011) ("The framework set forth in *Pickering* and *Garcetti* is traditionally applied in free-speech cases in which the public employer is the same individual or entity that takes the adverse action at issue against the employee") (citing *Worrell*, 219 F.3d at 1209-10 ("the *Pickering* balancing has been most frequently applied to adverse actions taken by employers–individuals. . . who have the authority to make hiring and firing decisions and take other personnel actions.")).

The five-prong *Garcetti/Pickering* test considers:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citation omitted).

Defendant emphasizes the lack of clearly established law suggesting that what she did would violate plaintiff's constitutional rights. Docket No. 16 at 8-9; Docket No. 20 at 5-6. In so doing, defendant overlooks the importance of developing the facts necessary for understanding the context in which the speech occurred. As noted in *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (Nov. 9, 2015), the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"

(quoting *al-Kidd*, 131 S. Ct. at 2074 (emphasis added)).  "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).  With the importance of understanding the context of the speech and the nature of defendant's conduct in mind, the Court turns to application of the *Garcetti/Pickering* test.

Defendant does not suggest that plaintiff was acting pursuant to his official duties when he sent the email, which is the first prong of the *Garcetti/Pickering* test.  Moreover, for purposes of the motion to dismiss, defendant does not contest that plaintiff's speech was on a matter of public concern, which is the second prong.  Docket No. 20 at 3.  Defendant offers no reasons that plaintiff has not also satisfied the fourth and fifth prongs of the *Garcetti/Pickering* test.  Thus, as in *Dixon*, 553 F.3d at 1304, the third prong is the nub of defendant's motion.

After determining that the employee's speech is protected by virtue of passing the first two prongs, the court in step three decides "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer."  *Id*. (citing *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007)).  "Although this element is framed as a 'balancing' test, this Court has held that First Amendment rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee."  *Id*. (citing *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1986)) (quotation marks omitted).  Thus, the employer must demonstrate that the

restrictions at issue were necessary. As *Dixon* explained, "unless the government employer can show that the termination was based on legitimate reasons grounded in the efficient conduct of public business, there is no need to proceed to balancing, and the First Amendment interest of the plaintiff prevails." *Id*. When assessing the third prong, "a court should generally consider 'whether the [speech] impairs discipline . . ., has a detrimental impact on close working relationships . . ., or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id*. at 1304 (citing *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1996)). "[A] public employer does not have to wait for speech actually to disrupt core operations before taking action." *Kent v. Martin*, 252 F.3d 1141, 1145 (10th Cir. 2001). The employer, however, "cannot rely on purely speculative allegations that certain statements caused or will cause disruption." *Gardetto*, 100 F.3d at 815.

Defendant asserts that she restricted plaintiff's access to online resources based on her belief that plaintiff's speech could be disruptive and pose a safety or security concern. Docket No. 16 at 9. Specifically, defendant contends that she was concerned that his email "could have incited violence on campus." *Id*.

> The email directly calls the Chancellor a "hitman" and calls on readers to "withstand the onslaught of a merciless enemy" and "face the latest in a long history of hitmen who have terrorized southern Colorado. The email compares the Chancellor to hitmen who "massacred those people. Coldly and methodically, the hitmen turned their guns on women and children. The hitmen riddled the little tent village in Ludlow with bullets, and then they set that village alight." The email uses violent imagery, contending that the Chancellor was "putting a gun to the head" of staff members "while he also throws a burning match on the hopes and dreams of their helpless, defenseless families.

*Id.* (internal citations omitted).[5]

Before a court even applies the balancing test in the third prong of the

*Garcetti/Pickering* test, defendant must show "legitimate reasons grounded in the

efficient conduct of public business." *Dixon*, 553 F.3d at 1304. Defendant does not do

this. For example, in the course of identifying her reasons for limiting plaintiff's access

to the university's electronic resources, defendant does not explain, as required by

*Dixon*, *id.*, that her actions were "necessary to prevent" the harm that she feared.

According to the complaint, "[l]ess than an hour after reading Professor McGettigan's

'Children of Ludlow' email, and prior to Chancellor Martin's public meeting, [President

Di Mare] terminated Professor McGettigan's access to electronic resources at CSU-P,

including his email account." Docket No. 1 at 9, ¶ 28. Plaintiff does not allege, and

defendant does not suggest, that the university somehow withdrew the "Children of

Ludlow" email. Since it was not withdrawn, the email would continue to have whatever

effect of inciting violence that it had when first issued. Given that fact, defendant does

not explain how cutting off plaintiff's university email privileges helped prevent the

possibility of violence and why it was necessary to go further and terminate, albeit

temporarily, plaintiff's access to all CSU-P electronic resources. There is also no

_____

[5]When asserting her motivations for imposing the restrictions on plaintiff, defendant's motion does not cite plaintiff's violation of any university policy and, in fact, denies that the restrictions were based on a violation of the Computer Resource Access Policy. Docket No. 16 at 10 ("Plaintiff's as-applied challenges [to the Computer Resource Access Policy] should be dismissed under Rule 12(b)(6) because he has not plausibly alleged – nor could he – that the challenged language in the policy was ever applied to him."). Although the motion does not cite it as a justification for defendant's actions, defendant states that a letter sent to plaintiff identified the Electronic Communication Policy as the basis for her actions. Docket No. 16 at 11 n.4.

explanation of what operative assumptions defendant had about how widely disseminated plaintiff's "Children of Ludlow" email was, how likely it was for plaintiff to send another email that could further incite violence, and what type of violence the email could incite.

The Tenth Circuit in *Trant v. State of Oklahoma*, 426 F. App'x 653 (10th Cir. 2011) (unpublished), was faced with similar unanswered questions. Like this case, the defendants filed a motion to dismiss based on qualified immunity. *Id*. at 655. Like this case, the defendants asked the court to focus its inquiry on the third prong of the *Garcetti/Pickering* test. *Id*. at 661. The court of appeals, however, refused to do so. It noted that the inquiry necessary under the third prong of the *Garcetti/Pickering* test "is not a simple matter. While it is framed as a 'balancing test,' it actually places a substantial threshold burden on the employer before balancing is even considered." *Id*. The court observed, "[a]s indicated by the repeated references in the quoted passage [of *Dixon*] to the need for a 'showing' of the employer's interest, this is a true burden of *demonstration*, not a mere matter of hypothetical articulation." *Id*. (emphasis in original). The court then considered the facts, or lack of facts, on which the defendants asked the court to resolve the third prong and observed:

> There are certainly instances in which this court has disagreed with a district court's initial determination that a government employee's speech was unprotected but gone on to determine whether the disposition in favor of the employer might still be affirmed at the balancing step of the inquiry. But, in light of the considerations noted above, it should not be surprising that such cases have involved the appeal from *summary judgment* — where an adequate factual record had been developed to actually "show," rather than merely speculate about, the employer's interest and to weigh it in an informed manner against the First Amendment interests involved.

*Id.* at 661-62 (citing *Thomas v. City of Blanchard*, 548 F.3d 1317, 1327-28 (10th Cir. 2008), and *Casey v. W. Las Vegas Indep. Sch. Dist*., 473 F.3d 1323, 1333-34 (10th Cir. 2007)) (emphasis in original).  The court remanded the issue to the district court for further proceedings.  *Id*. at 662.

In *Thompson v. District of Columbia*, 428 F.3d 283 (D.C. Cir. 2005), the appellate court reviewed a district court's order granting a municipal employer's motion to dismiss plaintiff's claim that he was terminated in retaliation for exercising his First Amendment rights.  Like this case, the defendants in *Thompson* only contested that step in the analysis requiring the court to balance the government's interests against those of the plaintiff.  *Id*. at 286.  Noting that "the balancing test calls for a fact-intensive inquiry," the court stated that "[t]he district court could not conduct this 'searching review' based on this record, nor can we.  Consisting only of the complaint, the record contains no evidence regarding the extent of Thompson's alleged disruptiveness."  *Id.*  In reversing, the court held that the defendant "cannot prevail in a balancing test with no record evidence on its side of the scale."  *Id*. at 287.

Here, defendant makes no attempt to confine herself to the allegations of the complaint concerning her reasons for imposing the restrictions on plaintiff's speech.  On a motion to dismiss, however, the Court must accept as true all well-pleaded facts. *Trant*, 426 F. App'x at 659.  Professor McGettigan alleges that defendant's goal was to "shut him up at the very time when public attention to CSU-P's budgetary issues was at its height," Docket No. 1 at 9, ¶ 31, and that her actions were done in retaliation for his email.  *Id*. at 10,  ¶ 35.  Defendant does not suggest that the allegations of the

complaint alone allow the Court to perform the balancing test for the third prong.

Nevertheless, defendant states that "the law did not clearly establish that President

Di Mare's actions violated the third prong of this test."  Docket No. 16 at 7.  Without a

better developed factual record, the relevance of various cases to defendant's actions

cannot be determined.  Because defendant offers only assertions of her motives

without any demonstration of her interests or of the necessity for the actions she took,

defendant's motion to dismiss plaintiff's First Amendment claim must be denied.

### B.  Defamation

As noted earlier, President Di Mare moves to dismiss Professor McGettigan's

defamation claim because her press statement is not libelous *per se*.

In Colorado, "[d]efamation is a communication that holds an individual up to

contempt or ridicule thereby causing him to incur injury or damage."  *Keohane v.*

*Stewart*, 882 P.2d 1293, 1297 (Colo. 1994) (citing W. Page Keeton et al., *Prosser &*

*Keeton on the Law of Torts* § 111, at 771-85 (5th ed. 1984)).  "A statement may be

defamatory 'if it tends so to harm the reputation of another as to lower him in the

estimation of the community or to deter third persons from associating or dealing with

him."  *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1357 (Colo. 1983)

(quoting *Restatement (Second) of Torts § 559* (1976)).  A written defamatory statement

is libel.  *Stump v. Gates*, 777 F. Supp. 808, 825 (D. Colo. 1991).  "The elements of a

libel claim are: (1) a written defamatory statement of and concerning the plaintiff; (2)

published to a third party; (3) with the publisher's fault amounting to at least negligence;

and (4) either actionability of the statement irrespective of special damages or the

16

existence of special damages caused by the publication." *Id.* (citing *Walters v. Linhof*, 559 F. Supp. 1231, 1235 (D. Colo. 1983)).

A defamatory statement may be defamation *per se* or defamation *per quod*. "The distinction between libel *per se* and libel *per quod* is that to be libel *per se* the libel must carry its defamatory imputation on its face and is actionable without an allegation or proof of damages; but any libel which does not carry such imputation on its face is libel *per quod* and is actionable only where special damages are pleaded and proved." *Inter-State Detective Bur., Inc. v. Denver Post, Inc.*, 484 P.2d 131, 133 (Colo. App. 1971) (citing *Bernstein v. Dun & Bradstreet, Inc.*, 368 P.2d 780, 782 (Colo. 1962)). In order to establish a defamation *per quod* claim, specific, quantifiable monetary losses must be pled. *Bernstein*, 368 P.2d at 782. Plaintiff's complaint contains no allegations of special damages and thus alleges only defamation *per se*.

"Whether a statement is defamatory per se. . . is a question of law" for the Court. *Miles v. National Enquirer, Inc.*, 38 F. Supp. 2d 1226, 1228 (D. Colo. 1999) (citing *Keohane*, 859 P.2d at 301). "In evaluating a statement or article alleged to be libelous *per se*, 'the court must interpret alone, without aid of inducements, colloquialisms, innuendos, and explanatory circumstances.'" *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 517 (10th Cir. 1987) (citing *Inter-State Detective Bur.*, 484 P.2d at 133).

First, it is necessary for the Court to identify the statement at issue. The complaint identifies the statement as a "prepared comment" that defendant published to a national news publication. Docket No. 1 at 11-12, ¶ 42. The complaint does not quote the statement and only generally refers to its content. Defendant's motion

attaches the entirety of the spokeswoman's email, which included President Di Mare's statement. *See* Docket No. 16-2. However, that is not exactly what was published in the article. Plaintiff's response attaches the *Inside Higher Ed* article, which contains the "UPDATE" quoted earlier in this order. Docket No. 17-1. Neither party argues that the spokeswoman's email or the brief synopsis of such email which prefaced defendant's written statement in the article should be considered a part of the allegedly defamatory statement. As a result, the Court will only consider defendant's statement.

Defendant argues that her statement is not libel *per se* because it is not defamatory on its face. Docket No. 16 at 13. Plaintiff responds that the statement is defamatory on its face because it states that he posed "the same kind of security threat as a school shooter" and it "imputes criminal activity, tends to hold Plaintiff up to public hatred, contempt, or ridicule and reflects adversely on his character or reputation." Docket No. 17 at 14. Defendant replies that "[n]one of the mentioned instances of school violence involved violence by faculty members; as a result, her reference to those events could not be reasonably construed as inferring that Plaintiff was similar to the perpetrators of violence in those events." Docket No. 20 at 8 n.3.

The first sentence of the defendant's statement says: "Considering the lessons we've all learned from Columbine, Virginia Tech, and more recently Arapahoe High School, I can only say that the security of our students, faculty, and staff are our top priority." Docket No. 16-2. The references to Columbine, Virginia Tech, and Arapahoe High School would be familiar to almost any reader of the article as school shooting incidents, but the "lessons we've all learned" from them is not clear. Each of those incidents involved student shooters who had a variety of motives and varying degrees

18

of mental health issues.  It would be difficult to discern a lesson from those events considered together other than that almost any school could be the scene of such a tragedy.  The second half of the sentence may shed light on the meaning of the first half; it says that "I can only say that the security of our students, faculty, and staff are our top priority."  *Id*.  Thus, whatever the phrase the "lessons we've all learned" means, which the Court will not attempt to use "explanatory circumstances" to interpret, *Sunward Corp.*, 811 F.2d at 517, the point of the first sentence seems simply to be that the university and the university community must be vigilant about security issues.

The second sentence states that "CSU-Pueblo is facing some budget challenges right now, which has sparked impassioned criticism and debate across our campus community."  Docket No. 16-2.  This sentence references the subject of the controversy, the "budget challenges," and notes that members of the "campus community" have become "impassioned" about this issue, which reaction the beginning of the next sentence states is "entirely appropriate."  *See id*.  The rest of the third sentence, however, discusses what is not appropriate: "everyone on campus – no matter how you feel about the challenges at hand – should be able to engage in that activity in an environment that is free of intimidation, harassment and threats."  *See id*. The last two sentences of defendant's statement strike a note of optimism and suggest that, instead of conducting the debate over the budget inappropriately, people should use "respectful debate and creative problem-solving."  *See id*.

Assuming, without deciding, that President Di Mare's statement referred to plaintiff, the statement, at most, suggests that plaintiff used "intimidation, harassment

19

and threats" during the debate over the budget.  Plaintiff does not claim those words

defamed him.[6]  The statement does not link Professor McGettigan to school shooters or

suggest that "intimidation, harassment and threats" leads to school shootings.  Rather,

the gist of the statement is that the debate over the budget, while impassioned, should

be free of intimidation, harassment, and threats.

      The Court finds that defendant's statement on its face is not unmistakably

injurious to plaintiff and thus is not defamatory *per se*.  Thus, dismissal of plaintiff's

defamation claim is proper.

## IV.  CONCLUSION

      For the foregoing reasons, it is

      **ORDERED** that defendant's Motion to Dismiss [Docket No. 16] is **GRANTED** in

part and **DENIED** in part.  It is further

      **ORDERED** that plaintiff's defamation claim is **DISMISSED**.  It is further

      **ORDERED** that plaintiff's claims against defendants Board of Governors of the

Colorado State University System and Lesley Di Mare in her official capacity are

**DISMISSED** without prejudice.

---

[6] The complaint does not allege that the words "intimidation, harassment and threats" were defamatory.  Rather, the basis of plaintiff's defamation claim is that President Di Mare "asserted that Professor McGettigan posed the same kind of threat as the mass shooters at Columbine High School, Virginia Tech, and Arapahoe High School."  Docket No. 1 at 12.

DATED March 24, 2016.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge