IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

No. 15-CV-00097-PAB-KLM

TIMOTHY McGETTIGAN,
        Plaintiff,

        v.

LESLEY DiMARE, *et al.*
        Defendant.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now comes Plaintiff, Timothy McGettigan, by his counsel, Loevy & Loevy, and hereby

respectfully submits this Motion for Summary Judgment pursuant to FRCP 56, as follows:

## INTRODUCTION

Now that discovery has been completed, the undisputed facts in this matter show that

Colorado State University-Pueblo President Lesley DiMare retaliated against Professor Timothy

McGettigan by silencing his speech after Prof. McGettigan opposed President DiMare's plans to

fire 50 employees at CSU-P. This is a clear example of a public official using her position of

power to shut down the speech of an opponent. The First Amendment prohibits President

DiMare's conduct, as has been clear through decades of court decisions.

In December 2013 and January 2014, CSU-P purportedly faced a $3.3 million budget

shortfall that President DiMare and the Colorado State University System ("CSUS") Chancellor,

Michael Martin, intended to close by firing 50 people. After President DiMare announced the

plan through a campus-wide email, Prof. McGettigan spoke out against the plan in a number of

campus-wide emails. In addition, Plaintiff questioned President DiMare's claims about whether

there was truly a budget shortfall in the first place, or whether, instead, the administration had

misused public funds. Plaintiff's speech culminated in an email sent on January 17, 2014, comparing the plan to the actions of militia who massacred striking coal miners and their families at Ludlow, Colorado, in 1914. Plaintiff's email encouraged people to attend a rally on campus to protest the layoffs. President DiMare disagreed with Plaintiff's email. In response, President DiMare stopped Prof. McGettigan from speaking any further on these matters of public concern by shutting down his computer and email access completely for three days. She also prevented Plaintiff from sending any more campus-wide emails for an entire year, by cutting off his access to group distribution lists.

Several elements of Plaintiff's First Amendment claim are completely undisputed, including that Plaintiff did not send his "Ludlow" email pursuant to his official duties; Plaintiff spoke on a matter of public concern; Plaintiff's "Ludlow" email was a motivating factor in Defendant's actions; and Defendant would not have reached the same adverse actions in the absence of Plaintiff's "Ludlow" email. And, there is no genuine dispute of material fact that Defendant has failed to articulate any legitimate reason for shutting down Plaintiff's email access completely for three days or preventing him from emailing groups for a year. Therefore, there is no need for this Court to "balance" DiMare's interests and Plaintiff's free speech rights. Plaintiff is entitled to judgment on his First Amendment claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**1.** Plaintiff Timothy McGettigan has been a sociology professor at CSU-P since 2000. Ex. 1 (McGettigan Decl.) ¶¶ 2-6.

**2.** Defendant Lesley DiMare is the President of CSU-P and has been since November 2011. Ex. 2 (DiMare Dep.) at 6:10-17.

**3.**   In December 2013, there was discussion on campus about budget cuts, and DiMare and Chancellor Martin believed that budget cuts were needed. Ex. 2 at 8:14-10:13.

**4.**   DiMare and the Chancellor proposed to address the budget cuts by eliminating certain staff positions. Ex. 2 at 11:10-12:3, 108:9-17.

**5.**   DiMare sent a campus-wide email on December 15, 2013 stating that there was a budget shortfall of $3.3 million, as many as 50 positions at CSU-P could be eliminated, and Chancellor Martin would hold a public meeting on January 17, 2014 at CSU-P to discuss. Ex. 3 (DiMare email dated 12/15/13); Ex. 2 at 12:4-7.

### Plaintiff Publicly Expressed Opposition to DiMare's Plan

**6.**   After DiMare sent her campus-wide email, McGettigan responded by sending seven different campus-wide emails encouraging people to attend the January 17 meeting and express their views on the budget and planned layoffs. Exs. 4-10 (McGettigan emails dated 12/23/13, 1/14/14, 1/15/14, 1/16/14, and 1/17/14); *see also* Ex. 11 (McGettigan Dep.) at 51:10-15.

**7.**   DiMare and McGettigan had "very serious differences of opinion" about the budget cuts, which they discussed at a meeting on December 20, 2013. Ex. 11 at 76:6-77:20; *see id.* at 77:3; Ex. 2 at 10:22-11:21.

**8.**   On December 23, 2013, McGettigan sent a campus-wide email challenging DiMare's assertion that there was a budget shortfall necessitating terminations, arguing that "neither [DiMare] nor anyone else has a sound working understanding of CSU-Pueblo's budget"; students would be  "negatively impacted"; the "quality of instruction at CSU-Pueblo will plummet as administrators attempts to replace flesh and blood professors with second-rate

distance learning technologies"; and encouraging people to attend the January 17, 2014 meeting and make their views known. Ex. 4 (McGettigan email dated 12/23/13).

9.   On December 23, 2013, McGettigan sent another email with specific information challenging DiMare's assertion of a budget crisis. Ex. 5 (McGettigan email dated 12/23/13).

10.   On January 14, 2014, McGettigan sent a campus-wide email to students questioning the planned terminations of CSU-P employees; criticizing comments that the Chancellor made at a January 6, 2014 meeting regarding the terminations; and encouraging people to attend the January 17, 2014 meeting. Ex. 6 (McGettigan email dated 1/14/14).

11.   On January 15, 2014, McGettigan sent a campus-wide email criticizing Chancellor Martin's plan to terminate employees and encouraging faculty, staff, and friends of CSU-P to gather at the University's central fountain on January 17, 2014 to "peacefully and civilly" demonstrate against the decision and call for a "no confidence vote in all CSU administrators." Ex. 7 (McGettigan email dated 1/15/14).

12.   On January 16, 2014, McGettigan sent two campus-wide emails: one in which he notified people of "two extremely important peaceful protest events taking place today and tomorrow" relating to the budget shortfall and proposed termination of employees, and a second critiquing the alleged budget shortfall. Ex. 8 (McGettigan email dated 1/16/14 titled "Important Events"); Ex. 9 (McGettigan email dated 1/16/14 titled "Tangible Benefits?").

13.   On January 17, 2014, McGettigan sent a campus-wide email titled "Children of Ludlow," in which he drew an analogy between the Chancellor's actions and the action of militia and camp guards who massacred striking coal miners and their families at Ludlow, Colorado, in 1914.

Plaintiff's email encouraged people to "lend a hand" by attending the rally at the fountain that afternoon. Ex. 10 (McGettigan email dated 1/17/14); Ex. 11 at 86:21-25.

14. McGettigan's "Ludlow" email was not sent pursuant to his official duties as a professor at CSU-Pueblo. Ex. 1 ¶ 7.

15. Although the "Ludlow" email went to about 27,000-28,000 email accounts, the majority of them were inactive; only about 6,000 accounts were active. Ex. 12 (Watson Dep.) at 61:4-24.

16. The rally at the fountain on the afternoon of January 17, 2014 was peaceful. *See* Ex. 13 (Brown Dep.) at 115:20-116:24; Ex. 14 (Lucero Dep.) at 76:9-77:15.

17. McGettigan sent his "Ludlow" email because he wanted "to draw the very clear parallels" between the violence inflicted during the Ludlow massacre with the "lies" that the Chancellor was making up about the "non-existent budget crisis," and because he wanted to get people to stand up for their "constitutional rights." Ex. 11 at 84:7-87:8.

18. McGettigan was unique among faculty members in terms of his willingness to confront the administration. Ex. 15 (Emerson Dep.) at 25:24-26:16.

19. DiMare did not believe any of McGettigan's emails prior to January 17 encouraged others to be disruptive or use violence. Ex. 2 at 110:10-14.

20. When asked whether she had received any indication that Plaintiff's pre-January 17 emails were causing people disruption at work, DiMare stated that the sheriff's office told her they received a few calls saying that work was being disrupted, and other people wanted to be taken off Plaintiff's distribution list. Ex. 2 at 55:12-56:17. She also stated that Plaintiff's emails caused disruption because "people were asking questions" *id.* at 105:6, about the Administration's position. *See also id.* at 102:16-18, 105:7-107:9.

**21.** Out of a University population of about 5,000, DiMare recalls seven or eight people who told her their work was being disrupted by Plaintiff's emails. Ex. 2 at 56:18-57:5, 137:17-138:7.

**22.** With respect to the individuals who asked to be removed from McGettigan's distribution list prior to January 17, 2014, DiMare asked IT to remove them from the list, and DiMare believes that IT did as she requested prior to January 17. Ex. 2 at 57:6-25.

**23.** Johnna Doyle, the CSU-P general counsel, did not think that Plaintiff's emails prior to January 17 violated the University's Electronic Communications Policy ("ECP"), and she believed that Plaintiff had a First Amendment right to send those emails, even though she disagreed with their substance. Ex. 16 (Doyle Dep.) at 22:10-25:21, 28:10-16, 30:1-4, 30:12-31:10, 68:10-69:13, 70:8-17, 74:11-15.

**DiMare Shut Down Plaintiff's Speech Less than One Hour After the "Ludlow" Email**

**24.** Plaintiff sent his "Ludlow" email on January 17, 2014 at 10:45 a.m. Ex. 2 at 59:2-5.

**25.** The "Ludlow" email was not rescinded or withdrawn. Ex. 2 at 116:4-10.

**26.** Doyle and DiMare discussed how the email had "inappropriate" language that they believed might incite violence and discussed turning off Plaintiff's email until the budget meeting was over. DiMare asked Doyle if they were "covered for that," and Doyle thought it would be ok. Ex. 2 at 62:19-63:11, 63:17-64:24, 65:3-13, 67:12, 116:11-18; Ex. 16 at 97:22-98:4, 98:22-99:25.

**27.** Doyle did not have any specific training or background in First Amendment law. She had worked as a prosecutor and in general practice. Ex. 16 at 9:1-10:23, 104:7-24.

**28.** Doyle and DiMare did not discuss any First Amendment implications or the ECP. Ex. 2 at 64:25-65:2; Ex. 16 at 99:10-18.

6

**29.** The conversation between Doyle and DiMare lasted a "couple minutes, maybe." Ex. 16 at 100:4-5.

**30.** By 11:35 a.m. on January 17, 2014, DiMare had instructed Matt Watson to shut down McGettigan's email and computer access. Ex. 2 at 59:9-12, 84:19-22.

### The "Ludlow" Email Did Not Violate any University Policy

**31.** Paragraph 4 of the Electronic Communications Policy ("ECP") in effect at the time prohibited "use of electronic communications to intimidate, threaten, or harass other individuals or to interfere with the ability of others to conduct university business." Ex. 17 (ECP).

**32.** Paragraph 4 of the ECP included an intent requirement. Ex. 16 at 106:4-13, 110:12-18; Ex. 12 at 32:3-33:9.

**33.** DiMare did not know whether McGettigan intended to intimidate anyone with his "Ludlow" email, Ex. 2 at 68:8-17, and she did not believe that he intended to threaten or harass anyone with his email, *id.* at 68:18-21, 69:3-14.

**34.** When asked whether she believed that McGettigan intended to interfere with the ability of others to conduct university business with his "Ludlow" email, DiMare stated only that she thought he might hope to slow down the budget cut process and reduce the likelihood of the cuts happening. Ex. 2 at 69:15-70:18.

**35.** Between the time that she received the "Ludlow" email and the time she advised DiMare to shut down McGettigan's email, Doyle had received no information that indicated McGettigan had an intent to intimidate, threaten, or harass other individuals, or that he intended to interfere with the ability of others to conduct University business. Ex. 16 at 109:17-110:11.

**36.** Despite this, Doyle's letter to McGettigan stated that his "Ludlow" email had violated paragraph 4 of the ECP. Ex. 16 at 111:22-112:15; Ex. 20 (Doyle letter dated 1/17/14).

### Termination of Plaintiff's Speech Was Not Necessary to Prevent Any Disruption

**37.** DiMare did not believe that McGettigan might threaten violence on campus, Ex. 2 at 67:22-24, or that he was encouraging others to commit violence on campus through his "Ludlow" email, *id.* at 67:25-68:7.

**38.** Doyle did not believe that the "Ludlow" email was a "true threat" or communication of "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," intimidation, or harassment. Ex. 16 at 86:16-88:6.

**39.** Prior to January 17, 2014, DiMare received some calls and emails from people about McGettigan's emails, but no one communicated any information about threats of violence or disruption that were expected. Ex. 2 at 17:12-30:4, 32:1-39:14, 40:16-45:3.

**40.** Prior to shutting down McGettigan's email on January 17, 2014, DiMare had no information that there was any imminent threat of violence on campus, Ex. 2 at 95:23-96:2; that anybody intended to be disruptive or violent at the budget meeting as a result of McGettigan's emails, *id.* at 39:8-14, Ex. 13 at 98:14-17; or that his emails were encouraging anybody to be disruptive or violent, Ex. 2 at 39:1-5, 47:18-48:22.

**41.** DiMare had no information to indicate that anyone on campus intended to commit disruption or violence because they thought their jobs would be at risk, Ex. 2 at 27:6-16, and no actual positions to be eliminated had been announced yet, *id.* at 13:2-5.

**42.** The people who called and emailed DiMare communicated only vague, subjective concerns, such as feeling a "tense environment" on campus, feeling "unnerved," or feeling things

were "getting really heated up" in terms of the budget debate. Ex. 2 at 23:1-9, 26:15-19, 28:13-19, 37:21-38:3, 39:15-41:3.

**43.** DiMare learned that McGettigan's emails were causing some people to felt stressed out about the possibility of losing their jobs, not that they were encouraged to violence by his emails. Ex. 2 at 31:18-34:5, 35:22-36:4, 42:17-43:8.

**44.** DiMare was concerned about losing retention and negative impact on recruitment, Ex. 2 at 46:22-47:5, after a couple of former students expressed concerns about "how [Plaintiff's emails] looked for the university," *id.* at 46:16.

**45.** Some people requested that DiMare put a stop to McGettigan's emails primarily because they were cluttering up email boxes and individuals were irritated by some of the content. Ex. 2 at 53:4-11, 136:15-137:5.

**46.** None of the handful of faculty members to whom DiMare spoke before January 17 expressed any concerns about potential violence at the budget meeting, only that there might be shouting and people talking over one another. Ex. 2 at 34:6-23, 35:4-12, 48:23-51:11.

**47.** DiMare saw one protest on campus on the morning of January 17 between 10:45 and 11:35 a.m., and it was peaceful. Ex. 2 at 125:3-126:13.

**48.** DiMare admitted that shutting down McGettigan's email did not address any concern about people talking over one another at the meeting. Ex. 2 at 34:20-23.

### DiMare's Concerns Were Completely Speculative

**49.** DiMare did not believe that the "Ludlow" email caused an imminent threat of violence on campus, Ex. 2 at 96:3-9, 96:25-97:1, only that it "could possibly cause a volatile situation on campus," *id.* at 96:10-17. *See also* Ex. 16 at 83:3-24, 85:15-16.

**50.** DiMare believed that someone could read the "Ludlow" email literally and think that the Chancellor was actually a hit man, because "[t]here are people who take metaphoric emails literally." Ex. 2 at 52:7-13, 116:11-119:25, 146:1-21. *See also* Ex. 16 at 78:24-80:21, 81:19-82:1.

**51.** However, DiMare did not receive any information indicating that McGettigan's emails were encouraging anyone to commit violence or disruption at the budget meeting, or that anyone had interpreted the "Ludlow" email literally to mean that Chancellor Martin was a hit man. Ex. 2 at 52:14-19, 120:1-6, 128:20-24; *see* Ex. 13 at 63:10-14.

**52.** DiMare did not read the part of the "Ludlow" email which encouraged people to attend the 2:00 p.m. rally at the fountain to protest Chancellor Martin. Ex. 2 at 119:1-16.

**53.** It was lawful for McGettigan to have a rally and encourage others to attend it. Ex. 16 at 35:11-36:9.

**54.** Any concerns about the presence of a large number of protestors at the budget meeting were adequately addressed by an operational plan put into place by the sheriff's office several days before the January 17 meeting. Ex. 14 at 8:25-9:7, 10:2-5, 19:5-21, 20:21-21:1; Ex. 13 at 37:14-17, 41:2-4, 136:21-137:7; Ex. 18 (Operational Plan) at McGttn000875-78; Ex. 2 at 30:5-31:17; Ex. 16 at 37:13-16.

**55.** Other than "concerns" about the text of McGettigan's emails, the sheriff's office had no indication that there might be violence at the protests. Ex. 14 at 20:4-20; Ex. 13 at 62:11-20.

**56.** No changes were made to the operational plan after the "Ludlow" email was sent. Ex. 13 at 86:14-87:5; 96:12-97:2, 119:7-12; *see also id.* at 112:12-25.

**57.** Between the time that DiMare received the "Ludlow" email on January 17 and the time that she decided to shut down his email access, the sheriff's office told DiMare that they were

getting some calls from people who said their ability to work had been disrupted by the email, and that some of the problem was caused by people hitting "Reply All" to the email. Ex. 2 at 58:1-59:1.

**58.** When asked what specifically led her to believe that people's ability to work had been disrupted by the email, DiMare said, "[i]t was just a compilation of information I had received throughout the week," Ex. 2 at 59:13-17, and she could not recall any specifics. *Id.* at 59:25-60:9.

**59.** DiMare was not aware of any classes being canceled, Ex. 2 at 160:20-161:5, any campus events being rescheduled or canceled, *id.* at 161:6-9, any research or academic pursuits that could not be pursued, *id.* at 161:10-14, any specific work that people could not do, *id.* at 161:15-24, or any administrative work that people could not do, *id.* at 162:1-4, as a result of the "Ludlow" email.

**60.** DiMare believes that McGettigan had a right under the First Amendment to say what he said in his "Ludlow" email and prior emails. Ex. 2 at 98:13-99:7.

**61.** McGettigan's email and computer access remained shut off from January 17 to 20, 2014. Ex. 2 at 85:4-6.

**DiMare Prevented McGettigan from Sending Campus-Wide Emails for Over a Year**

**62.** On January 20, 2014, DiMare instructed IT to restore McGettigan's email access with the exception of his ability to send emails to group distribution lists. Ex. 2 at 85:9-13.

**63.** DiMare admitted that the "crisis of the moment had passed," which is why she restored his email access. Ex. 2 at 85:14-17.

**64.** DiMare never restored Plaintiff's access to group lists. Ex. 2 at 93:8-11.

**65.** About a year after DiMare prohibited Plaintiff from emailing group lists, the mass email policy for the entire CSU-P campus was changed to require everyone to first obtain prior permission from DiMare herself before sending emails to group lists. Ex. 2 at 89:9-13, 93:8-15; Ex. 21 (Email and Electronic Mass Communications Policy dated 2/6/15) at McGttn000824 ¶ 4.

**66.** DiMare conditioned McGettigan's access to the lists on his meeting with her, because she wanted him to meet with her, and she wanted to tell him why she thought that his "Ludlow" email was "a security threat" and discuss "other avenues" for his speech that would not reach as many people. Ex. 2 at 85:18-87:11, 89:18-22, 91:11-21.

**67.** When asked if she wanted McGettigan "to agree to tone down the language of his emails before [she] would turn on his access to distribution lists," DiMare said, "No. As long as they weren't sent out during a time of crisis," Ex. 2 at 90:19-23, but then justified refusing him access to the lists for a whole year because "there could have been" a crisis, *id.* at 89:24-90:16.

**68.** DiMare did not rely on any advice from Doyle in preventing McGettigan from sending emails to group lists after January 17, 2014. Ex. 16 at 131:7-132:4.

**69.** During that year-long period when DiMare prevented McGettigan from communicating to the campus community using the group lists, other people had the ability to send out campus-wide emails using the lists. Ex. 2 at 89:14-17.

**70.** As a result, McGettigan could not use the group lists to communicate on many matters of public concern. Ex. 11 at 175:20-178:5, 179:13-180:11, 185:16-186:21.

**71.** If McGettigan had access to the group lists, he would have sent out one email a week on important issues, such as academic freedom, the creation of a CSU-South Denver campus, and labor contracts. Ex. 11 at 200:19-202:12.

**72.** On November 17, 2014, McGettigan sent DiMare an email agreeing to meet with her to discuss his access to group lists, but she never responded. Ex. 2 at 92:4-14, 93:16-19, 94:5-10, 94:15-23; Ex. 19 (McGettigan email dated 11/17/14).

## ARGUMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## I. There Is No Genuine Dispute of Material Fact on Plaintiff's First Amendment Claim

Under the *Garcetti/Pickering* test applicable to government employees, *see Garcetti v. Ceballos*, 547 U.S. 410 (2006), the undisputed material facts show that Plaintiff is entitled to judgment on his First Amendment claim. This Court considers the following five prongs:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citation omitted). The first three prongs are questions of law; the last two are factual issues for a jury. *Id.* Plaintiff has satisfied the first three prongs, and there is no genuine dispute of material fact on the last two prongs.

## A. The "Ludlow" email was not sent pursuant to Plaintiff's official duties

Plaintiff's speech was not made pursuant to his official duties. SUMF[1] ¶¶ 1, 14; *see also id.* ¶ 17. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203-04 (10th Cir. 2007). Plaintiff's official duties as a professor included teaching, research, advising students,

---

[1] "SUMF" refers to the Statement of Undisputed Material Facts, above.

and publishing work; they did not include commenting on issues of concern to the University community such as the budget cuts and proposed firing of employees.

### B.  Plaintiff's "Ludlow" email was speech on a matter of public concern

Plaintiff's "Ludlow" email was speech on a matter of public concern. *See* SUMF ¶¶ 3-6, 13.[2] DiMare agreed that Plaintiff's email was protected under the First Amendment. *Id.* ¶ 60. She and Plaintiff disagreed about the budget cuts and planned terminations. *Id.* ¶ 7. Plaintiff's interest as a citizen in disputing DiMare's and the Chancellor's view of the budget deficit and opposing the plan to terminate 50 employees is "self-evident." *See Patrick v. Miller*, 953 F.2d 1240, 1248 (10th Cir. 1992); *see Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1988). *Pickering* itself involved a public school teacher who was dismissed by the board of education for sending a letter to a local newspaper critical of the way in which the board and the district superintendent had handled past proposals to raise revenue for the schools and allocated financial resources between the schools' educational and athletic programs. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 564-67 (1968). The school board argued that the teacher's statements would, among other things, "be disruptive of faculty discipline, and would tend to foment 'controversy, conflict and dissension' among teachers, administrators, the Board of Education, and the residents of the district." *Id.* at 567. The Supreme Court held that a teacher's speech on whether a school system requires additional funding is a matter of legitimate public concern protected by the First Amendment. *Id.* at 571-72. Similarly, in *Hulen v. Yates*, 322 F.3d 1229, 1238 (10th Cir. 2003), the Tenth Circuit held that speech concerning malfeasance or impropriety on the part of CSU officials, including misuse of state funds, constitutes speech

---

[2] Plaintiff's prior emails were also on matters of public concern. *See* SUMF ¶¶ 8-12, 23.

on a matter of public concern. *See also Brammer-Hoelter*, 492 F.3d at 1205 ("Statements

revealing official impropriety usually involve matters of public concern."); *Gardetto v. Mason*,

100 F.3d 803, 813 (10th Cir. 1996) ("complaints about the proposed closing of a branch of a

university or its spending priorities, when these decisions affect the basic functions and missions

of the university … constitute speech on matters of public concern" and advocacy efforts by a

teacher to obtain a "no confidence" vote by faculty in a public college president was a matter of

public concern); *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) ("[s]peech that seeks to

expose improper operations of the government or questions the integrity of governmental

officials clearly concerns vital public interests."); *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

### C.  Plaintiff's interest in speaking outweighed Defendant's interest as an employer

The Tenth Circuit has held:

> Although this element is framed as a 'balancing' test, … First Amendment rights are
> protected unless the employer shows that some restriction is necessary to prevent the
> disruption of official functions or to insure effective performance by the employee.

*Dixon*, 553 F.3d at 1304; *see Brammer-Hoelter*, 492 F.3d at 1207. Thus, DiMare "must

demonstrate that the restrictions at issue were necessary." Dkt. 34 (Mem. Op. and Order) at 11-

12. "[U]nless the government employer can show that the termination was based on legitimate

reasons grounded in the efficient conduct of public business, there is no need to proceed to

balancing, and the First Amendment interest of the plaintiff prevails." *Dixon*, 553 F.3d at 1304;

*Brammer-Hoelter*, 492 F.3d at 1207 (employer bears the burden).

Before this Court "even applies the balancing test in the third prong of the

*Garcetti/Pickering* test, defendant must show 'legitimate reasons grounded in the efficient

conduct of public business.'" Dkt. 34 at 13 (quoting *Dixon*, 553 F.3d at 1304). DiMare has not

provided any such reasons. First, with respect to Plaintiff's pre-"Ludlow" emails, DiMare claims that out of a University population of 5,000 people, she received seven or eight complaints about Plaintiff's emails disrupting work. SUMF ¶¶ 15, 20-21. She addressed this by having those people taken off the distribution lists prior to January 17, 2014. *Id.* ¶ 22. Thus, the small number of people who complained did not even receive Plaintiff's "Ludlow" email because they were taken off the lists before January 17. In any event, neither DiMare nor Doyle believed that any of Plaintiff's pre-"Ludlow" emails violated the ECP, were disruptive, or were unprotected under the First Amendment. *Id.* ¶¶ 19, 23, 53.

Second, DiMare shut down Plaintiff's email and computer access less than one hour after receiving the "Ludlow" email on January 17, 2014. *Id.* ¶¶ 24, 30. She made that decision after a two-minute conversation with Doyle. *Id.* ¶¶ 26, 29. DiMare and Doyle did not discuss any First Amendment implications or whether Plaintiff's email violated the ECP. *Id.* ¶ 28. Although Doyle's letter to Plaintiff regarding the shutdown of his email stated that the "Ludlow" email violated the ECP, Doyle admitted that the ECP contained an intent requirement, *id.* ¶¶ 31-32, and that she did not think that Plaintiff possessed the requisite intent, *id.* ¶ 35. Moreover, DiMare had not received any information indicating that Plaintiff's email violated the ECP or that anyone expected violence or disruption; she did not believe that Plaintiff intended to intimidate or harass anyone; and she did not believe that Plaintiff was threatening or encouraging violence. *Id.* ¶¶ 33-35, 37-41, 58. Furthermore, the one protest DiMare saw on January 17 was peaceful, *id.* ¶ 47, and the rally that Plaintiff encouraged people to attend was peaceful, *id.* ¶ 16.[3]

---

[3] At most, DiMare received some information *prior to January 17* that people were "irritated by the content" of Plaintiff's earlier emails, SUMF ¶ 45; worried about the possibility of losing their

In fact, DiMare's concerns about the "Ludlow" email were completely speculative, and they were not reasonable or formed in good faith. *See Gardetto*, 100 F.3d at 815-16. DiMare did not believe that the email caused an imminent threat of violence on campus, only that it "could possibly cause a volatile situation on campus." *Id.* ¶ 49. Her belief was that someone could read the email literally, think that Chancellor Martin was a hitman coming to campus to shoot people, and that this would cause someone to come to campus and react violently. *Id.* ¶ 50. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 509 (1969). Not only was DiMare's belief manifestly unreasonable, speculative, and not formed in good faith, but Plaintiff's explicit "call to action" in the "Ludlow" email was asking people to "lend a hand" by attending the rally. SUMF ¶ 13. DiMare didn't even read this part of the email. *Id.* ¶ 52. DiMare's belief was also not based on any indication that anyone had interpreted the email literally. *Id.* ¶ 51. It is DiMare's burden to justify her shutting down of Plaintiff's speech, and "the employer 'cannot rely on purely speculative allegations that certain statements caused or will cause disruption.'" *Dixon*, 553 F.3d at 1304; *see also Cragg v. City of Osawatomie, Kan.*, 143 F.3d 1343, 1346-47 (10th Cir. 1998); *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995). DiMare relies only on speculative, far-fetched worries about potential disruption which ignored the text of Plaintiff's email, which explicitly encouraged people to respond to the proposed budget cuts and layoffs by *attending a protest rally at the fountain* that afternoon.

Furthermore, Plaintiff's email was not withdrawn. SUMF ¶ 25. As this Court previously observed, since the email was not withdrawn, it continued to have whatever effect that it had on

---

jobs, *id.* ¶ 43; and vaguely feeling "unnerved" or "tense," *id.* ¶ 42. None of these could possibly justify shutting down Plaintiff's speech.

its recipients when it was first issued. Dkt. 34 at 13. In light of this, DiMare has no explanation

for how cutting off Plaintiff's access to email and computer resources for three days helped

prevent any possibility of violence (even if she legitimately feared any), or why it was necessary

to go further and terminate Plaintiff's access to group distribution lists for a year. At her

deposition, DiMare could provide no explanation whatsoever for this continued, year-long denial

of Plaintiff's speech. *See* SUMF ¶¶ 62-72.

DiMare had no "legitimate reasons grounded in the efficient conduct of public business"

for her denial of Plaintiff's speech. *Dixon*, 553 F.3d at 1304. DiMare was not aware of any

classes being canceled, any campus events being rescheduled or canceled, any research or

academic pursuits that could not be pursued, or any administrative work or other work that

anyone could not do, as a result of Plaintiff's "Ludlow" email. SUMF ¶ 59. In other words, there

was nothing about Plaintiff's speech that interfered with "the regular operation" of CSU-P.

*Dixon*, 553 F.3d at 1304. At most, DiMare had received information that a handful of people

could not concentrate on work as a result of Plaintiff's email, but she admitted that some of the

problem was caused by other people responding to the email by hitting "Reply All." SUMF ¶ 57.

The fact is, Plaintiff's emails were a *response* to DiMare's initial December 15, 2013 campus-

wide email about the budget cuts, and Plaintiff's total of seven emails over a period of four

weeks was hardly a deluge of mass emails to everyone on campus. Anyone who did not want to

read Plaintiff's emails simply did not have to open them. And finally, any concerns that DiMare

had about potentially disruptive protests during or close in time to the budget meeting on January

17 were adequately addressed by the operational plan that the sheriff's office had already put

into place prior to January 17. *Id.* ¶¶ 54-55. No changes were made to the operational plan as a

result of the "Ludlow" email, *id.* ¶¶ 56, which shows that there were no legitimate concerns of violence or disruption due to the "Ludlow" email.

Moreover, the undisputed record shows that DiMare retaliated against Plaintiff at the exact moment in time when the campus was paying the greatest attention to his speech that opposed DiMare's plans. For weeks, DiMare had been promoting a plan to fire 50 people to fill a supposed budget hole. The campus naturally cared about this issue a great deal. Plaintiff made clear and direct statements opposing this plan, and he was unique among faculty in his vociferousness to the Administration. *Id.* ¶ 18. By January 17, 2014, the issue was well-known to the campus community, and DiMare and Plaintiff had both made their positions known through public statements. There was no operational efficiency to be gained by shutting down Plaintiff's speech. Instead, DiMare gained the upper hand in the debate that was already happening.

And finally, even if DiMare had presented a legitimate reason for her actions, Plaintiff's interest in speaking outweighed DiMare's interest as an employer. DiMare's "burden to justify [her] restriction on speech increases in proportion to the value of that speech in the public debate." *Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998) (citation and internal quotation marks omitted). DiMare bears a heavy burden because Plaintiff's speech was extremely valuable in the public debate over the budget. Plaintiff's speech "embod[ied] core first amendment values," because he was the only CSU-P faculty member who was publicly challenging the facts that DiMare and the Chancellor had presented to the University community about the supposed budget shortfall and need for layoffs. *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) (citation omitted). DiMare has not met her burden. Nor has she shown that Plaintiff's email "impaired discipline," had a "detrimental

impact on close working relationships," impeded the performance of [Plaintiff's] duties" as a professor, or "interfere[d] with the regular operation" of CSU-P. *Dixon*, 553 F.3d at 1304; *Gardetto*, 110 F.3d at 815. DiMare "cannot rely on purely speculative allegations that certain statements caused or will cause disruption." Dkt. 34 at 12. At most, DiMare has testified that a handful of people found Plaintiff's email upsetting or offensive. She was concerned that Plaintiff was causing people to "ask questions" about the supposed budget shortfall, the need for layoffs, and the legitimacy of the Administration's goals. *See* SUMF ¶ 20. None of this outweighs Plaintiff's interest in speaking, and none of it shows any "direct disruption" by Plaintiff's "speech itself" to CSU-P's "internal operations" or "employment relationships." *Flanagan*, 890 F.2d at 1565 (holding that a public employer cannot justify disciplinary action against a plaintiff "simply because some members of the public find plaintiffs' speech offensive …."). DiMare's position also amounts to a heckler's veto, which the Supreme Court has long rejected as a justification for curtailing "offensive" speech in order to prevent public disorder. *See, e.g.*, *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Terminiello v. Chicago*, 337 U.S. 1 (1949).

**D. Plaintiff's "Ludlow" email was a substantial or motivating factor in Defendant's adverse actions, and she would not have taken those actions in the absence of Plaintiff's speech**

There is no genuine dispute of material fact over the fourth and fifth prongs of the *Garcetti/Pickering* test. Plaintiff's "Ludlow" email was not only a substantial or motivating factor in DiMare's shut down of Plaintiff's email access for three days and his access to group lists for a year, but it was *the* reason she took those actions. DiMare would not have taken these actions if Plaintiff had not sent the "Ludlow" email. *See* SUMF ¶¶ 24, 26, 29-30, 36, 61-72.

**II.  DiMare Is Not Entitled to Qualified Immunity**

DiMare may argue that she is entitled to qualified immunity because (1) the law was

purportedly not clearly established that a person in her position could not silence a professor who

had sent out an email containing a violent metaphor, and/or (2) she relied on the legal advice of

Doyle when she decided to silence Plaintiff. Neither of these arguments has any merit.

### A.  The Law Was Clearly Established, and No Reasonable Official Would Have Acted as DiMare Did

The key to this inquiry is whether DiMare's actions were objectively reasonable in light

of "clearly established" law on January 17, 2014. There need not be any prior cases directly on

point. In *Casey v. West Las Vegas Indep. Sch. Dist.*, the Tenth Circuit readily held that the

plaintiff's right to be free from retaliatory employment action based on First Amendment

activities was clearly established. 473 F.3d 1323, 1333-34 (10th Cir. 2007) (citing *Paradis v.

Montrose Mem. Hosp.*, 157 F.3d 815, 818-19 (10th Cir. 1998) (holding that the law in this area

has been clearly established at least since the 1990 decision in *Schalk v. Gallemore*, 906 F.2d

491 (10th Cir. 1990), and denying qualified immunity after *Pickering* balancing), and *Considine

v. Bd. of County Comm'rs of County of Adams*, 901 F.2d 695, 700 (10th Cir. 1990)); *see also

Finn v. New Mexico*, 249 F.3d 1241, 1250 (10th Cir. 2001) ("existing case law clearly

established that speech such as plaintiff's touched on matters of public concern and that the

employee's interest in such speech would outweigh unsubstantiated assertions of workplace

disruption.").

DiMare herself admitted that Plaintiff had a First Amendment right to send his "Ludlow"

email. SUMF ¶ 60. It has been clearly established for decades that the government cannot shut

down a person's speech on the basis of content unless it falls within one of the narrow categories

of speech that are not afforded protection under the First Amendment, such as "fighting words," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); advocacy of use of force or violence where it is directed to inciting or producing imminent lawless action and is likely to incite or produce such action, *Brandenberg v. Ohio*, 395 U.S. 444, 447 (1969); or "true threats," *Watts v. United States*, 394 U.S. 705, 708 (1969). *See also Cannon v. City and County of Denver*, 998 F.2d 867, 871-74 (10th Cir. 1993) ("Here the defendants have argued that the signs aroused violent feelings in some persons who viewed them. The fact that speech arouses people to anger is simply not enough to amount to fighting words in the constitutional sense.") (quoting *Terminiello*, 337 U.S. at 4 ("[A] function of free speech under our system is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."). DiMare does not claim that Plaintiff's "Ludlow" email falls into any of these exceptions, and no reasonable person in her position could have believed that it did.

It has also been clearly established for decades that speech on a matter of public concern "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458 (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.")); *Boos v. Barry*, 485 U.S. 312, 322 (1988) ("in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (internal quotation marks omitted). No reasonable official in DiMare's position would have taken the action that she did in response to Plaintiff's "Ludlow" email, for

several reasons. First, DiMare's belief that the email "could possibly" incite armed resistance to

the Chancellor was, to put it lightly, far-fetched. Second, there was zero evidence that any such

violence—or any disruption at all—was happening or likely to happen as a result of the email.

Third, even if the "Ludlow" email were upsetting or offensive to a handful of people, decades of

case law establish that that is not a reason to shut down Plaintiff's further ability to speak.

### B. Doyle's Advice Did Not Constitute "Extraordinary Circumstances" which Prevented DiMare from Knowing that the Right She Violated Was Clearly Established

Under this defense, DiMare would have to show that even though the law was clearly

established, there are "extraordinary circumstances and [she] can prove that [she] neither knew

nor should have known of the relevant legal standard," because she relied on Doyle's legal

advice. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); *Cannon*, 998 F.2d at 876. The Tenth

Circuit has required that "extraordinary circumstances" of the type claimed here—legal advice—

be such that the defendant was so "prevented from knowing that his actions were

unconstitutional that he should not be imputed with knowledge of an admittedly clearly

established right." *V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality*, 902 F.2d 1482, 1488 (10th

Cir. 1990). Such "exceptional circumstances"—as indicated by its name—exist only rarely, and

proving this defense is DiMare's burden. *Cannon*, 998 F.2d at 874. As the Tenth Circuit has

explained, simple reliance on legal advice, without more, does not constitute "exceptional

circumstances." In *Melton v. City of Oklahoma City*, 879 F.2d 706, 731 (10th Cir. 1989), the

court rejected the defendant's argument that his good faith reliance on advice of legal counsel

should "absolve[]" him of any liability for the consequences of his actions. The court explained:

> While superficially attractive, this argument proves too much. Adopting the proffered
> position would immunize officials from liability via the simple expedient of consulting

counsel. In *Harlow*, the Supreme Court sought to protect officials in the good faith exercise of discretion in areas of the law which are not clearly charted. However, where the law is clearly established, there is no justification for excusing individuals from liability for their actions. In sum, officials are presumed to know and abide by clearly established law. When their actions are otherwise, their claims of qualified immunity will fail.

*Id.*

"Whether reliance upon legal advice 'bars our imputation to [the defendant] of constructive knowledge concerning the laws allegedly violated by his conduct,'" depends upon the circumstances of each case. *V-1 Oil Co.*, 902 F.2d at 1489 (internal citation omitted). Relevant factors include: "how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was," "whether complete information had been provided to the advising attorney[]," "the prominence and competence of the attorney[]," and "how soon after the advice was received the disputed action was taken." *Id.* (internal citations omitted). *See Cannon*, 998 F.2d at 874-76 (holding that summary judgment for the defendant officers could not be upheld on the basis of a judge's advice under the "extraordinary circumstances" exception).

This is not one of the rare cases in which the defendant can prove that "exceptional circumstances" exist. First, Doyle and DiMare's conversation lasted only a couple minutes. SUMF ¶ 29. Although they discussed the "Ludlow" email, they did not discuss the First Amendment or the ECP. *Id.* ¶ 28. Doyle's advice was thus not "unequivocal" or "specifically tailored to the facts giving rise to the controversy." Neither of them actually considered or discussed the First Amendment implications of shutting down Plaintiff's access to email and computer resources. Second, Doyle was not an especially prominent or competent attorney. She had been a prosecutor and a general practitioner, and she had not practiced First Amendment law

or been specifically trained in it. *Id.* ¶ 27. Moreover, this is not a case where the law is not "clearly charted." *Melton*, 879 F.2d at 731. The law, as discussed above, has been clearly established for decades, and the facts of this case do not present the "exceptional circumstances" that allow DiMare to escape liability even though the law is clearly established.

Furthermore, DiMare claims to have relied on Doyle's advice only in shutting down Plaintiff's email access from January 17 to 20, 2014. SUMF ¶ 26. She did not rely on Doyle's advice in preventing Plaintiff from accessing the group distribution lists for a whole year after January 17, 2014. *Id.* ¶¶ 62, 68. Thus, even if DiMare could use Doyle's advice on January 17, 2014 as a shield under the "exceptional circumstances" exception—which she cannot, as discussed above—she does not assert Doyle's advice as a defense to her action of preventing Plaintiff from sending any campus-wide emails for a year after January 17, 2014. DiMare could not have qualified immunity for the act of preventing Plaintiff from using group distribution lists to speak on matters of public concern for an entire year.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that his motion for summary judgment against Defendant DiMare be granted.

Respectfully submitted,

s/ Elizabeth Wang
One of Plaintiff's Attorneys

Daniel M. Twetten (dan@loevy.com)
Elizabeth Wang (elizabethw@loevy.com)
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642

25

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth Wang, certify that I served the foregoing Plaintiff's Motion for Summary Judgment upon all counsel of record for the parties herein by e-filing it with the CM/ECF system maintained by the court on January 27, 2017.

s/ Elizabeth Wang
One of Plaintiff's Attorneys

Daniel M. Twetten
Elizabeth Wang
Loevy & Loevy
2060 Broadway, Ste. 460
Boulder, CO 80302
(720) 328-5642
dan@loevy.com
elizabethw@loevy.com