1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 15-cv-00097-PAB-KLM
3    _____

4    DEPOSITION OF:  LESLEY Di MARE - October 12, 2016
     _____
5
    TIMOTHY McGETTIGAN,
6
    Plaintiff,
7
    v.
8
    LESLEY Di MARE, President of Colorado State
9    University - Pueblo, in her individual capacity,

10   Defendant.
     _____
11

12            PURSUANT TO NOTICE, the deposition of
    LESLEY Di MARE was taken on behalf of the Plaintiff at
13   1300 Broadway, 10th Floor, Denver, Colorado 80203, on
    October 12, 2016, at 9:43 a.m., before Maria M. Orton,
14   Registered Professional Reporter and Notary Public
    within Colorado.
15

16

17

18

19

20

21

22

23

24                          EXHIBIT 2

25

**H+G**

**Hunter + Geist, Inc.**

**303.832.5966**          1900 Grant Street, Suite 1025          ▪ www.huntergeist.com
**800.525.8490**          Denver, CO 80203                      ▪ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

**5**

Exhibit 56   Email from Lesley Di Mare to Johnna    146
             Doyle, Subject: FW: You have my
             Support, 1/23/14, DEF 610-611

Exhibit 57   Email from Lesley Di Mare to Johnna    147
             Doyle, Subject: FW: Support for you,
             1/23/14, DEF 3313-3314

Exhibit 58   Email from Lesley Di Mare to Johnna    148
             Doyle, Subject: FW: Chancellor
             Martin's Grand Plan to Quit
             Wasting Money on CSU-Pueblo Students
             1/23/14, DEF 612-614

Exhibit 60   Email from Lesley Di Mare to Johnna    149
             Doyle, Subject: FW: Msg from community
             member, 1/23/14, DEF 3311-3312

Exhibit 61   Email from Lesley Di Mare to Johnna    152
             Doyle, Subject: FW: Thank you,
             1/23/14, DEF 3316-3318

Exhibit 63   Email from Matthew Watson to           163
             Lesley Di Mare, no subject,
             1/17/14, DEF 507

---

**6**

1        WHEREUPON, the following proceedings were
2    taken pursuant to the Federal Rules of Civil Procedure.
3            *   *   *   *   *
4            LESLEY Di MARE,
5    having been first duly sworn to state the whole truth,
6    testified as follows:
7        (Deponent's reply to oath:  Yes.)
8            EXAMINATION
9    BY MS. WANG:
10       Q.  Could you please state your name and
11   spell it for the record.
12       A.  Lesley Di Mare, L-e-s-l-e-y, D-i M-a-r-e.
13       Q.  Okay.  You are currently the president of
14   CSU-Pueblo?
15       A.  That's correct.
16       Q.  How long have you had that position?
17       A.  It will be five years in November.
18       Q.  Where did you come from prior to that?
19       A.  I was in Nevada, at Nevada State College.
20       Q.  What was your position there?
21       A.  I was the interim president and, prior to
22   that, the provost.
23       Q.  How long were you interim president
24   there?
25       A.  For a year.

---

**7**

1        Q.  How long were you provost?
2        A.  I think it was approximately four years.
3        Q.  Prior to 2006, where were you employed?
4        A.  Arizona State University, the West
5    Campus.
6        Q.  And how long did you have -- what
7    position did you have there?
8        A.  I was originally the chair of the
9    department of communication studies, the interim chair
10   of criminal justice.  And I was the interim dean for
11   the college of human services for two years.  Then I
12   was the associate vice provost for undergraduate
13   studies and curriculum.
14       Q.  How long were you at Arizona State
15   University?
16       A.  15 years.
17       Q.  Prior to that, where did you work?
18       A.  I was at California State University,
19   Los Angeles for nine years.
20       Q.  What was your position there?
21       A.  I was a professor and then the department
22   chair for two years.
23       Q.  What were you a professor of?
24       A.  Communication studies, rhetoric, and
25   persuasion.

---

**8**

1        Q.  Prior to being at Cal State, were you
2    employed?
3        A.  Yes.  I was a junior high school teacher
4    from 1972 to 1980, seventh, eighth, and ninth grade.
5    And then I pursued my Ph.D. at Indiana for three years.
6        (Interruption at the door.)
7        (Discussion off the record.)
8        Q.  What did you get your Ph.D. in?
9        A.  Rhetoric and persuasion, speech
10   communications.
11       Q.  Okay.  And that was at Indiana
12   University?
13       A.  University, yes.
14       Q.  In late 2013, was there discussion on
15   campus involving the necessity for budget cuts?
16       A.  Yes.
17       Q.  What was your position about whether
18   budget cuts were needed?
19       A.  I felt that in some areas there could be
20   some cuts.
21       Q.  What areas?
22       A.  I felt that we could possibly have more
23   students in some of the classrooms so we could combine
24   the classes that were the similar sections, and that
25   would reduce the need for adjuncts.

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

9

1    **Q.  Was it Chancellor Martin's position in**
2    **2013 that there needed to be cuts, budget cuts, at**
3    **CSU-Pueblo?**
4        A.  As I recall, he did believe there needed
5    to be some budget cuts.
6        **Q.  Did you agree with him?**
7        A.  I agreed that we could cut some adjuncts
8    if we combined sections of courses.
9        **Q.  Did you believe that there needed to be**
10   **budget cuts in order for -- in order to deal with the**
11   **budget deficit?**
12       A.  I felt that if we combined sections of
13   courses, we could cut enough adjuncts that moneys would
14   be able to be applied to the deficit.
15       **Q.  Did you feel that the deficit needed to**
16   **be addressed?**
17       A.  Yes.
18       **Q.  Okay.  Did you think that the budget cuts**
19   **were optional?**
20       A.  I'm not sure I understand your question.
21   Optional?
22       **Q.  Were you indifferent as to whether or not**
23   **the budget deficit should be fixed?**
24       MS. SCOVILLE:  Object to the form.
25   You can go ahead and answer.

10

1        A.  No, I was not indifferent.
2        **Q.  (BY MS. WANG)  Okay.  You had a position**
3    **on whether the budget deficit needed to be addressed in**
4    **2013, correct?**
5        A.  Yes.
6        **Q.  Okay.  And your position was in agreement**
7    **with Chancellor Martin's; is that correct?**
8        MS. SCOVILLE:  Object to the form.
9        A.  I believe that we needed to address the
10   deficit.
11       **Q.  (BY MS. WANG)  Okay.  And that was**
12   **Chancellor Martin's position as well?**
13       A.  That is what I recall.
14       **Q.  Okay.  You had discussions with**
15   **Chancellor Martin about the budget, correct?**
16       A.  That is correct.
17       **Q.  What was Timothy McGettigan's position on**
18   **the budget cuts in 2013?**
19       A.  I don't know that Tim and I discussed the
20   budget cuts in late 2013.  I don't know how late "late"
21   is, so I'm not sure I knew what his stand was.
22       **Q.  At any time in 2013, did you become aware**
23   **of whether or not Professor Timothy McGettigan had a**
24   **position on the proposed budget cuts?**
25       A.  Yes.

11

1        **Q.  And what was that position?**
2        A.  I believed he thought there was no
3    deficit.
4        **Q.  When did you first become aware of**
5    **Timothy McGettigan's position on the budget cuts?**
6        A.  2013.  That would be in December.
7        **Q.  He disagreed with you and Chancellor**
8    **Martin regarding the budget cuts; is that correct?**
9        A.  Yes.
10       **Q.  One way in which you had proposed to cut**
11   **the budget was to eliminate certain -- certain**
12   **positions of -- certain staff positions at the**
13   **university; is that correct?**
14       A.  Correct.
15       **Q.  Okay.  What was Timothy McGettigan's**
16   **position on that proposal?**
17       A.  Well, my proposal was to cut vacant
18   positions, and that was with input from people across
19   the campus, and then some visiting lines.  I -- I -- I
20   believe Professor McGettigan felt there was no need for
21   any cuts.  That was my understanding.
22       **Q.  Are you saying that all the positions**
23   **that you proposed to cut in 2013 or 2014 involved**
24   **vacant positions only?**
25       A.  Not all of them, no.

12

1        **Q.  Okay.  How many of them involved people**
2    **who were actually in those positions at that time?**
3        A.  I think it was approximately 12.
4        **Q.  Okay.  The initial proposal for -- for**
5    **terminations or layoffs involved a proposal of cutting**
6    **50 staff members; is that correct?**
7        A.  That's correct.
8        **Q.  Later, was that reduced?**
9        A.  Yes.
10       **Q.  What was it reduced to?**
11       A.  22, as I recall.
12       **Q.  And did those cuts actually take place?**
13       A.  The vacant positions were eliminated, and
14   the visiting lines, some folks had left -- were already
15   going to leave because they were visiting, and they
16   stayed for a year.  We also -- let's see, within that
17   12, I believe we also had six administrative lines that
18   we cut, and those lines went away.
19       **Q.  Okay.  So of the 22 positions eliminated,**
20   **there were 12 that were vacant positions?**
21       A.  That's what I recall, yeah.
22       **Q.  And the other ten involved elimination of**
23   **people's jobs?**
24       A.  Yes.
25       **Q.  When were the actual positions -- or,**

3 (Pages 9 to 12)

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

13

1 strike that.
2 As of January 17 of 2014, is it accurate
3 to say that actual positions to be eliminated had not
4 yet been announced?
5 A. That is correct.
6 Q. Okay. When were the actual people whose
7 positions were to be eliminated -- when was that
8 actually announced?
9 A. We made some announcements on January 17,
10 and then there were one or two classified, I believe,
11 and there was a process for that. So that process took
12 two or three months through the HR office. So not
13 everything was finalized at once.
14 Q. Did you have any conversations with
15 Professor McGettigan in December of 2013 regarding the
16 budget cuts?
17 A. Not that I recall.
18 Q. Did you have any conversations with
19 Professor McGettigan at any earlier point in 2013
20 regarding these budget cuts?
21 A. I don't believe so.
22 Q. Did you have any conversations with
23 Professor McGettigan in January of 2014 regarding the
24 budget cuts?
25 A. No, not that I recall.

---

14

1 Q. What prior interactions had you had with
2 Professor McGettigan prior to January 17 of 2014?
3 A. When I first arrived at CSU-Pueblo, he
4 and a colleague came to my office and we talked about
5 the campus. Prior to my arriving at the campus, he
6 sent many emails about his view of the budget then.
7 That was back in October 2011.
8 Q. Are those the only interactions you'd
9 ever had with Professor McGettigan between 2011 and
10 2014?
11 A. No. We -- as I recall, we might have had
12 three or four short discussions. They were always just
13 short discussions about general issues.
14 Q. Were those in-person discussions or over
15 the phone?
16 A. They were over the -- in person. We
17 didn't speak over the phone, that I recall.
18 Q. What kind of issues did he bring to your
19 attention between 2011 and 2014?
20 A. There had been an accounts receivable
21 audit, which apparently he had a copy of, and he wanted
22 to apprise me of the seriousness of the financial
23 situation of the university.
24 Q. Those were -- was that the topic of all
25 the discussions that you had between 2011 and 2014?

---

15

1 A. No. There was one discussion where
2 Professor McGettigan wanted to know -- he said he was
3 interested in being my chief of staff, and would I
4 encourage him to apply. And I said, of course, if he
5 would like to apply, he should apply.
6 Q. When did he have this conversation with
7 you?
8 A. It would have had to have been in the
9 spring of 2012. I think that was the time frame.
10 Q. And how did that conversation come up?
11 A. He brought it up. He was in -- he had
12 come to my office. I believe he -- I believe he was
13 asking for a letter of recommendation at the same time
14 for a position at some other institution. But I -- I
15 could be wrong. They might not have been on the same
16 day.
17 Q. Did he actually apply to be your chief of
18 staff?
19 A. No, he did not.
20 Q. Did he ever have any further discussion
21 with you about that?
22 A. No.
23 Q. In December of 2013 did you receive any
24 information from any source indicating that students
25 planned to -- students or anyone else on campus planned

---

16

1 to be disruptive or violent at the January 17, 2014,
2 meeting?
3 A. I'm not sure if it was in December or
4 January 2014. It may have been December. But the
5 student body president did come to me at a cabinet
6 meeting and said that she had heard that there was a
7 group of students who were planning to blockade the
8 entrance to the OUC for the budget forum on January 17
9 and throw things.
10 Q. Who else was present for this
11 conversation?
12 A. As I recall, Karl Spiecker, Carl Wright,
13 Paul Orschlen, and I believe Rick Kreminski was in the
14 room as well.
15 Q. How did this topic of conversation come
16 up?
17 A. Honestly, I don't recall. Vanessa was in
18 cabinet. I think we were discussing the February Board
19 of Governors meeting. I'm not really sure. And she
20 brought it up. She said, I think you should know this.
21 Q. This is Vanessa Emerson, correct?
22 A. Yes.
23 Q. What did you say in response?
24 A. I said, "Vanessa, do you think it would
25 help if I went and spoke with the students?"

---

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

17

1    Q.  What did she say in response?
2    A.  She said, "No, let me talk with them."
3    Q.  Did you have any further conversation
4  with her about that?
5    A.  No.
6    Q.  Did she give you any indication at that
7  time that Timothy McGettigan was encouraging students
8  to do any of those things?
9    A.  Honestly, I don't recall.  She may have
10  said that faculty -- some faculty, but I just really
11  don't recall.
12    Q.  Vanessa Emerson told you that some
13  faculty were encouraging students to throw things at
14  administrators at the January 17 meeting?
15    A.  No, that's not what I said.  I said that
16  she may have said that faculty were working with
17  students, but what she said was that the students
18  stated that they were going to blockade the doorway to
19  the OUC and throw things.
20    Q.  Did Vanessa Emerson tell you that any
21  faculty members were encouraging students to either
22  throw things at people at the meeting or blockade the
23  entrance?
24    A.  No.
25    Q.  What did she say to you about faculty

---

18

1  working with students?
2    A.  I told you, I can't really recall.
3    Q.  Did she tell you which faculty or did she
4  name any particular faculty?
5    A.  No.
6    Q.  Did you have any follow-up conversation
7  with Vanessa Emerson after this conversation?
8    A.  I don't think so.  I don't recall.
9    Q.  Did you ever ask her whether she had
10  spoken to discourage them from throwing
11  things or blockading the entrance?
12    A.  I think we might have had a discussion in
13  passing, just, How are the students doing?  And she
14  said, I think it will be okay.  Something along those
15  lines.
16    Q.  And when did that conversation happen?
17    A.  It was either in December or January.
18    Q.  It was before January 17 of 2014?
19    A.  It was before that day, yes.
20    Q.  When Vanessa said, I think it will be
21  okay, how did you interpret that statement?
22    A.  I really didn't know what to make of it.
23  I assumed they might show up, they might not show up.
24  I didn't know.
25    Q.  Did you believe that the students had

---

19

1  been persuaded by her not to blockade the entrance or
2  to throw things?
3    A.  No, I hadn't come to that conclusion.
4    Q.  Other than your conversation with Vanessa
5  Emerson, or your conversations with Vanessa Emerson --
6  strike that.
7    Are there any other conversations that
8  you had with Vanessa Emerson prior to January 17, 2014,
9  that indicated to you that anybody planned to be
10  disruptive or violent at the meeting?
11    A.  Not that I recall.
12    Q.  Prior to January 17, 2014, did you
13  receive any information from any other source
14  concerning whether or not there were people who planned
15  to be disruptive or violent at the January 17 meeting?
16    A.  No.
17    Q.  Did you receive any calls from any
18  students, faculty members, or anybody else indicating
19  any concerns about the January 17, 2014, meeting?
20    A.  Yes.
21    Q.  When -- how many calls did you receive?
22    A.  I don't remember.
23    Q.  From whom did you receive calls?
24    A.  I received calls from staff members, from
25  students.  Not just calls, emails.  I had folks speak

---

20

1  to me directly.  So staff, students, faculty, the
2  sheriff's office.  Legal counsel also had received some
3  concerns.
4    Q.  Anybody else?
5    A.  Not that I can recall at the moment.
6    Q.  Which staff members did you receive calls
7  from?
8    A.  Loretta Cisneros, Tanya Baird.
9    Q.  Wait.  Who was the first one?
10    A.  Sorry.  Loretta Cisneros.  Tanya Baird.
11  My own assistant, Trisha Macias.  Cora Zaletel.  Erin
12  Frew, F-r-e-w.  And we are talking about staff,
13  correct?
14    Q.  Correct.
15    A.  Okay.  Nick Potter, Lacey Desmond, Susie
16  Pagnotti, Todd Kelly.  Had concerns from my own staff.
17  Paul Orschlen, Karl Spiecker.
18    Q.  And these are people you spoke with or --
19    A.  I spoke with all of these folks, yes.
20    Q.  Anybody else?
21    A.  I'm sure there are more, but I can't
22  recall at the moment.
23    Q.  Is there anything that you could look at
24  that would refresh your recollection as to from who --
25  which staff members you received calls expressing

---

5 (Pages 17 to 20)

21

1 concerns about the January 17, 2014, meeting?
2     A.  I don't think so.
3     Q.  When did you speak with Loretta Cisneros?
4     A.  It was the day before the meeting on the
5 17th.
6     Q.  So you spoke with her on the 16th?
7     A.  I believe so.
8     Q.  Who is she?
9     A.  She is an assistant in the college of
10 CEEPS.
11     Q.  An assistant what?
12     A.  I'm sorry.  An administrative assistant.
13     Q.  This was a phone call that you received
14 from her?
15     A.  She sent an email and then I believe we
16 either spoke over the phone or in person.
17     Q.  She sent you an email?
18     A.  No.  I think the email went to -- I think
19 it was forwarded to me from someone else.  I can't
20 really recall.
21     Q.  Do you recall who she forwarded it from?
22     A.  No.
23     Q.  It was received by you in your inbox?
24     A.  It might have gone to the president's
25 inbox.  I don't know.  I can't remember.

22

1     Q.  Who reads the mail in the president's
2 inbox?
3     A.  Typically, the assistant, the executive
4 administrative assistant, because it goes through them.
5     Q.  And who was that at the time?
6     A.  Trisha Macias.
7     Q.  What did Loretta Cisneros's email say?
8     A.  As I recall, basically, it was just that
9 she was concerned about the emails that had been coming
10 out.
11     Q.  Which emails?
12     A.  Those were the ones prior to January 17.
13 I think one was called the -- it was about the Grinch.
14 And then there were several others, and I can't recall
15 what their titles were.
16     Q.  She was referring to the emails sent by
17 Timothy McGettigan?
18     A.  I don't know if she said his name in
19 there.  She just said the titles of the emails.
20     Q.  But she was referring to his emails, not
21 emails that anybody else sent?
22     A.  Right.  Correct.  Yes.
23     Q.  What did she say about those emails?
24     A.  Again, basically, that she was concerned
25 about the environment in the upcoming meeting.

23

1     Q.  What about it was causing her concern?
2     A.  She just felt, as I recall, that the --
3 the environment was getting tense, something along
4 those lines.
5     Q.  What else did she say in her email?
6     A.  That's all I can remember.
7     Q.  Did she express any particular concerns
8 about Professor McGettigan?
9     A.  I don't remember.
10     Q.  Did she indicate to you that anybody was
11 being -- sorry.  Strike that.
12         Did she indicate to you that anyone on
13 campus or off campus was planning to do anything in
14 particular at the January 17 meeting?
15     A.  No, not that I recall.
16     Q.  What did she want you to do?
17     A.  I think she just wanted to apprise me of
18 the situation.
19     Q.  What did she say about how the
20 environment was getting tense?
21     A.  She didn't.  She just said it was tense,
22 as I recall.
23     Q.  Was she referring to the students, or was
24 she referring to the faculty, or was she referring to
25 the staff, or was she referring to nobody in

24

1 particular?
2     A.  I don't know.
3     Q.  Did she use the word "environment"?
4     A.  Perhaps.  I don't recall her exact
5 wording.
6     Q.  Did she use the word "tense"?
7     A.  That is my recollection.
8     Q.  Did she describe how the environment was
9 getting tense?
10     A.  No.
11     Q.  Did she give you any specific information
12 of any kind indicating that anything disruptive or
13 violent was going to happen at the meeting?
14     A.  As I said previously, no.
15     Q.  What did you do in response to her email?
16     A.  In response to any email or conversation
17 that I might have had, I reported it to legal counsel,
18 and my understanding is it was shared with the
19 sheriff's office.
20     Q.  What did you do in response to Loretta
21 Cisneros's email?
22     A.  I believe we spoke about it.
23     Q.  When did you call her?
24     A.  I don't recall.  And I don't know if I
25 actually called her or if we passed in the hallway,

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

25

1 because she often was down on the second floor, and we
2 would speak. So . . .
3     Q.  Did you have a conversation with her,
4 whether it was in person or over the phone, before
5 January 17, 2014?
6     A.  I think it would had to have been, but I
7 don't recall.
8     Q.  What did you discuss in that conversation
9 with Loretta Cisneros?
10     A.  I just said I was aware of what she had
11 said in the email and I appreciated the email.
12     Q.  Did you say anything else?
13     A.  Not that I recall.
14     Q.  Did she provide you with any additional
15 information?
16     A.  No.
17     Q.  Was that the only time that you spoke
18 with Loretta Cisneros before January 17 of 2014?
19     A.  I have -- I had spoken with Loretta --
20     Q.  I mean about this topic.
21     A.  No, I didn't speak with her about this
22 topic again.
23     Q.  Did you forward her email to legal
24 counsel and to the sheriff's office?
25     A.  I don't recall.  I think -- I'm not sure

26

1 that it wasn't there to begin with, but -- I hope I'm
2 not getting Loretta's mixed up.
3     Q.  When did you speak with Tanya Baird about
4 any concerns that she had regarding the January 17
5 meeting?
6     A.  Well, she -- we spoke probably quite
7 often from December through January, because she was in
8 the provost's office.  I can't tell you how many times
9 we spoke, but we did speak.
10     Q.  And what did Ms. Baird say to you about
11 any concerns that she had regarding the January 17
12 meeting?
13     A.  She was worried that it might be
14 disruptive.
15     Q.  Did she give you any specific information
16 to indicate why she believed it might be disruptive?
17     A.  She just felt that when people's jobs are
18 at stake, people can become tense and the environment
19 can become hostile.
20     Q.  No particular positions, no specific
21 positions, had been announced for elimination at that
22 point; is that correct?
23     A.  That is correct.  Some people were
24 wondering if it might be theirs.
25     Q.  How many people on campus were within the

27

1 category of people whose positions may be cut?
2     A.  Everyone's.  We had three categories.
3     Q.  What are the three categories?
4     A.  We have faculty, administrative
5 professionals, and classified.
6     Q.  Did you have any specific information to
7 indicate that there was anyone on campus who was
8 intending to commit disruption or violence because they
9 thought that their jobs would be at risk?
10     A.  No.
11     Q.  Tanya Baird didn't provide you with any
12 specific information indicating that anybody thought
13 that their job -- that anybody was intending to be
14 disruptive or violent at the January 17 meeting because
15 they felt their jobs might be at risk?
16     A.  No.
17     Q.  What other information did Tanya Baird
18 provide you before January 17 of 2014 indicating any
19 concerns that she had about the meeting?
20     A.  She was worried that it could be
21 disruptive.  She didn't give me a rationale as to why,
22 other than the fact that the emails that were going
23 out, people were responding negatively, and that she
24 had planned an evacuation -- she had an evacuation plan
25 for her office and the provost's office so that people

28

1 could escape if they needed to.
2     Q.  Did you adopt any kind of evacuation plan
3 for the people in your office?
4     A.  No.
5     Q.  Why not?
6     A.  We have a typical evacuation plan that
7 goes through the safety team, so I just assumed that
8 that would fall into place if something happened.
9     Q.  Did you make any changes to that
10 evacuation plan as a result of any of Timothy
11 McGettigan's emails?
12     A.  No.
13     Q.  Did Tanya Baird mention any specific
14 people who were responding negatively to Professor
15 McGettigan's emails?
16     A.  No.  She basically said that the folks in
17 her office and the students in her office were
18 unnerved.  And I -- she may have said that a woman she
19 worked with, Michelle Gjerde, also felt unnerved.
20     Q.  Was there anything more specific than
21 certain people in Tanya Baird's office feeling
22 unnerved?
23     A.  Do you mean outside of her office?  Other
24 people?
25     Q.  Any information that she provided to you

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

29

1  concerning specific people who were feeling --
2  responding negatively or feeling unnerved by Professor
3  McGettigan's emails.
4       A.  Just the individuals I mentioned.
5       Q.  She didn't mention anybody else; is that
6  correct?
7       A.  Not that I recall.
8       Q.  What did you do in response to any
9  concerns that Tanya Baird mentioned to you concerning
10  the meeting?
11       A.  I know I talked with the sheriffs on a
12  regular basis, and we decided at the meeting and after
13  we would need to have more deputies on the campus in
14  that time frame.  I tried to reassure her that even
15  though things were disruptive in terms of work,
16  hopefully nothing would erupt on campus.
17       Q.  Tanya Baird told you that her work was
18  being disrupted -- or whose work was being disrupted?
19       A.  She mentioned that it was hard to
20  concentrate with the emails.
21       Q.  Because she kept reading Timothy
22  McGettigan's emails, right?
23       A.  Uh-huh.
24       Q.  Is that a "yes"?
25       A.  Yes.

---

30

1       Q.  Did she say that anybody else's work had
2  been disrupted because they decided to open and read
3  Professor McGettigan's emails?
4       A.  No, not that I recall.
5       Q.  The decision to add deputies to the
6  meeting -- strike that.
7            The decision to have an increased number
8  of deputies at the January 17, 2014, meeting, was that
9  decision made by you or was that decision made by
10  somebody else?
11       A.  All decisions are made by me based on
12  advice that I receive from experts.
13       Q.  Who advised you that more deputies needed
14  to be present at the January 17 meeting?
15       A.  Than are commonly on campus?  Is that
16  question?
17       Q.  Right.  Right.
18       A.  The sheriff's office.  I spoke with legal
19  counsel.  We thought that there should be an increase.
20  Spoke with Cora Zaletel, who had been at the university
21  for some time, and she also agreed.  Spoke with cabinet
22  members, they believed so.  So there were -- there was
23  a large group of people with whom I spoke.  And we felt
24  that there had been some peaceful protests on campus,
25  but we could feel that the -- the tension was mounting,

---

31

1  and we just thought it best to have additional deputies
2  on campus for that day in particular.
3       Q.  And that decision was made prior to
4  January 17, 2014, correct?
5       A.  Yes.
6       Q.  Did you make any changes to the
7  operational plan or to the number of deputies who would
8  be on campus between the time that Timothy McGettigan
9  sent his Children of Ludlow email on January 17, 2014,
10  and the time of the budget meeting?
11       A.  No.  I think -- I think the SWAT team --
12  we had decided that day or the day before that there
13  also needed to be a SWAT team.  But I don't think that
14  was in relation to that particular email.
15       Q.  The decision to have a SWAT team
16  occurred -- was made before the 17th; is that correct?
17       A.  I believe so.
18       Q.  Okay.  When did you speak with Trisha
19  Macias about any concerns that she had concerning the
20  January 17, 2014, meeting?
21       A.  Well, she was in the office next to mine,
22  so we probably spoke daily throughout December and
23  January about the meeting and that it seemed to be
24  taking on a -- a growing intensity in regard to the
25  cuts.

---

32

1       Q.  What indication -- what information did
2  Trisha Macias provide to you that indicated that the
3  meeting was taking on a growing intensity?
4       A.  She basically spoke about the emails that
5  Tim was sending out and that and, within her circles,
6  folks that she spoke with felt that those emails were
7  disrupting work and creating an intensity on the campus
8  that might not have to be there.
9       Q.  What did she mean by "intensity"?
10       A.  That there was a hostility, that the
11  worry that might be there was increasing.
12       Q.  The worry about what?
13       A.  Losing one's job.
14       Q.  Who did she speak with who was concerned
15  about losing their job?
16       A.  I'm sure she spoke to Tanya Baird, with
17  Cora Zaletel, with Michelle Gjerde.  She had quite a
18  large group of friends on campus.  So those are some of
19  the names I can recall.
20       Q.  So what did -- so was she indicating to
21  you that Tanya Baird thought she might lose her job?
22       A.  No.
23       Q.  Was she indicating to you that any of the
24  people you just mentioned might lose their jobs?
25       A.  She didn't indicate that.

---

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

33

1     Q.   Okay.  So how do you know that the people
2  she spoke with were becoming more worried or intense
3  because they thought they might lose their jobs?
4     A.   No, I didn't say that.  They just felt
5  that the environment on campus was becoming more
6  hostile because anyone might be fired, and the
7  letters -- or the emails were adding to that, that
8  worry and that doubt.
9     Q.   And what I am asking you is what
10 specifically about the environment on campus became
11 more intense as a result of the emails that Timothy
12 McGettigan sent out prior to January 17, 2014.  So with
13 regard to Trisha Macias, what did she say to you prior
14 to January 17 of 2014 that indicated that the
15 environment on campus was becoming more intense?
16     MS. SCOVILLE:  Object to the form.  Go
17 ahead.
18     A.   She stated that people were stressed
19 enough about possibly losing their jobs and that the
20 emails were aggravating that stress.
21     Q.   (BY MS. WANG)  Did she name any specific
22 people?
23     A.   No.
24     Q.   She just said people are stressed, and
25 she didn't tell you who?

34

1     A.   Again, in -- she mentioned Michelle
2  Gjerde, Tanya Baird, the other folks that I indicated.
3  They felt stressed.  They didn't necessarily feel that
4  they were going to lose their jobs, but there was a
5  possibility of that.
6     Q.   Is there anything else that Trisha Macias
7  said to you prior to January 17 of 2014 that indicated
8  that she had any concerns about the meeting?
9     A.   She was worried that not everyone would
10 have an opportunity to speak.
11     Q.   Why?
12     A.   Because she was worried that certain
13 individuals, faculty, perhaps Tim McGettigan, might
14 take over the microphone, as had happened on January 6.
15     Q.   What did you do in response to that
16 concern?
17     A.   I said, "We'll make certain that we have
18 more individuals available so that no one person can
19 co-opt the microphone."
20     Q.   Does your shutting down of Tim
21 McGettigan's email access on January 17, 2014, address
22 that particular concern in any way?
23     A.   No.
24     Q.   Was there anything else that Trisha
25 Macias said to you prior to January 17 of 2014 that

35

1  indicated she had any concerns about the meeting?
2     A.   Probably, but I don't recall.  I've told
3  you everything I remember.
4     Q.   What did you do in response to any of
5  Trisha Macias's concerns?
6     A.   As I said, we made certain that at the
7  January 17 meeting we had a few more people at the mic
8  and tried to be much more specific about how much time
9  people could have at the microphone.
10     Q.   Those decisions were made prior to
11 January 17, 2014; is that correct?
12     A.   Yes.
13     Q.   What conversations did you have with Cora
14 Zaletel prior to January 17, 2014, regarding any
15 concerns that she had about the meeting?
16     A.   Well, she was concerned that, again,
17 individuals might not have the opportunity to speak.
18 She had been the individual at the January 6 meeting
19 who was to invite people up to the microphone.  So she
20 wanted to make certain that there were enough people at
21 the microphone so that everybody had a chance to speak.
22     Q.   Was there anything else that Cora Zaletel
23 said to you prior to January 17, 2014, that indicated
24 that she had any concerns about the meeting?
25     A.   She was just worried about how folks,

36

1  just generally, might react because of the fear that
2  they might lose their jobs.  That's -- it was daily
3  conversation about the meeting.  I can't remember all
4  the specifics.
5     Q.   Did you do anything to address the
6  concerns that she had?
7     A.   There was -- wasn't really anything I
8  could do other than talking with folks and try to calm
9  them down.  So . . .
10     Q.   Who did you talk to to calm them down?
11     A.   A number of people that I can't -- I
12 can't recall what their names were.  Many of the people
13 I've told you, right there on that list, were people I
14 spoke with.
15     Q.   To calm them down?
16     A.   Uh-huh.
17     Q.   About what?
18     A.   About the hostility on the campus.
19     Q.   Okay.  Was there anybody that you spoke
20 to -- strike that.
21     What is Cora Zaletel's position -- or
22 what was her position at that time?
23     A.   Director of external affairs.
24     Q.   Who was her supervisor?
25     A.   I was, at that time.

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

37

1  **Q.  And what did she do generally as director**
2  **of external affairs?**
3      A.  Well, she worked with the outside public,
4  press releases.  She also did a lot with marketing and
5  branding, that sort of thing.
6      **Q.  What was Niki Whitaker's position at the**
7  **university?**
8      A.  I can't remember her title, but she
9  worked for Cora Zaletel.  I think at that time she'd
10  moved to that office from athletics.
11      **Q.  And what were her job responsibilities,**
12  **Niki Whitaker?**
13      A.  She worked with the budget, helped Cora
14  Zaletel with press releases, social media, that sort of
15  thing.
16      **Q.  What was Trisha Macias's job title at**
17  **that time?**
18      A.  Executive assistant to the president.
19      **Q.  So she worked for you?**
20      A.  Uh-huh.  Yes.
21      **Q.  What conversations did you have with Erin**
22  **Frew regarding any concerns that he [sic] had about the**
23  **January 17, 2014, meeting?**
24      A.  She just basically said that the campus
25  environment with the budget cuts felt tense to her.

---

38

1  And what "tense" meant to her is probably what it meant
2  to me, it wasn't a calm atmosphere.  We didn't talk too
3  much, Erin and I.
4      **Q.  It's E-r-i-n, right, Erin?**
5      A.  Yes, Erin, I believe.
6      **Q.  What was her position?**
7      A.  She was the assistant provost.
8      **Q.  How many times did you speak with her**
9  **about these concerns that she had prior to January 17?**
10      A.  I don't remember.
11      **Q.  Did she provide you any specifics about**
12  **whether or not she was aware of anyone who would be**
13  **disruptive or violent at the meeting?**
14      A.  No.
15      **Q.  Did she provide you with any information**
16  **indicating that anybody was responding to any of**
17  **Professor McGettigan's emails by being disruptive or**
18  **violent at the meeting?**
19      A.  I'm sorry.  I don't understand that
20  question.
21      **Q.  Did she give you any specific information**
22  **indicating that Professor McGettigan's emails were**
23  **encouraging anybody to be violent or destructive at the**
24  **January 17 meeting?**
25      A.  No, she did not.

---

39

1      **Q.  Did anyone at any point prior to January**
2  **17 of 2014 indicate to you that Professor McGettigan's**
3  **emails were encouraging anybody to be disruptive or**
4  **violent?**
5      A.  No.
6      **Q.  Did you receive any information -- strike**
7  **that.**
8          **Prior to the time you decided to shut**
9  **down Professor McGettigan's email on January 17, 2014,**
10  **did you receive any information from any source**
11  **indicating that anybody intended to be disruptive or**
12  **violent at the budget meeting as a result of Tim**
13  **McGettigan's emails?**
14      A.  No.
15      **Q.  Who is Nick Potter?**
16      A.  Nick Potter works for the CSU-Pueblo
17  Foundation.  He's had several roles there, so -- I
18  think he's director of operations right now.  But I
19  don't recall -- and, in all honesty -- 2013?  I think
20  he worked for the foundation then.  Yes, he would have.
21      **Q.  What would his general responsibilities**
22  **have been?**
23      A.  Fundraising at some level.  And then
24  probably some administrative work within the
25  foundation, I believe.

---

40

1      **Q.  How many times did you speak with him**
2  **prior to January 17 of 2014 regarding any concerns that**
3  **he had about the budget meeting?**
4      A.  I would say about three or four times.
5      **Q.  Were those in-person conversations or**
6  **over the phone?**
7      A.  Those were in person.  Their office is
8  right down the hall from mine, and we would see each
9  other at the elevator and such.
10      **Q.  What did he say to you in those**
11  **conversations?**
12      A.  He just said things like, Wow, it's
13  getting really heated up.  And anytime -- we talked
14  about the fact that anytime people might lose their
15  jobs, it was always difficult.
16      **Q.  Did Nick Potter did give you any**
17  **information that anybody was being encouraged by**
18  **Professor McGettigan's emails to be disruptive or**
19  **violent at the January 17, 2014, meeting?**
20      A.  No.
21      **Q.  Did Nick Potter provide you with any**
22  **information indicating there were specific individuals**
23  **who might become disruptive or violent at the meeting?**
24      A.  No.
25      **Q.  Did he say anything to you expressing**

---

10 (Pages 37 to 40)

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

---

41

concerns about the January 17 meeting other than, Wow, it's getting really heated up?

A. No.

Q. How many times did you speak with Susie Pagnotti?

A. Again, probably two or three times. There are reasons for me to be in the foundation office, and much of it was conversation in passing.

Q. What was her position at that time?

A. You mean what did she do there?

Q. Yeah. Right.

A. Susie dealt with moneys, handled the books. And she also did some things with software for the foundation.

Q. For the foundation?

A. Yeah.

Q. What did she say to you in expressing any concerns about the January 17 meeting?

A. She just thought it was going to be a difficult meeting.

Q. Did she say anything else?

A. Not that I recall.

Q. Who's Todd Kelly?

A. Todd Kelly is the CEO of the foundation.

Q. What is his general job responsibility?

---

42

A. He runs the foundation, and he is basically responsible for fundraising.

Q. How many times did you speak with him prior to January 17, 2014, regarding any concerns that he had about the meeting?

A. Well, we had weekly meetings. And he did have concerns. He had had meetings with faculty and staff -- and this is in regard to fundraising -- and they were concerned about whether they would continue to give money to the foundation because they were unaware of whether or not their jobs or their positions might be cut.

Q. Did he say anything else to you in any of his conversations with you expressing any concerns about the meeting?

A. Just the concerns I just mentioned.

Q. Paul Orschlen, how many times did you speak with him prior to January 17?

A. Well, we met at least twice a week in cabinet. So we spoke twice a week, at least.

Q. What concerns did he express to you concerning -- regarding the meeting?

A. Again, the same -- there were themes -- the same theme, that it was starting to get a bit hostile, people were worried about losing their jobs.

---

43

Just a -- a tenseness on the campus that I hadn't experienced before.

Q. Did he indicate to you how he had knowledge that people were worried about losing their jobs?

A. Yes. He ran a very large unit. And they expressed to him that they were very worried that administrative professionals might lose their jobs.

Q. Who did he -- who was in -- generally, who was in his unit?

A. There were over a hundrd people. So John Valdez, Chrissy Holiday. I mean, I can --

Q. I don't mean specifically. I mean what department was he in?

A. Oh, I'm sorry. He ran enrollment management, and at the time it was called Student Services, so he had the registrar, admissions, financial aid. Then he had housing, the rec center. So he had a large group of people.

Q. Okay. Did Paul Orschlen say anything else to you other than what you've already testified to expressing any concerns about the January 17 meeting?

A. He was concerned that it -- it could get out of hand, meaning that people might be speaking over each other, and that we might not be able -- I might

---

44

not be able to say what I needed to say up at the microphone. And I'm trying to remember, I think it was another public meeting, but I can't recall the date on that.

Q. Did Paul Orschlen say anything else to you indicating why he thought the meeting might get out of hand?

A. Just that people were nervous about losing their jobs and that the email traffic was -- from Tim was pushing that intensity a bit.

Q. What conversations did you have with Karl Spiecker concerning -- relating to any concerns he had about the January 17 meeting?

A. I think just what was stated in cabinet, about basically how we were going to approach the meeting, what the procedure was going to be. Karl was new. I think he came in January 1, 2014. So it was just cabinet meetings.

Q. Did he provide you with any specific information indicating that anybody was going to be disruptive or violent at the meeting?

A. No.

Q. Did Karl Spiecker say anything else to you that you recall concerning Timothy McGettigan's emails?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

45

1    A.  He just said that, being new to the
2  campus, he wasn't used to these types of emails.  That
3  was it.
4        Q.  What emails did you receive from staff
5  members expressing any concerns about the January 17
6  meeting?
7        A.  Let's see, and I can't remember if they
8  were forwarded to me or if they came to me directly.
9  The Gatchels.
10       Q.  That's Rebecca and John?
11       A.  Yes.  Ruth and Jude DePalma.  There was
12 a -- Face- -- there was a text from Jen Mullen, sending
13 me something from a Simon Tearpak.  There was another
14 Loretta, so I may be -- I'm pretty certain I saw an
15 email from a different Loretta.  There were others that
16 I can't recall at the moment.
17       Q.  What was Jen Mullen expressing to you
18 when she either texted or emailed you something?
19       A.  She just forwarded it.
20       Q.  And who's Simon Tearpak?
21       A.  He was an alum of the university.  And I
22 forgot what role he had after that.  My understanding
23 was that he was also Nick Potter's partner.
24       Q.  Who?
25       A.  Nick Potter.  He worked in the

46

1  foundation.
2        Q.  Oh, okay.  And what -- what was in the
3  email that she forwarded to you from Tearpak?
4        A.  I'm paraphrasing.  He said, I can't
5  believe a tenured faculty member can get away with what
6  he's saying.  Isn't there something that can be done?
7  Something along those lines.  But I do believe you have
8  the email or the . . .
9        Q.  And this is prior to the 17th, correct?
10       A.  Yes, I think so.
11       Q.  The emails that you received from the
12 Gatchels, when did you receive those?
13       A.  I -- I think they -- they were -- I can't
14 remember if they were before or after.  I believe they
15 were after the 17th.  Just expressing concern about the
16 language, how it looked for the university.  I think
17 one of the concerns was we were losing retention and
18 recruitment was becoming difficult, that it appeared
19 that there wasn't truth to these emails, and that the
20 metaphoric tone in the emails was inappropriate.
21 That's what I remember.
22       Q.  Were you concerned that Timothy
23 McGettigan's emails were affecting recruitment or
24 retention?
25       A.  Yes, I felt they could.

47

1        Q.  Why did you believe that they could?
2        A.  Well, anytime someone from the outside
3  reads something negative about the university or
4  perceives an individual negatively, you could have
5  repercussions.  It happens.
6        Q.  Did that concern you?
7        A.  At the time, no.  That wasn't my concern.
8        Q.  Why not?
9        A.  Because there were bigger concerns.  I
10 was worried about the tone on the campus before and
11 after the meeting.
12       Q.  What about the tone on the campus were
13 you worried about?
14       A.  People were upset, distraught.  And I
15 wanted to try to have a productive working relationship
16 with the group that I was working with and the larger
17 campus.
18       Q.  What conversations did you have with any
19 students regarding any concerns that any of them had
20 about the January 17 meeting?
21       A.  Well, other than Vanessa, I believe I
22 spoke with Mario -- why can't I think of Mario's last
23 name at the moment -- who was involved with the
24 protests and he wanted me to know that he wasn't
25 protesting me and he understood I had to do what I had

48

1  to do.  And he was just a -- a really good kid.  And he
2  played in the mariachis, and I knew him.  And I just
3  said, "Mario, you have to do what you have to do."
4        Q.  When did you have this conversation with
5  him?
6        A.  He'd come in, I believe, right before the
7  break.  I don't remember, to tell you the truth.  But
8  Mario and I had spoken on different occasions.
9        Q.  Before the winter break?
10       A.  I think it was before the winter break.
11       Q.  Did he say anything to you indicating
12 that anybody was planning to be violent or disruptive
13 at the meeting?
14       A.  No.
15       Q.  Who else did you speak -- do you remember
16 Mario's last name?
17       A.  Ruiz.  I think it's Mario Ruiz.
18       Q.  R-u-i-z?
19       A.  I believe so.
20       Q.  Did you speak with anybody -- any other
21 students besides Vanessa and Mario?
22       A.  Honestly, not that I recall.
23       Q.  What faculty did you speak with
24 concerning any concerns that they had about the January
25 17 meeting?

12 (Pages 45 to 48)

49

1    A.  Margie Massey.
2    Q.  Margie?
3    A.  Massey.  M-a-s-s-e-y.  Susan
4  Calhoun-Stuber.  That's with a hyphen.  Carol Loats,
5  L-o-a-t-e-s [sic], Helen Caprioglio,
6  C-a-p-r-i-o-l-i-g-i-o [sic], I think.  And they met
7  with me weekly to work on the budget cuts.
8    Q.  All four of them?
9    A.  Uh-huh.
10    Q.  Is that a "yes"?
11    A.  Yes.  I'm sorry.  I wanted representation
12  from across the campus.  So Carol Loats was the
13  president of AAUP.  Margie Massey and Calhoun-Stuber
14  were co-presidents of faculty senate.  And Helen
15  Caprioglio was the chair of the university budget
16  board.  They worked with me and with my cabinet.
17    Q.  What concerns did Margie Massey express
18  to you regarding the January 17 meeting?
19    A.  She just said she thought it could --
20  people used language like, "get out of hand," "it might
21  be intense," "we want to make certain that everybody
22  has the opportunity to speak."  She'd been at the
23  January 6 meeting -- in fact, I believe all of them
24  had -- and it was not apparent that everyone who wanted
25  to speak was able to.

50

1    Q.  All right.  And what did you do to
2  address any of Margie Massey's concerns?
3    A.  As I said, we made certain that -- excuse
4  me.  We had two people at the microphone to help guide
5  people to come up, finish their statement in two
6  minutes.  And then we had a few more officers around
7  the room.
8    Q.  What did Susan Calhoun-Stuber say to you
9  regarding any concerns about the January 17 meeting?
10    A.  Basically the same thing.  We were all in
11  agreement that it could get out of hand.  There might
12  be shouting.  There was chanting at the meeting in the
13  back of the room.
14    Q.  What did Carol Loats tell you --
15    A.  Carol.
16    Q.  Yeah -- Carol Loats tell you about any
17  concerns that she had?
18    A.  She was worried about the same thing.
19  She was -- she was surprised at what one had to do to
20  go through budget cuts, because she had never had to do
21  that before.  And she was appreciative of being in the
22  group.
23    Q.  What did Helen Caprioglio express to you
24  regarding any concerns that she had about the January
25  17 meeting?

51

1    A.  Well, at one point she said that she
2  would prefer that her name not be cited as part of the
3  group that came to a conclusion about what cuts should
4  be made.
5    Q.  When did she say that to you?
6    A.  It was right before the January 17
7  meeting.
8    Q.  What did you do to address that concern?
9    A.  I did nothing, because we had already
10  written up the memo, who participated in the
11  discussions.  And her name was already on there.
12    Q.  Did your shutting down of Timothy
13  McGettigan's email on January 17, 2014, do anything to
14  address any of the concerns that Margie Massey, Susan
15  Calhoun-Stuber, Carol Loats, or Helen Caprioglio
16  expressed to you?
17    A.  I don't know.  I just know that on that
18  day, things were extremely tense.  And, based on
19  advisement, I had to weigh whether or not another email
20  going out of the nature of the Ludlow email to 25,000
21  people could a create a situation where things might
22  become violent, that against shutting off Professor
23  McGettigan's email for that day.
24    Q.  Where do you get the 25,000 number from?
25    A.  That came from IT.  Originally, we

52

1  thought it was 15,000.  Then I was informed it was
2  25,000.
3    Q.  There are not 25,000 people on campus,
4  correct?
5    A.  Oh, no.  It was going all over the
6  country.
7    Q.  Did you think that there were going to be
8  people traveling from across the country to attend this
9  budget meeting at CSU-Pueblo on January 17, 2014?
10    A.  I thought that people were people outside
11  of the campus who could be getting these emails and
12  might say, There's a hit man over there, What's going
13  on, and might come to the campus, yes.
14    Q.  Did you think -- did you receive any
15  information from any specific source indicating that
16  Timothy McGettigan's emails were encouraging anybody to
17  come to the meeting and commit any kind of violence or
18  disruption?
19    A.  No.
20    MS. SCOVILLE:  So, Liz, it's a little bit
21  before 11:00.  Is this a good time for a break?
22    MS. WANG:  Sure.
23    (Recess taken, 10:51 a.m. to 11:00 a.m.)
24    Q.  (BY MS. WANG)  Are there any other
25  faculty members that you spoke with where they

13 (Pages 49 to 52)

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

53

1 expressed any concerns about the January 17 meeting
2 prior to the meeting?
3     A. Not that I can recall at the moment.
4     Q. At the grievance hearing you stated that
5 before January 17, 2014, you received calls from
6 students, staff, community members, and faculty asking
7 you to put a stop to Professor McGettigan's emails,
8 primarily because they were cluttering up email boxes
9 and because individuals were irritated by some of the
10 content. Is that true?
11     A. Yes, that's true.
12     Q. What community members did you hear from?
13     A. I'm trying to remember. I can't really
14 recall their names. I think one or two were people on
15 the foundation, who are community members. And Simon
16 Tearpak was someone who was talking about the fact
17 that -- the nature of the emails that were going out.
18 And I'm sure he saw those, probably through Nick's
19 email, perhaps. Who were the others you asked me
20 about?
21     Q. You mentioned community members. So I'm
22 just asking you who you recall receiving any phone
23 calls or having any conversations with where they
24 expressed any concerns.
25     A. And I did have a couple members of my

54

1 advisory board ask me about the emails, because I
2 believe they went into the newspaper. And they had
3 heard that they had been sent via email. So I think
4 one of them was actually Jane Rawlings, who works for
5 The Chieftain, just asked me about whether or not they
6 were coming through email, and I said yes.
7     Q. What was coming through email?
8     A. The types of news articles that they were
9 printing, because they were getting emails as well.
10 That's my understanding anyway. That's how they got to
11 the paper.
12     Q. Jane Rawlings is at The Chieftain?
13     A. Uh-huh. Yes.
14     Q. She's a reporter?
15     A. She -- she and her father own the paper.
16     Q. Okay. And so what did she express to you
17 about any concerns about the budget meeting?
18     A. Oh, well, that's a different question.
19 And she wondered how that was going to go. They wanted
20 to make certain that they had a reporter from The
21 Chieftain there.
22     Q. Okay. Did she say anything specific --
23 was she just asking you how it was going to go? What
24 do you mean, she was wondering how it was going to go?
25     A. Well, she wondered what the -- when it

55

1 was going to occur, what the process was. They wanted
2 to have a reporter there.
3     Q. Did she give you any information
4 indicating that anybody was being incited to or
5 encouraged to violence or disruption as a result of
6 Timothy McGettigan's emails?
7     A. No.
8     Q. Did you receive any information from any
9 community member -- any other community members who --
10 that you recall by name?
11     A. No.
12     Q. Prior to January 17 of 2014, did you
13 receive any indication from any source that Timothy
14 McGettigan's emails that he had sent prior to the 17th
15 were causing people disruption at work?
16     A. Well, I did have some individuals say
17 that, and I know if I saw the emails, I would recall
18 specifically what they said, because there were emails.
19 The sheriff's office said -- I think they received a
20 few calls saying that work was being disrupted. So I
21 know they informed me of that. And I can just kind of
22 give you the theme of -- I did have one student say,
23 Please -- and I can't remember his name -- Please, take
24 me off the mass distribution email list.
25         And we even received an -- someone called

56

1 from Washington state, I believe it was, saying, "I'm
2 getting these emails, and I don't want to be on the
3 distribution list." So there were people who were
4 concerned, outside and inside. And folks said, when
5 the emails popped up -- and I -- I think there was a
6 faculty member, too, who said, "Just, please, just take
7 me off the distribution list." I just can't remember
8 their names.
9     Q. Is there any other information that you
10 received from any source prior to January 17, 2014,
11 that indicated to you that Professor McGettigan's
12 emails up to that date were disrupting people and their
13 ability to work?
14     A. Other than -- than what I've already told
15 you?
16     Q. Right.
17     A. Not that I recall.
18     Q. Who specifically gave you any information
19 about their ability to work being disrupted?
20     A. As I said, I recall Loretta Cisneros.
21 And then there were individuals on campus whose names I
22 can't recall, but if I saw emails I might be able to.
23     Q. How many people?
24     A. Maybe six or seven.
25     Q. What's the student population at

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

57

CSU-Pueblo?

A. It's around 4,500 students.

Q. What's the approximate number of faculty, staff, and administrators?

A. Probably about 400, 500.

Q. Do you remember the names of any specific individuals who the sheriff's office mentioned to you as indicating any disruptions they had at work as a result of Tim's emails that he sent prior to the 17th?

A. I can't remember their names, but I know that I've seen the emails and the list of the names.

Q. The people who asked you if they could get off the distribution list, do you know if they did get off the distribution list?

A. I don't know. I know I asked IT to remove them.

Q. And you did that prior to the 17th; is that right?

A. Uh-huh. Yes.

Q. And you did that for each person who asked you?

A. As I recall, yes.

Q. Do you believe that IT did as you instructed?

A. I believe so.

---

58

Q. Between the time that you received Timothy McGettigan's email, Children -- titled, The Children of Ludlow on January 17, 2014, and the time that you decided to shut down his email access, did you receive any information from any source indicating that people's ability to work had been disrupted by his email?

A. Yes. On that morning the sheriff's office informed me of that. I don't remember names.

Q. Well, what did the sheriff's office tell you?

A. Just that they were getting calls from individuals saying that it was difficult to continue their work. The emails were going back and forth. Inadvertently, some folks would hit Reply All, which is problematic. I also spoke with legal counsel prior to that. And I know we had a meeting with Cora Zaletel, some of my cabinet members, the sheriffs. I think there was Lucero, Bill Brown. I can't remember the third deputy's name.

And we were talking about the fact that there seemed to be this mounting pressure from the emails in terms of kind of a -- I don't know how you would frame it -- but the totality of the situation. The emails were coming. And then -- well, you didn't

---

59

ask me about that, so I won't refer to it.

Q. Okay. The Children of Ludlow email sent by Timothy McGettigan on January 17, 2014, was sent at 10:45 a.m. Is that correct?

A. That's my recollection, yes.

Q. Was Bill Brown your primary contact at the sheriff's office?

A. Yes.

Q. By 11:35 a.m. on January 17, 2014, you had instructed Matt Watson to close down Professor McGettigan's email, correct?

A. Correct.

Q. So in that 50-minute period of time, what information did you learn that people's ability to work had been disrupted by his emails? You mentioned --

A. It was just a compilation of information I had received throughout the last week. And we were discussing it in -- in the meeting, so -- in the morning.

Q. I'm asking --

A. And it was disrupting my -- I'm sorry. Go ahead.

Q. It was disrupting your ability to work?

A. Yes, it was.

Q. Between 10:45 a.m. and 11:35 a.m. on

---

60

January 17, 2014, what specific information did you receive from any source that indicated that people's ability to work was being disrupted by that email, The Children of Ludlow email?

A. Oh, I don't recall. It was -- there were many people coming in and out of the office.

Q. You don't recall receiving any such information; is that correct?

A. Well, not between 10:45 and 11:35.

Q. Okay. When did you first see the email that Tim sent titled, Children of Ludlow?

A. I can't remember if -- he often left me off the lists, but I believe it was brought to my attention by legal counsel and the sheriff's office.

Q. Were you in your office at about 10:45 a.m. on the 17th?

A. Yes, I believe I was.

Q. And how was the email brought to your attention?

A. Again, I think it was hand-carried into my office. And then we had, I believe, some discussion with legal counsel, the sheriff's office, some members of my cabinet. I think they were still in there. There was a lot of confusion once that email came out.

Q. Who hand-carried it into your office?

---

15 (Pages 57 to 60)

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

61

1  A.  I believe it was legal counsel, but I
2  can't remember for certain.
3  Q.  Is that Johnna Doyle?
4  A.  That is correct.
5  Q.  Who is a part of your cabinet?
6  A.  At the time it was Carl Wright, who was
7  the provost; Rick Kreminski, who was the interim IR
8  director; Paul Orschlen, VP for enrollment management
9  and student services; and Karl Spiecker was the VPFA.
10  I believe Cora Zaletel was in the room, along with the
11  three deputies.
12  Q.  Who were the three deputies?
13  A.  Again, Bill Brown, Dave Lucero.  And, I'm
14  sorry, I can't remember the third deputy's name.
15  Q.  Was it the sheriff?
16  A.  Sheriff Taylor?
17  Q.  Sheriff Taylor.
18  A.  I don't believe so.  I don't think so.
19  Q.  Not Sheriff Taylor?
20  A.  Yeah.  I don't believe so.  He may have
21  been.  I'm having a hard time remembering.
22  Q.  Okay.  So -- I'm sorry, I think you said
23  Johnna Doyle brought it into your office?
24  A.  I believe so.
25  Q.  And what did she -- had you seen it at

---

62

1  that point, the email?
2  A.  I don't think so, because I was on the
3  phone, I was talking with people, and I'm not sure that
4  I was on the distribution list.  Because sometimes Tim
5  would take me off, and then it would be delivered to me
6  by other people.  And sometimes I can't remember who
7  sent me what.
8  Q.  What distribution list are you on -- or
9  were you on at the time?
10  A.  Well, I would be on administration,
11  administrators.  So there are, like, four or five
12  different lists.  And then sometimes, I believe, he
13  wouldn't necessarily use those lists but might just put
14  a string together of individuals.  And different people
15  from across the campus would send me an email and say,
16  Did you see this, or send me a Facebook post, Did you
17  see this?  I never asked for that, but they would send
18  things to me.
19  Q.  What conversation did you have with
20  Johnna Doyle when she brought you a copy of The
21  Children of Ludlow email?
22  A.  I think we just said that this was
23  inappropriate language that might incite certain kinds
24  of behaviors on the campus or from somebody who came
25  off campus onto campus.  She suggested, after talking

---

63

1  with the sheriffs and looking at all the information we
2  had received, for example, from Vanessa Emerson, the
3  possibility of blockading the door and so on, that we
4  might want to turn the professor's email off until the
5  budget forum was over.
6  Q.  Ms. Doyle said that?
7  A.  Well, that was our conversation.  I can't
8  remember who said what exactly.  But the conversation
9  was, Is this the right thing to do?  Could there be
10  violence on campus based on some of the rhetoric in the
11  actual email.
12  Q.  Was there any anybody else present for
13  this conversation?
14  A.  I can't remember if everyone had left the
15  room or if they were sitting over across at the
16  conference table.  I just can't remember.
17  Q.  Who suggested that the appropriate
18  response would be to shut down Professor McGettigan's
19  email?
20  A.  Well, legal counsel said, Well, there --
21  there is one way to prevent another email from going
22  out, and we could just suspend Professor McGettigan's
23  email.  And I said, "Are we covered for that," which I
24  felt that we were, based on the policies we had in
25  place, but I rely on legal counsel to advise me for any

---

64

1  other legalities that I might not be aware of.  And she
2  said yes.  And so then -- I think it was then that she
3  suggested that I write to Matt Watson and ask him to
4  please suspend Professor McGettigan's email.  I think
5  that was the sequence.
6  And, again, the decision was a difficult
7  one.  Do I go ahead and just let the emails continue
8  and take the chance that something might happen on
9  campus?  And all I could think about were shootings
10  that happened at Arapahoe High School and Virginia
11  Tech.  And every president worries about those sorts of
12  things.  So you have to make a decision.  And that was
13  the decision I made, to suspend Professor McGettigan's
14  email for that day.
15  Q.  When you said, "Are we covered for that"
16  to Johnna Doyle in this conversation, what did she say
17  in response?
18  A.  She said yes.
19  Q.  Did you use those exact words?
20  A.  I don't know if she said, Yes, I -- we
21  are or --
22  Q.  No.  I mean did you use those words, "Are
23  we covered for that?"
24  A.  Yes.
25  Q.  Okay.  Did you discuss with her any First

---

16 (Pages 61 to 64)

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

65

1  Amendment implications during this conversation?
2      A.  No.
3      Q.  Did you discuss the electronic
4  communications policy?
5      A.  We -- we discussed that so many times in
6  different arenas, but I did -- we did talk about the
7  fact that the policy covered us.  I believe we had --
8  these were brief conversations, but I believe we talked
9  about both of the policies.
10      Q.  Wait.  What both policies?
11      A.  Well, there's the electronic email
12  policy.  And then there was the CRA, the Computer
13  Resources Access policy.
14      Q.  What specific -- I'm sorry.  Strike that.
15      Did Johnna Doyle show you a copy of the
16  electronic communications policy during this
17  conversation?
18      A.  I believe she had it with her.
19      Q.  Did you actually look at it together?
20      A.  I think we did.  It's hard to remember,
21  because I know we've looked at it so many times
22  beforehand.  I'm pretty certain we did, but I was very
23  familiar with those policies because we had been
24  working on them for a long time.
25      Q.  I'm showing you what has previously been

66

1  marked as Deposition Exhibit 46.  Is that the
2  Electronic Communications Policy that was in place in
3  January 2014?
4      A.  Hard to read.
5      Q.  The font is kind of small.
6      A.  Yeah.
7      (Pause in the proceedings.)
8      A.  This appears to be the policy that was in
9  place as of that date, but I wanted to say that Number
10  4 was actually Number 8, but I'm probably thinking of
11  the other policy.
12      Q.  The computer resource policy?
13      A.  Uh-huh.
14      Q.  Did you discuss the computer resource
15  policy with Johnna Doyle in this conversation?
16      A.  That came up.  I don't know if I saw a
17  copy of it, but that came up.  That's the CRA, correct?
18  Is that what you are referring to?
19      Q.  Right.  Right.
20      A.  Uh-huh.
21      Q.  What in that policy did you believe
22  allowed you to shut down Professor McGettigan's email
23  computer access?
24      A.  In that policy?
25      Q.  Yes.

67

1      MS. SCOVILLE:  In -- I'm sorry.  Which
2  policy are we talking about?
3      MS. WANG:  The CRA.  The CRA.
4      A.  I believe in that policy it states
5  that -- and it may so in here, too, that the -- one,
6  the system is owned by the university; and, two, the
7  use of the email to harass, intimidate, threaten -- I
8  believe that language is in both of the policies, the
9  electronic communications policy and the CRA policy.
10  Or to interfere with the ability of others to conduct
11  university business.  I believe that language is in
12  both policies.
13      Q.  (BY MS. WANG)  You had mentioned that you
14  were concerned that somebody might come on campus and
15  commit violence and that you had in mind the school
16  shootings that had occurred in other places?
17      A.  Yes.  Those weigh on your mind when you
18  are the president of the university.
19      Q.  It's always on your mind?
20      A.  No.  I said it weighs on your mind,
21  particularly in situations like this.
22      Q.  Did you believe that Timothy McGettigan
23  might threaten violence on campus?
24      A.  No.
25      Q.  Did you believe that he was encouraging

68

1  others to commit violence on campus?
2      MS. SCOVILLE:  Object to the form.
3      A.  Could you repeat the question?
4      Q.  (BY MS. WANG)  Did you believe that
5  Timothy McGettigan through his Children of Ludlow email
6  was encouraging others to commit violence?
7      A.  No.
8      Q.  Did you believe that in sending his
9  Children of Ludlow email, Timothy McGettigan intended
10  to intimidate anyone?
11      A.  I really don't know what Professor
12  McGettigan intended to do with his email.
13      Q.  Did -- was it your belief on January 17
14  of 2014 that Timothy McGettigan intended to intimidate
15  anybody with his The Children of Ludlow email?
16      A.  As I said, I don't know what Professor
17  McGettigan intended to do with his email.
18      Q.  Did you believe that Professor McGettigan
19  intended to threaten anyone with his Children of Ludlow
20  email?
21      A.  I don't believe so, but I really don't
22  know what he intended to do.
23      Q.  I'm asking you what your belief was about
24  his intentions, or did you not consider his intentions
25  at all on the 17th of January 2014?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

---

69

1    A.  If you are -- I don't believe -- I don't
2  believe Tim was trying to encourage violence on campus.
3    Q.  Did you believe that by sending his
4  Children of Ludlow email, Timothy McGettigan intended
5  to threaten anyone?
6    MS. SCOVILLE:  Object to the form.
7    A.  Okay.  Well, I cannot tell you what he
8  intended.  I did not believe he intended to threaten
9  anyone.
10    Q.  (BY MS. WANG)  Right.  Did you believe
11  that Timothy McGettigan intended to harass anyone with
12  his Children of Ludlow email?
13    MS. SCOVILLE:  Same objection.
14    A.  No.
15    Q.  (BY MS. WANG)  Did you believe that
16  Timothy McGettigan intended to interfere with the
17  ability of others to conduct university business with
18  his Children of Ludlow email?
19    A.  I think he hoped that perhaps the email
20  might have the effect of slowing down the budget cuts.
21  I think that could have been a possibility, but I don't
22  know for sure.
23    Q.  I'm not asking you what his actual
24  intentions were.  I'm asking what you believed on
25  January 17, 2014, his intentions were.  On January 17,

---

70

1  2014, did you believe that he meant to or intended to
2  interfere with the conduct of university business
3  through the sending of his Children of Ludlow email?
4    A.  At that time I thought he might hope to
5  slow down the budget cuts in terms of the process,
6  yeah.
7    Q.  You believed that one of his intentions
8  with the sending of his Children of Ludlow email was to
9  slow down the budget process -- or the budget cuts?
10    A.  I think that could have been a
11  possibility.
12    Q.  Was there any other way in which you
13  believe that Professor McGettigan intended to interfere
14  with the conduct of university business through his
15  sending of the Children of Ludlow email?
16    A.  Other than hopefully cutting out --
17  reducing the likelihood of the budget cuts, I can't
18  think of any other reason.
19    Q.  The electronic communications policy
20  prohibits -- sorry.  Strike that.
21    What provision -- what prohibited use of
22  the electronic communications policy do you believe The
23  Children of Ludlow email violated?
24    A.  Number 4.
25    Q.  Is there any other provision that you

---

71

1  believe it violated?
2    A.  At the moment, Number 4.
3    Q.  In what way do you believe that The
4  Children of Ludlow email -- sorry.  Strike that.
5    Number 4 in the electronic communications
6  policy says that "Prohibited uses include, but are not
7  limited to, use of electronic communications to
8  intimidate, threaten, or harass other individuals or to
9  interfere with the ability of others to conduct
10  university business."  Which provision or provisions of
11  that policy do you believe the email violated?
12    A.  The Ludlow email?
13    Q.  Right.
14    A.  I think they violated both.
15    Q.  Both clauses?
16    A.  Yes.
17    Q.  The policy states that it is prohibited
18  to use electronic communications to intimidate,
19  threaten, or harass other individuals, correct?
20    A.  Uh-huh.  Yes.
21    Q.  In what way do you believe that The
22  Children of Ludlow email was sent to intimidate,
23  threaten, or harass other individuals?
24    A.  I think that whether or not it was
25  intended to, the sending of the email created a

---

72

1  situation that intimidated, threatened, and harassed
2  other individuals and interrupted work.
3    Q.  In what way do you believe that The
4  Children of Ludlow email was sent to interfere with the
5  ability of others to conduct university business?
6    A.  I don't understand your question, "in
7  what way."
8    Q.  In what way was it a use of electronic
9  communications to interfere with the ability of others
10  to conduct university business?
11    MS. SCOVILLE:  I'm going to object to the
12  form.  You can answer if you can.
13    THE DEPONENT:  Okay.
14    A.  By slowing down the budget-cut process.
15    Q.  (BY MS. WANG)  The university -- the
16  electronic communications policy does not state that it
17  is a violation of the policy if there are people who
18  are -- who feel harassed, intimidated, or threatened,
19  correct?
20    MS. SCOVILLE:  Object to the form.
21    A.  I'm sorry.  I don't understand your
22  question.  Could you repeat it?
23    Q.  (BY MS. WANG)  You indicated earlier that
24  even if the email that Professor McGettigan sent was
25  not intended to intimidate, harass, or threaten other

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

81

that indicated to you that anybody felt intimidated, harassed, threatened, or unable to work as a result of Tim's Children of Ludlow email?

A. She just basically said that the campus was getting nervous.

Q. Where had she gone between 10:45 and 11:35?

A. Oh, she'd gone out, was talking to the newspapers. She had to talk to a few other people. So she came back and informed me.

Q. Who else did she speak with?

A. I don't recall.

Q. What newspapers did she speak with?

A. She certainly was getting calls from The Chieftain. She might have gotten calls from KOAA and -- those -- those would be the two outlets, I think, that would be contacting her. Probably the CSU-Pueblo Today. I can't tell you every outlet that might have contacted her.

Q. Did anybody ever ask you -- strike that. After Timothy McGettigan sent out his Children of Ludlow email and before you decided to shut down his email, did anybody ask you whether the campus was safe?

A. Yes.

---

82

Q. Who did?

A. Tanya Baird asked me if I thought the campus was safe.

Q. Anybody else?

A. Not that I can recall at the moment.

Q. Did you receive any emails from anybody asking you if the campus was safe?

A. I think I saw an email that wondered if the campus was safe, but I can't recall which email and from who.

Q. Was that between the time that you received The Children of Ludlow email and the time you decided to shut down Timothy McGettigan's email access?

A. I believe so.

Q. Were you told -- between the time that -- between 10:45 and 11:35 on January 17, 2014, were you told by anybody that there were people who wanted to attend the budget meeting but were afraid to because of the violent tones in the email?

A. Not at that time, no.

Q. Between 10:45 and 11:35 a.m. on January 17, 2014, were you told by anybody that they felt intimidated by the email?

A. There were several people who said that, mainly in my office, the provost's office, Cora's

---

83

office. They said that the email was threatening. People were worried that it could cause problems on the campus.

Q. Who told you that?

A. I'm not -- I don't have names. I have given you the names of the heads of units.

Q. Between 10:45 and 11:35 on January 17, 2014, were you told by anybody that they felt some kind of hostile environment has been created on campus by the email?

A. Yes. By the individuals I told you in the previous question and answer.

Q. Who is that? Who are those people?

A. Cora Zaletel; Tanya Baird; my own assistant, Trisha Macias; and, as I said, my cabinet members were saying things were becoming much more hostile on campus and intense.

Q. Where had your cabinet members been between 10:45 and 11:35 a.m. on that day?

A. In and out of my office.

Q. Do you know where else they went?

A. No. They went to talk to different people, tried to get ahold of the deans and folks in admission and financial aid. So on and so forth.

Q. Did you receive the emails that Tim

---

84

McGettigan sent out about the budget situation prior to January 17, 2014?

A. I did receive all of them at some point or other.

Q. Okay. In the emails that Timothy McGettigan sent prior to January 17 of 2014 regarding the budget cuts, he asked people to attend a rally on the 17th to protest the cuts, correct?

A. I believe so.

Q. And in at least one of his emails he asked people to peacefully and civilly protest; isn't that correct?

A. I believe so.

Q. The operations plan that was put in place by the sheriff's office was created prior to January 17, 2014; is that correct?

A. Yes. There may have been some adjustments after that, after the original date.

Q. On January 17, 2014, you instructed Matt Watson to shut down Timothy McGettigan's email and computer access; is that correct?

A. Correct.

Q. And his access to both his email and his computer were -- remained shut down until the 20th; is that right?

---

21 (Pages 81 to 84)

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

---

85

1    A.  I believe he had access to his computer,
2  but not email.  So I don't know if I could answer your
3  question.
4    Q.  Okay.  Well, he had no email access at
5  all from the 17th to the 20th; is that correct?
6    A.  That is correct, from my understanding.
7    Q.  And after the 20th -- sorry.  Strike
8  that.
9    On the 20th you instructed Matt Watson to
10 restore Professor McGettigan's email access with the
11 exception of his access to distribution groups; is that
12 right?
13   A.  Correct.
14   Q.  Why did you do that?
15   A.  I wanted his email restored because the
16 crisis of the moment seemed to have passed, and he
17 would need his email to work with his students.
18   Q.  Why did you keep his email access to
19 distribution groups off?
20   A.  Because I asked Professor McGettigan to
21 please come and talk with me.  I sent an email to his
22 personal email and asked him if he would be willing to
23 come and talk with me, that he could bring someone with
24 him.  I wanted to have a dialogue about what happened
25 and if there would be some way to come to some

---

86

1  understanding about why I did what I did.  I thought he
2  might come, but he did not.  So I made the judgment,
3  based on conversations with my cabinet and others, that
4  until Professor McGettigan came to see me, I would not
5  turn back on his mass distribution list.
6    The campus was going to have other
7  moments where perhaps there would be more discussions
8  of budget cuts, and I just wanted to have a discussion
9  with Tim, which we discussed in the grievance process.
10 So his department chair showed up at the time for the
11 meeting.  And I thought -- I did not know that Tim
12 wasn't coming.  And she didn't believe that he would
13 come if I asked again.
14   Q.  Is it fair to say that you conditioned
15 Professor McGettigan's access to the group distribution
16 list on meeting with you?
17   A.  That I --
18   MS. SCOVILLE:  Object to the form.
19   A.  -- conditioned?
20   Q.  (BY MS. WANG)  You were not going to turn
21 on Professor McGettigan's access to distribution groups
22 until he came to meet with you; is that fair to say?
23   A.  I think that's fair to say.
24   Q.  And why is it that you wanted him to meet
25 with you before you would turn on his access to group

---

87

1  distribution lists?
2    A.  I already stated that.  Do you want me to
3  restate it?  Because I wanted to have a discussion with
4  him so that we could understand what had happened and
5  why I thought the campus -- through the language in the
6  email, there had been a security threat, and there was
7  potential for volatility on the campus.  And I was
8  hopeful he and I could talk about ways in which he
9  could express whatever he wanted to express through
10 that particular mechanism without creating what I
11 thought was a problem on the campus.
12   Q.  So you wanted to prevent -- make sure --
13 before you would turn on his access to group
14 distribution lists, you wanted to make sure that he
15 would not send out another email like The Children of
16 Ludlow email; is that fair to say?
17   A.  No, that's not fair to say.  I wanted to
18 discuss with him what the consequences of emails like
19 that might create and could we come to some conclusion.
20   Q.  What do mean, "come to some conclusion"?
21 You wanted to agree with you about your reasons for
22 shutting down his email; is that fair?
23   MS. SCOVILLE:  Object to the form.
24   A.  That is incorrect.  I wouldn't expect him
25 to agree with me.  I hoped we could come to some

---

88

1  understanding about the use of the mass distribution.
2  And, in fact --
3    Q.  (BY MS. WANG)  And you did not think that
4  it was appropriate for him to send out emails
5  containing the kind of metaphors that were in The
6  Children of Ludlow email; is that fair?
7    MS. SCOVILLE:  I'm going to object to the
8  form and also ask that counsel let the witness finish
9  her answer.
10   A.  Now I'm -- I can't remember what your
11 first question was.  You interrupted me with another
12 thought.
13   Q.  (BY MS. WANG)  You did not want him to
14 send out another email like The Children of Ludlow
15 email; is that fair to say?
16   A.  I wanted to talk with him about ways that
17 he could express whatever he wanted to express, but not
18 to 25,000 people.  Would there be a way that he would
19 feel like I can still say what I want to say about the
20 chancellor, about the situation.  We have open forums
21 which he could have used for that.  I just wanted to
22 talk with the individual.
23   And it would seem to me that a professor,
24 if the president said, "Can we talk about this," the
25 professor would be willing to come and talk with me.

89

1    Furthermore, if I might add --
2         **Q.   Was it your concern --**
3         A.   -- if I might add, and I think you well
4    know, we were in the process, and had been over the
5    last two years, to develop a new email policy that
6    disallowed mass distributions, because they interfere
7    with work, they clog down the system.  And that policy
8    was being developed.
9         **Q.   For approximately a year, Professor**
10   **McGettigan did not have access to group distribution**
11   **lists, and this was prior to the development and**
12   **implementation of a new policy; is that correct?**
13        A.   Correct.  We were in the process of that.
14        **Q.   So other people on campus had the ability**
15   **to send out group emails, but Professor McGettigan did**
16   **not?**
17        A.   That is correct.
18        **Q.   You were -- you earlier stated that your**
19   **concern was -- or not "that your concern," but that you**
20   **wanted to speak with him about whether there would be a**
21   **way for him to communicate what he wanted to**
22   **communicate but not to 25,000 people; is that fair?**
23        A.   Yes.
24        **Q.   Was your only concern about how many**
25   **people he was communicating with?**

90

1         A.   I think for the situation of the campus,
2    yes.  As -- I mean, faculty have forums where they can
3    say anything that they like and exchange ideas and
4    thoughts.  And I know that they were working on one for
5    the campus.  And we have the IDrive, so I was hopeful
6    that Tim and I could talk about that and see if he
7    would be happy with that mechanism for making the
8    claims that he was making.  I didn't object -- I mean,
9    to me, the language was inappropriate, but it was
10   worrisome to me in terms of to whom it went.
11        **Q.   So if Tim had come to the meeting with**
12   **you and said, I would use the same exact language but**
13   **send it to fewer people, you would have turned on his**
14   **group email distribution list access?**
15        A.   You know, I'd have to actually have been
16   in the meeting, had the conversation, to tell you what
17   I would have done, but that would have been a very good
18   possibility.
19        **Q.   Did you want him to agree to tone down**
20   **the language of his emails before you would turn on his**
21   **access to distribution lists?**
22        A.   No.  As long as they weren't sent out
23   mass distribution during a time of crisis.
24        **Q.   Well, the -- was there a time of crisis**
25   **for the yearlong period that his access to**

91

1    distribution --
2         A.   There could have been.
3         **Q.   -- was off?**
4         A.   There could have been.
5         **Q.   You'd earlier said that the immediate**
6    **crisis involving the budget meeting had passed,**
7    **correct?**
8         A.   That is correct.
9         **Q.   So do you believe that you were justified**
10   **in turning off -- sorry.  Strike that.**
11        **Do you believe that you were justified in**
12   **not allowing Professor McGettigan to send emails to**
13   **group distribution lists for a yearlong period because**
14   **there might have been some crisis that you -- that**
15   **might have come up?**
16        A.   Yes.  And because he had not yet come to
17   talk with me so we could see and understand what had
18   happened, and why I did what I did, and determine if
19   there was another forum in which he felt he was able to
20   express himself outside of the other avenues he had for
21   saying what he wanted to say.
22        **Q.   And if he had come to a meeting and said,**
23   **I don't agree to simply express myself in any of these**
24   **other forums, but I want to resume sending out emails**
25   **on whatever universitywide issues that I think are**

92

1    **appropriate, would you have turned on his email access?**
2         A.   I don't know.  I would have had to have
3    the conversation.
4         **Q.   After the grievance hearing Professor**
5    **McGettigan sent you an email stating that he was**
6    **willing to meet with you on a time and date that was**
7    **convenient for both of you to discuss the restoration**
8    **of his group email access, correct?**
9         A.   I believe that was November 17, 2014; is
10   that correct?
11        **Q.   Yes.**
12        A.   Yes.
13        **Q.   Did you respond to that email?**
14        A.   No.  I responded to my legal counsel,
15   which I believe you have there.
16        MS. SCOVILLE:  So I'm going to interject.
17   We produced this pursuant to RFP1 and as our objection
18   to RFP1 stated, we did not include in our responses
19   privileged communications relating to this litigation.
20        MS. WANG:  Right.
21        MS. SCOVILLE:  So --
22        MS. WANG:  Okay.
23        MS. SCOVILLE:  -- you -- we have produced
24   the underlying email from Professor McGettigan to
25   President Di Mare, but not the subsequent emails

23 (Pages 89 to 92)

93

1  relating to litigation.
2      Q.  (BY MS. WANG)  How long after November 17
3  of 2014 did Professor McGettigan's access to group
4  distribution lists remain off?
5      A.  I don't -- I don't recall.  I'm trying to
6  remember when the new policy went in, because it had to
7  have gone in -- 2015, I believe.  But . . .
8      Q.  So you never at any point turned on
9  Professor McGettigan's access to group distribution
10  lists, right?
11     A.  No.
12     Q.  At some point -- it remained off, and
13  then at some point the new policy was implemented; is
14  that fair?
15     A.  Correct.
16     Q.  You never met with Professor McGettigan
17  after he sent you an email saying that he would like to
18  meet with you about his group access, correct?
19     A.  That's correct, because we were in --
20     THE DEPONENT:  Oh, I'm not supposed to.
21     MS. SCOVILLE:  No, that's fine.  You can
22  testify, but not to the content of your communications
23  with counsel in this litigation.  So you can certainly
24  testify that you had communications, if you did, but we
25  won't let you get into the substance of these?

94

1      A.  So . . .
2      Q.  (BY MS. WANG)  You answered the question.
3      MS. SCOVILLE:  Can you restate the
4  question?
5      Q.  (BY MS. WANG)  I think I only asked, You
6  never did meet with him, meet with Professor
7  McGettigan, to discuss his group email access after he
8  sent you this November 17, 2014, email; is that
9  correct?
10     A.  No.  That's correct.
11     MS. WANG:  All right.  Let's take a quick
12  break.
13     (Recess taken, 11:58 a.m. to 12:49 p.m.)
14     (Deposition Exhibit 66 was marked.)
15     Q.  (BY MS. WANG)  You have before you what's
16  been marked as Deposition Exhibit 66.  Could you take a
17  look at that and let me know if you've seen that
18  before.
19     A.  Sure.  Yes, I have seen it.
20     Q.  Is that the email that Timothy McGettigan
21  sent you asking to meet with you to discuss the
22  restoration of his group email access?
23     A.  That's correct.
24     Q.  Did you have any conversations with
25  Sheriff Kirk Taylor prior to January 17, 2014,

95

1  regarding any concerns that you or he had about the
2  budget meeting?
3      A.  Honestly, I can't recall.
4      Q.  Did you have any discussions with
5  Samantha Hernandez, from the Pueblo County Sheriff's
6  Office, regarding any concerns she had about Timothy
7  McGettigan's emails?
8      A.  I don't believe so.
9      Q.  Did you ever have a conversation with
10  Vanessa Emerson where she asked you -- or where --
11  strike that.
12         Did you ever have a conversation with
13  Vanessa Emerson where she suggested that you meet with
14  Timothy McGettigan?
15     A.  Not that I recall.
16     Q.  Did you ever say anything to Vanessa
17  Emerson to the effect that you felt fearful of
18  Professor McGettigan?
19     A.  No, not that I recall.
20     Q.  Did you ever feel fearful of Professor
21  McGettigan?
22     A.  No.
23     Q.  Prior to deciding to shut down Timothy
24  McGettigan's email access on January 17, 2014, did you
25  have any information from any source indicating that

96

1  there was an imminent threat of violence on campus?
2      A.  No.
3      Q.  Did you believe that Professor
4  McGettigan's Children of Ludlow email caused any
5  imminent threat of violence?
6      A.  Did I believe that the email caused an
7  imminent threat?  I wouldn't say "imminent threat."  I
8  would say the possibility of a volatile situation on
9  campus.
10     Q.  So you believe that The Children of
11  Ludlow email caused the possibility of a volatile
12  situation on campus?
13     A.  Could possibly cause.
14     Q.  Could possibly cause --
15     A.  Yes.
16     Q.  -- a volatile situation on campus?
17     A.  Uh-huh, yes.
18     Q.  And what do you mean by "volatile"?
19     A.  One where there could be an eruption of
20  violence.
21     Q.  Of actual physical violence?
22     A.  Uh-huh, yes.
23     Q.  You did not believe that this threat of
24  violence was imminent; is that correct?
25     A.  I wouldn't say I thought it was imminent,

97

no.  That's what made the decision so difficult.

Q.  You would agree that as a public university and as the president of a public university, the First Amendment does apply to your actions with respect to speech of faculty?

MS. SCOVILLE:  Object to the form.

A.  I'm not sure I understand your question.

Q.  (BY MS. WANG)  Do you believe that your actions are -- towards what faculty can and cannot say on campus -- strike that.

Do you -- would you agree that your ability to put restrictions on the speech of faculty on campus is restricted by the First Amendment?

MS. SCOVILLE:  Object to the form.

A.  With limits.

Q.  (BY MS. WANG)  Do you believe the First Amendment applies to you with respect to your duties and responsibilities as a university president --

A.  Yes.

Q.  -- at a public university?

MS. SCOVILLE:  Objection.

A.  Yes.

Q.  (BY MS. WANG)  So what do you mean by "with limits"?

A.  I mean, there are certain things, based

98

on the First Amendment, that people may not say, and I might have to -- I might be responsible for that.

Q.  Did you believe -- do you believe that Timothy McGettigan's Children of Ludlow email is unprotected by the First Amendment?

MS. SCOVILLE:  Object to the form.

A.  I don't know that I can answer that question.

Q.  (BY MS. WANG)  Well, do you have a belief --

A.  Are you asking me if it's unconstitutional?

Q.  Do you believe that his Children of Ludlow email was protected by the First Amendment?

MS. SCOVILLE:  Same objection.

A.  He had a right to say what he said.

Q.  (BY MS. WANG)  Under the First Amendment?

A.  Uh-huh, yes.

Q.  In The Children of Ludlow email?

A.  Yes.

Q.  How about his prior emails, the ones he sent about the budget cuts prior -- in December 2013 and January 2014, prior to the 17th?  Did he -- were those emails also protected by the First Amendment?

MS. SCOVILLE:  Objection, lack of

99

foundation, calls for legal conclusion.

THE DEPONENT:  Do I answer?

MS. SCOVILLE:  Yeah, go ahead.

A.  I believe so.

Q.  (BY MS. WANG)  Do you believe that he had a right to send those emails under the First Amendment?

A.  Yes.

Q.  Did you see a -- well, let me show you.  So they're all in order, I think, in this binder.  So I will just refer you to Deposition Exhibits 28, 29, 30, 31, 32, and 33.  Take a look at those and let me know if you've seen all of them at some point prior to January 17 of 2014.

A.  Okay.  Do you want that back?

Q.  Sure.

A.  Thank you.  Up through 32?

Q.  Through -- 29 through 33.

A.  Okay.

(Pause in the proceedings.)

A.  I have seen Exhibit 29, or is that 28?  28.

Q.  Whatever the sticker says.

A.  28.

(Pause in the proceedings.)

A.  I have seen Exhibit 29.

100

(Pause in the proceedings.)

A.  I have seen Exhibit 30.

(Pause in the proceedings.)

A.  I have seen Exhibit 31.

(Pause in the proceedings.)

A.  And I have Exhibit 32.

(Pause in the proceedings.)

A.  And I have seen Exhibit 33.

Q.  Did you receive all those emails, or see those emails, that are Deposition Exhibits 28 through 33, prior to January 17, 2014?

A.  I believe so.

Q.  Did you believe that any of the emails in -- that are Deposition Exhibits 28 through 33 -- did you believe that any of them were in violation of the electronic communications policy of the university?

A.  I think that they were causing some disruption, not to the point that I thought it violated completely the policy.  I had some complaints, I can't recall from whom.  One professor, in my mind, stands out.  She said, Why don't you just put a stop to this.  But at this point, I didn't feel there was a security issue at hand.  I felt that the latter part of the policy was close to being violated.  But . . .

Q.  What do you mean "the latter part of the

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

101

1    policy"?
2         A.  There were two clauses.
3         Q.  Right.
4         A.  I meant the piece that said interfering
5    with the work at the university.
6         Q.  So did -- which one of the emails that
7    are Exhibits 28 through 33 did you think violated that
8    portion of the policy?
9         A.  Well, I just think all of these did,
10   particularly the analysis of the finances because they
11   were inaccurate.  So people were then worried that, was
12   it inaccurate, was it accurate?  And we were -- as a
13   group, we were trying to work productively with the
14   faculty, staff, and students.
15        Q.  All right.  So are you talking
16   specifically about Deposition Exhibit 33?
17        A.  Yes.  And then I can look at the others.
18   And I thought Exhibit 30 also was interfering in some
19   ways with some of the projects that we were trying --
20   we were trying to accomplish.
21        Q.  All right.  Let's talk about Deposition
22   Exhibit 33.  In what way -- strike that.
23            Do you believe that the email that
24   Timothy McGettigan sent out in Deposition Exhibit 33
25   was a violation of the electronic communications

102

1    policy?
2         A.  Yes.  In the sense that it basically,
3    again, was giving numbers that were not accurate, and
4    it was causing difficulty getting our goals
5    accomplished, and people were not attending to their
6    work as they might have been, without having to address
7    inaccuracies.
8         Q.  Okay.  Do you believe that because --
9    strike that.
10            You believe that the information
11   Professor McGettigan put in his email in Deposition
12   Exhibit 33 was inaccurate and that, therefore, it
13   violated the electronic communications policy because
14   it was inaccurate?
15            MS. SCOVILLE:  Object to the form.
16        A.  Because the inaccuracies caused people to
17   not pay as much attention at work and ask for analyses
18   of this that weren't accurate.
19        Q.  (BY MS. WANG)  Could you have shut down
20   Professor McGettigan's email access based on his email
21   in Deposition Exhibit 33 being in violation of the
22   electronic communications policy, as you interpreted
23   it?
24        A.  I could have.
25        Q.  Do you think that would have been also

103

1    consistent with the First Amendment, if you had done
2    that?
3            MS. SCOVILLE:  Object to the form.
4         A.  I don't understand your question.
5         Q.  (BY MS. WANG)  If you had decided to shut
6    down Professor McGettigan's email access because he
7    sent out information in an email that you thought was
8    inaccurate --
9         A.  Uh-huh.  No, that --
10        Q.  -- do you think that would have been
11   consistent with the First Amendment?
12        A.  I wouldn't be shutting --
13            MS. SCOVILLE:  Same objection.  Sorry.
14        A.  I wouldn't have shut it down because it
15   was inaccurate.  It was because of the consequences.
16   But the consequences, I felt, were not severe enough at
17   this point to shut down the email.  My concern was
18   safety.
19        Q.  (BY MS. WANG)  Turning to Deposition
20   Exhibit 28, what about that email do you feel violated
21   the electronic communications policy?
22            MS. SCOVILLE:  Same objection.
23        A.  And same answer.  It, again, had
24   inaccuracies about the situation, which created issues
25   on campus.

104

1         Q.  (BY MS. WANG)  Would it be fair to say
2    that Professor McGettigan did not believe that his
3    information that he put about the budget cuts in
4    Deposition Exhibit 28 or 33 was inaccurate?  He did not
5    believe it was inaccurate; is that fair to say?
6         A.  I wouldn't know what he believed.
7         Q.  Do you think that he intended to disrupt
8    the ability of others to conduct university business by
9    sending out Deposition Exhibits 28 and 33?
10        A.  He could have.
11        Q.  If you had decided to shut down Professor
12   McGettigan's email access on the basis of the email he
13   sent out in Deposition Exhibit 28, do you think that
14   that would have been consistent with the First
15   Amendment?
16            MS. SCOVILLE:  Objection, lack of
17   foundation, calls for a legal conclusion.  You can go
18   ahead and answer if you can.
19        A.  Again, I'm not sure what your question
20   is, but what I can tell you is there is some judgment
21   in reading any policy and making any decision.  In my
22   opinion, this email, Exhibit 28, did not create a
23   security threat on the campus.  Therefore, I did not
24   shut it down.
25        Q.  (BY MS. WANG)  My question originally was

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

---

105

1  whether or not you believe Deposition Exhibit 28
2  violated the electronic communications policy. And
3  your answer, as I understood it, was that you believed
4  it contained inaccurate information, and thus required
5  people to --
6      A. People were asking questions.
7      Q. Okay. So an email that a faculty member
8  sends out which causes people to ask questions
9  distracts them from their work; is that your position?
10     A. About losing their jobs, yes.
11     Q. So Professor McGettigan's Grinchy
12 Christmas email -- that's the subject line of
13 Deposition Exhibit 28, right?
14     A. Uh-huh.
15     Q. -- this email caused people to ask
16 questions; is that fair to say?
17     A. Yes.
18     Q. It caused people to ask questions about
19 whether or not they might be terminated?
20     A. Uh-huh.
21     Q. Is that fair?
22     A. (Deponent nodded head up and down.)
23     Q. It caused people to ask questions about
24 the legitimacy of budget cuts being proposed?
25     A. That is correct.

---

106

1      Q. And is it your position that because
2  Professor McGettigan's Grinchy Christmas email caused
3  people to ask those questions, that that was a
4  violation of the electronic communications policy?
5      A. As I said, there's some judgment in
6  assessing any policy. And I felt that this did not
7  create a security threat. Did it interfere with the
8  work flow because it had inaccuracies in it? Yes.
9      Q. So it interfered with people's work flow
10 because it caused them to ask questions; is that fair
11 to say? Is that what you are saying?
12     MS. SCOVILLE: Object to the form.
13     A. It caused them to ask questions about
14 what we all had presented, and that wasn't just
15 administration. And so, yes, it interfered with their
16 work process.
17     Q. (BY MS. WANG) Because you had certain
18 goals that you were trying to accomplish as a
19 university president in terms of getting the budget
20 cuts in place; is that fair to say?
21     A. I, the head of AAUP, the two presidents
22 of the faculty senate, and the head of UBB, and the
23 cabinet had goals regarding the budget, yes.
24     Q. And Professor McGettigan was raising
25 questions about the legitimacy of those goals, right?

---

107

1      A. Yes.
2      Q. And because he was causing people to ask
3  questions about whether your goals were legitimate,
4  that, in your opinion, was a violation of the
5  electronic communications policy?
6      MS. SCOVILLE: Object to the form.
7      A. Anything that -- according to the
8  policy -- that interferes with the work process could
9  be considered a violation of the policy.
10     Q. (BY MS. WANG) Would you say -- is it
11 your opinion that anything that interferes with the
12 goals of the administration at CSU-P would be a
13 violation of the university -- of the electronic
14 communications policy?
15     A. No. And that is not what I said. It was
16 not the administration who is working toward positive
17 goals to cut the fewest number of people and hurt the
18 fewest number of people. It was a much larger group,
19 including faculty, staff, and students. So
20 characterizing it as just the administration is simply
21 inaccurate.
22     Q. It was one of your goals, correct?
23     A. What was one of my goals?
24     Q. To have certain terminations of staff in
25 order to deal with the budget deficit.

---

108

1      A. My goal was to address the deficit,
2  hopefully, without eliminating anyone's positions, if
3  possible.
4      Q. Okay. But the proposal that was on the
5  table in December of 2013 and January of 2014 was to
6  cut people's jobs, right?
7      A. I'm not sure what proposal you are
8  referring to in 2013, December 2013.
9      Q. There was never a proposal in place to
10 eliminate 50 positions?
11     A. There was an announcement from the
12 chancellor, but there was no written proposal that I
13 recall.
14     Q. I didn't ask you if there was a written
15 proposal. The chancellor announced that he was going
16 to eliminate 50 positions; is that fair to say?
17     A. That's correct.
18     Q. Ultimately, you only eliminated 22; is
19 that right?
20     A. Yes.
21     Q. Okay.
22     A. 12 of which were vacant.
23     Q. It was one of your goals to implement the
24 cuts that you believed necessary, including by
25 eliminating staff positions, correct?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

109

1    A.  No.  It was my goal to address the
2  deficit whichever way possible.  Did we have to
3  eliminate some positions?  Yes.
4    Q.  Okay.  Timothy McGettigan disagreed with
5  you about the necessity of that goal, correct, because
6  he didn't believe that there was a budget deficit that
7  needed to be addressed in this manner?
8    A.  I think he -- he did not -- well, I think
9  at this point in time he said he did not believe there
10  was a need -- or that there was a deficit.
11    Q.  Is it your belief that by sending out an
12  email or a series of emails that were critical of the
13  position that you and the chancellor had adopted
14  regarding the budget cuts that he was raising questions
15  in a way that violated the electronic communications
16  policy?
17    A.  Say your question again, please.
18    Q.  What way -- in what way do you think
19  Timothy McGettigan's emails prior to the 17th of
20  January was disrupting people's work, other than they
21  were asking questions about what he was saying in those
22  emails?
23    A.  Asking questions is fine, but we had to
24  provide different sets of analyses, which is fine, too,
25  but it disrupts work, whether we like it or not.  I'm

110

1  not saying that you shouldn't ask questions.  You asked
2  me if it disrupted work.  Yes.
3    Q.  And is that a violation of the electronic
4  communications policy, in your opinion?
5    A.  Yes.
6    Q.  Do you think that it is consistent or
7  inconsistent with the First Amendment to -- strike
8  that.
9        Do you believe that -- strike that.
10        Was there anything in any of the emails
11  that Professor McGettigan sent out about the budget
12  cuts prior to January 17 of 2014 that encouraged others
13  to be disruptive or to use violence?
14    A.  Not that I know of.
15    Q.  Were there any other emails that
16  Professor McGettigan sent out before January 17, 2014,
17  that, in your opinion, interfered with the ability of
18  others to conduct university business?
19    A.  Do you mean other than these
20  (indicating)?
21    Q.  Other than 28 and 33.
22    A.  Not that I know of.
23    Q.  Was there any problem that you saw with
24  any of the other emails?
25        MS. SCOVILLE:  Are we referring to 29,

111

1  30, and 31 or --
2        MS. WANG:  Yeah.
3    A.  And what do you mean by "problem"?
4    Q.  (BY MS. WANG)  Anything that violated the
5  electronic communications policy.
6    A.  No, huh-uh.
7    Q.  Is it your position that you did not have
8  to restore the access of Professor McGettigan to group
9  distribution lists because he had other potential
10  forums in which to speak?
11    A.  No.  Although he did, but no.
12    Q.  Were you at the meeting that you
13  previously referred to on January 6 of 2014?
14    A.  Yes.
15    Q.  And what was that meeting about?
16    A.  I guess I would characterize that meeting
17  as a forum -- first of all, it was requested by the two
18  senate presidents, the co-presidents.  And they just
19  wanted to ask questions about the proposal that had
20  been announced.  And they asked that the chancellor
21  come down to answer questions.  So . . .
22    Q.  And so did the chancellor come to campus
23  on January 6 of 2014?
24    A.  Yes.
25    Q.  And what did he discuss at that meeting?

112

1    A.  Oh, it was -- he gave an overview of why
2  he believed there was a deficit, but it quickly turned
3  into question and answer, largely between the faculty,
4  staff, and students who were in attendance and the
5  chancellor.
6    Q.  Did you attend the meeting yourself?
7    A.  Yes.
8    Q.  Did you see Tim McGettigan at the
9  meeting?
10    A.  Oh, yes.
11    Q.  And what did he do at the meeting that
12  you observed?
13    A.  He came up the first time to ask a
14  question -- perhaps "question" isn't the right word,
15  but mainly make a statement.  And then, I think -- we
16  had two people perhaps before him.  I can't remember
17  exactly how many.  But then he came up, and he just
18  kept talking and he talked about the prior
19  administrations and how they were fiscally
20  irresponsible.  He identified the then president Joe
21  Garcia.  He talked about Mike Martin.  And he talked
22  about the fact that there really wasn't a deficit.  And
23  he talked for quite some time.  That's what I recall.
24    Q  Well, did he make any threats?
25    A.  I don't recall him making any threats.

28 (Pages 109 to 112)

**LESLEY Di MARE - 10/12/2016**
**Timothy McGettigan v. Lesley Di Mare**

---

113

1   Q.   Was he acting in a threatening manner?
2   A.   According to people who came to my office
3   afterwards, yes.
4   Q.   You were there, right?
5   A.   Right.  I can't tell you --
6   Q.   Did you believe he was acting in a
7   threatening manner at the time?
8   A.   I believed he wouldn't move aside from
9   the microphone, and others were afraid to come up to
10  the mic and speak.
11  Q.   Okay.  And is there any other way in
12  which you believe he was acting in a threatening
13  manner?
14  A.   No.
15  Q.   So hogging the microphone.  He was
16  hogging the microphone?
17  A.   Yeah, you could call it that.
18  Q.   Okay.  And you thought that was
19  threatening.
20  MS. SCOVILLE:  Object to the form.
21  A.   I think that if you wanted to get up
22  there, which one person did, and they couldn't, because
23  Tim did this (indicating), and turned around and went
24  back, that could be perceived as threatening.
25  Q.   (BY MS. WANG) Do you think he was

---

114

1   threatening violence on anybody?
2   A.   All I know is, is what you perceive when
3   someone behaves a certain way towards you.  And I can
4   tell you what the administrative professionals told me
5   after that meeting if you would like me to.
6   MS. WANG:  Could you ask my original
7   question.
8   (The last question was read back as
9   follows:  "Do you think he was threatening violence on
10  anybody?")
11  Q.   (BY MS. WANG) Could you answer that
12  question?
13  A.   I don't know whether he was or not.
14  Q.   Did you perceive him to be?
15  A.   I think he was behaving in a way that
16  could be perceived as violent.
17  Q.   Did you perceive him to be threatening
18  violence on anybody?
19  A.   I -- I just can't answer that question.
20  I can just tell you that when he wouldn't step aside
21  from the mic and he held his body in a certain posture,
22  it looked like he was preventing people from coming to
23  the mic.
24  Q.   And that was violent?
25  A.   It was physical.

---

115

1   Q.   What did the administrative professionals
2   tell you after the meeting?
3   A.   The head of the administrative
4   professionals had had a meeting with the professionals.
5   She came to my office.  And she said, "People were
6   afraid to go to the mic."  She said, "We feel that Tim
7   McGettigan always has his say in these meetings, and
8   people are afraid to move forward and go up to the mic,
9   and we are tired of it."
10  So I addressed that by developing
11  constituent meeting groups, so that the staff,
12  classified and administrative professionals, both of
13  whom -- their leaders told me that they were afraid of
14  Tim and didn't have the ability to express themselves
15  in the way that they wanted.  So now we have
16  constituent groups, so that you can come to your own
17  group and have your say.  And that's how we addressed
18  that matter.
19  Q.   Did you think the shutting down of Tim's
20  email on January 17 of 2014 addressed that particular
21  concern in any way?
22  A.   No.
23  Q.   What else did you observe of Timothy
24  McGettigan's demeanor or behavior at the January 6
25  meeting?

---

116

1   A.   That was what I told you.
2   Q.   Was there anything else?
3   A.   Not that I can recall at the moment.
4   Q.   Turning to Deposition Exhibit 34, is that
5   The Children of Ludlow email we've been discussing?
6   A.   Yes.
7   Q.   Okay.  That email was not withdrawn
8   somehow from people's inboxes after it was issued,
9   right?
10  A.   I don't -- I don't think so.
11  Q.   Okay.  Could you explain how it is that
12  cutting off Professor McGettigan's email and computer
13  access prevented the possibility of violence at the
14  January 17 meeting?
15  A.   We were afraid -- the sheriff's office,
16  myself, legal counsel, cabinet -- that if another email
17  of this nature went out, there could be problems on
18  campus that could turn into violence.
19  Q.   What in that email that's Deposition
20  Exhibit 34 was encouraging of violence or created the
21  possibility of violence?
22  A.   "The hit men massacred those people.
23  "Coldly and methodically."  They're themes.  I am a
24  rhetorician.  Themes go through and can lead you to
25  certain types of behaviors.  For example, "When the hit

---

29 (Pages 113 to 116)

---

117

1  man returns today," if someone were reading this and
2  had not been in the context of the university and what
3  was going on, they might think it's appropriate for us
4  to go up to that campus and see what's going on.
5      Q.  So you think that somebody who hadn't
6  been a part of any of the budget discussions or, you
7  know, wasn't aware of what was going on on campus might
8  read this email and see the reference to Chancellor
9  Martin as a hit man and think, He actually is a hit
10 man, maybe we should go up there and prevent him from
11 killing people?
12     A.  That is correct.
13     Q.  Okay.  That was your belief on January
14 17, 2014?
15     A.  That was my belief informed by sheriffs,
16 informed by legal counsel, discussing with my cabinet,
17 that there was a possibility that someone could misread
18 this -- including someone on campus.  I'm not just
19 saying it could have been someone off campus.  But
20 language incites, it heightens feelings, and it can
21 create situations.
22         So, again, I go back to my comment.  I
23 had to weigh two things, the possibility that if I
24 didn't turn the email off and another one went out,
25 someone could get hurt, versus turning off a

---

118

1  professor's email, which I didn't want to do.  But I
2  would rather be sitting here in this deposition right
3  now than having the other alternative that could have
4  happened.
5      Q.  The -- what other language in this email,
6  to you, encourages or incites violence?
7      A.  "A squad of murderous hit men," and I'm
8  not saying that that wasn't the case.  "Coldly and
9  methodically, the hit men turned their guns on women
10 and children."  "The hit men riddled the little tent
11 village in Ludlow with bullets."  It goes on to say --
12 "I can't understand that.  I simply can't imagine how
13 anyone could look upon the children of Ludlow and see
14 anything [sic] the incalculable virtues of an
15 indomitable people.  Over the years, hit men have
16 repeatedly attacked, beaten, and burned the children of
17 Ludlow, but those hit men have never broken the spirit
18 of that proud and courageous people.  When the hit man
19 returns today."  And it goes on.
20         "We can't change the past, but if we
21 choose to, we can help the children of Ludlow in their
22 struggle to work toward a better, brighter future."
23     Q.  So you think that would -- why did you
24 put emphasis on that last line?
25     A.  If you choose to make a difference.

---

119

1      Q.  And then it says, "If you have the time
2  and courage, please lend a hand this afternoon.  Today.
3  Reclaim USC rally, free at last.  Friday, January 17 at
4  2 p.m., Fountain Plaza."
5      A.  Right.  I didn't read that.
6      Q.  Well, he was encouraging people to go to
7  this rally, right?
8      A.  (No verbal response.)
9      Q.  You have no idea?
10     A.  No.  It could be any number of things
11 he's encouraging them to do.
12     Q.  Well, it says, "Please lend a hand this
13 afternoon.  Today.  Reclaim USC rally."  Follows
14 immediately after he asks people to please lend a hand,
15 right?
16     A.  Okay.  That's an obvious option too.
17     Q.  All right.  What do you think the other
18 option was that he was encouraging?
19     A.  I'm not saying what he's encouraging.
20 I'm saying what someone reading this could perceive.
21     Q.  Somebody who takes the email literally
22 and believes that Chancellor Martin is, in fact, a hit
23 man?
24     A.  There are people who take metaphoric
25 emails literally.

---

120

1      Q.  And you had no information that anybody
2  had actually interpreted this email that way, right,
3  before --
4      A.  Of course not.
5      Q.  -- 11:35 on January 17?
6      A.  No.
7      Q.  Okay.  So this was a possibility out
8  there in your mind?
9      A.  Not just in my mind.  In many people's
10 minds, who have had experience with these kinds of
11 situations.
12     Q.  What -- how likely did you believe it was
13 that Professor McGettigan would send a follow-up email
14 to this email given that the budget meeting was to take
15 place at 3 p.m. on that day?
16     A.  I thought it was a pretty good
17 likelihood.
18     Q.  Did you think to go talk to him after you
19 saw this email?
20     A.  I didn't know where Tim was.  It was --
21     Q.  Did you have his phone number?
22     A.  No, I didn't.  I don't have his cell
23 phone.
24     Q.  You had his email address, right?
25     A.  I could have sent him an email, but I

---

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

125

1    A.  I believe it was prior so.  And there had
2  been some the day before as well.
3    Q.  I'm talking about that day.  So
4  between -- what time did that demonstration at the
5  fountain take place?
6    A.  I can't recall.  It was in the morning
7  sometime.
8    Q.  And you are sure that's not the one that
9  was in the afternoon at 2:00?
10   A.  There was one at 2:00 in the afternoon as
11 well.  But there were different groups.
12   Q.  Okay.  The one that took place in the
13 morning, was that before or after Tim sent out his
14 Children of Ludlow email?
15   A.  I can't recall.
16   Q.  How many people were at that
17 demonstration?
18   A.  Maybe 30, 40.
19   Q.  Was it peaceful?
20   A.  Yeah, it seemed to be peaceful.
21   Q.  Okay.  Did you learn of any disruption
22 that took place as a result of that demonstration?
23   A.  I don't know what kind of disruption you
24 are speaking of, but . . .
25   Q.  Well, anything that concerned you in

126

1  terms of security.
2    A.  No.  Anytime there are groups on campus,
3  when we are talking about budget cuts, it concerns me.
4  But I watched, and I felt that it could remain
5  peaceful.
6    Q.  How long did that demonstration last?
7    A.  I don't know.  I was probably going in
8  and out of my office.  Maybe an hour.  I really don't
9  know.
10   Q.  What other demonstrations did you see on
11 campus between 10:45 and 11:35?
12   A.  The one -- just the one I talked to you
13 about.
14   Q.  The demonstration that took place at the
15 rally at 2 p.m., did you observe that?
16   A.  Oh, I can't remember if I was in my
17 office or not.  But I believe that demonstration then
18 fed into the one that went into the OUC.
19   Q.  Was that demonstration peaceful?
20   A.  It was getting loud.  There was chanting.
21 There was a megaphone.  And then the sheriffs asked
22 me -- they felt that it would be better, safer, if I
23 and Chancellor Martin went around the back way instead
24 of going in through the front doors of the OUC, because
25 what of what the student had said.  And I chose not to

127

1  do that, because if there is going to be violence, I'm
2  not going to go around the back door.  And I want to be
3  with the students and the faculty and the staff.
4    So we went into the front door.  No one
5  tried to stop us.  But we did have sheriffs on either
6  side of us, deputies.  And I went up to the stage.  And
7  at one point, someone threw a bag of onions on the
8  stage, which was -- might not be unnerving to you,
9  sitting right there, but up on the stage, with a lot of
10 chanting in the background, and someone walking forward
11 and throwing something on the stage, it's a little
12 unnerving.  And afterwards people told me they were
13 afraid that things could get violent.
14   Q.  Did you have any indication that the
15 student who threw onions -- put onions onto the stage
16 was doing so because he or she was encouraged by
17 Timothy McGettigan to do so?
18   A.  No.  I -- I don't have any knowledge of
19 that.
20   Q.  Okay.  Were you aware of what the reason
21 was that that person brought onions?
22   A.  No.
23   Q.  Were you aware of whether that had some
24 symbolic significance?
25   A.  Oh, of course, it has symbolic

128

1  significance.  My point is, it was on the side -- this
2  person was on the side.  It was fairly dark in there,
3  because the ballroom's dark, unfortunately.  And I just
4  could see someone approaching me.  And it unnerved me.
5  I understand that onions are symbolic.
6    Q.  What did you think it was symbolic of?
7    A.  A disregard, a distaste.  It's -- that
8  doesn't matter to me.  It was the movement coming on
9  the side.  I didn't know what would happen.
10   Q.  Did you see Timothy McGettigan on January
11 17 of 2014?
12   A.  I saw -- it may sound a bit odd, but I
13 was up on a platform, and I saw his head in the back of
14 the room with a group of students.  That's as much of
15 him as I saw, I believe, on that day.
16   Q.  Did you see him do anything to encourage
17 anybody to be violent?
18   A.  No, not with just seeing the top of his
19 head.  I couldn't really tell you.
20   Q.  Did you receive information from any
21 source indicating that Tim McGettigan -- that Tim
22 McGettigan's emails or words had encouraged other
23 people to be violent?
24   A.  No.
25   Q.  Did you receive any information from any

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

---

**133**

1  it -- and gave it to Professor McGettigan, correct?
2      A.  A draft copy?
3      Q.  Yeah.
4      A.  I think so.
5      Q.  Do you recall if Johnna Doyle sent you --
6  or showed you a draft of this letter before she gave it
7  to Tim?
8      A.  I think I received one -- I think I did
9  receive a draft letter to this effect.
10         (Deposition Exhibit 67 was marked.)
11     Q.  All right.  Take a look at Deposition
12 Exhibit 67.  And let me know if you've seen that
13 before.
14     A.  67?  Is this what you just handed me?
15         MS. SCOVILLE:  It's this one
16 (indicating).
17         THE DEPONENT:  Okay.  Right.
18     A.  Okay.  Yeah.  This is familiar.
19     Q.  (BY MS. WANG)  Okay.  So that's an email
20 that Johnna Doyle sent you.  That was a draft of the
21 letter -- that included a draft of the letter to Tim,
22 right?
23     A.  Yeah.  Yes.
24     Q.  Did you have any comments on her draft?
25     A.  No.  To be honest with you, I don't think

---

**134**

1  I was looking at my email at that point in time, and I
2  don't think I made any comments.
3         MS. WANG:  I gave you the right thing,
4  didn't I?
5         (Discussion off the record.)
6         MS. WANG:  So what was marked as --
7  Bates-stamped DEF 513 through 516, is that what you
8  have in front of you?
9         MS. SCOVILLE:  Okay.  So --
10        MS. WANG:  513 through 516?
11        MS. SCOVILLE:  67, yes, is 513 through
12 516.  I think this one has been previously marked also,
13 but let's not confuse things further.
14        MS. WANG:  Okay.
15     Q.  (BY MS. WANG)  All right.  So in the
16 letter -- going back to Deposition Exhibit 47, in that
17 letter --
18        MS. SCOVILLE:  You mean 67.
19        MS. WANG:  No.  Now I'm talking about 47.
20        MS. SCOVILLE:  Oh, 47.  Sorry.
21        MS. WANG:  Sorry.
22     Q.  (BY MS. WANG)  In that letter that Johnna
23 Doyle did ultimately give to Professor McGettigan, she
24 only cites to the electronic communications policy; is
25 that right?

---

**135**

1      A.  Right, not the CRA.  Is that what you are
2  asking me?
3      Q.  Right.
4      A.  Correct.
5      Q.  Okay.  Do you know why she did that?
6      A.  Do I know why she did what?
7      Q.  Why she -- well, it was -- do you know
8  why she cited only to the electronic communications
9  policy?
10     A.  Instead of CRA?
11     Q.  Right.
12     A.  I don't know.  Probably because it says
13 pretty much the same thing in both the policies, as I
14 recall.  Could be wrong.
15     Q.  Turning to -- turning to Deposition
16 Exhibit 50, could you take a look at that and let me
17 know if you've seen it before.
18     A.  Yes.
19     Q.  And those are emails that you and
20 Ms. Doyle exchanged, right?
21     A.  Correct.
22     Q.  In your email to Johnna Doyle on January
23 18 of 2014 at 12 p.m. you stated, "I know you realize
24 this, but this is going to get nasty."
25     A.  Uh-huh.

---

**136**

1      Q.  And you forwarded her an email from Tim,
2  right?
3      A.  Correct.
4      Q.  Why did you say, "This is going to get
5  nasty"?
6      A.  Because anytime, even if it's for the
7  right reason, that you purportedly take someone's
8  freedom of speech away, it can get nasty.
9      Q.  The -- did Johnna -- yeah, go ahead.
10     A.  I'm sorry.  I think she got this, too,
11 and then I responded to it, right.
12     Q.  Okay.  Right.  You sent her a message
13 about it?
14     A.  Right.
15     Q.  Okay.  In Johnna's email she says, "I
16 will tell you, though, that I have received email
17 messages from people around campus that want him
18 stopped."  Did she ever tell you about the content of
19 any of those emails or messages prior to January --
20 prior to 11:35 on January 17?
21     A.  I'm sure she mentioned the -- the
22 sheriff's office and Sam Hernandez.  I think she
23 mentioned her concerns.  I think she had a few others,
24 but that's all I remember.
25     Q.  What specific messages did Johnna Doyle

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

---

137

1  tell you about?
2       A.  Basically just the same thing, that
3  people are tired of the emails, it just causes
4  additional stress, that folks were glad we got through
5  Friday, that sort of thing.
6       Q.  Do you believe that The Children of
7  Ludlow email was interfering with the core operations
8  of the university?
9       MS. SCOVILLE:  Object to the form,
10 foundation.
11      A.  With the core operations?  How do you
12 define "core"?
13      Q.  (BY MS. WANG)  Well, you've testified
14 that you believe that they interfered with some
15 people's ability to work, right?
16      A.  Uh-huh.
17      Q.  Do you believe that, in fact, Tim's
18 Children of Ludlow email was interfering with the core
19 operations of the university?
20      MS. SCOVILLE:  Same objection.
21      A.  Same question.  I'm sorry.  I don't
22 understand what you mean by "core operations."
23      Q.  (BY MS. WANG)  Well, how many people did
24 you receive information from indicating that their
25 ability to work was disrupted by his Children of Ludlow

---

138

1  email?
2       A.  Seven or eight, as I said.
3       Q.  And that is out of a university
4  population of approximately 4,500?
5       A.  Sure.  But not everybody is going to say
6  what they feel.  They just assume -- especially if they
7  think their jobs are on the line.
8       Q.  All right.  So there are people that you
9  are guessing had feelings that their ability to work
10 was interrupted, but you didn't receive any information
11 from any of those people, right?
12      A.  Right.  Maybe after the fact, but we are
13 talking about 10:45 to 11:30?
14      Q.  Right.
15      A.  Okay.
16      Q.  Okay.  So given that you had received --
17 the number of people you had received information from
18 about The Children of Ludlow email disrupting their
19 ability to work was a handful, right?
20      A.  Uh-huh.  Well, more than five.  And I do
21 believe I have seen those emails that have come in
22 after the fact.  So it would be more than a handful.
23      Q.  Okay.  How many?
24      A.  I can't remember offhand.
25      Q.  And how many were you aware of prior to

---

139

1  11:35 on January 17?
2       A.  That, I would say four or five.
3       Q.  Okay.
4       A.  But after the fact.
5       Q.  Did you -- all right.  Well, let's stick
6  to before 11:35 on January 17, 2014.  Do you believe
7  that the fact that four or five people indicated to you
8  that they had -- that The Children of Ludlow email
9  interfered with their ability to work, do you believe
10 that that was a disruption to the core operations of
11 the university?
12      MS. SCOVILLE:  Same objection.
13      A.  Again, I don't know what you mean by
14 "core operations."  It interfered with their work.
15 That wasn't my biggest concern of -- in regard to the
16 emails overall.  And -- and you are only asking me for
17 a 45-minute period of time.  So it's hard for me to --
18      Q.  (BY MS. WANG)  Well, you didn't find any
19 of Tim's other emails concerning enough to shut down
20 his email, right?
21      A.  Right.  Because --
22      Q.  And you didn't believe that any of his
23 other emails actually --
24      MS. SCOVILLE:  You know, Liz, you need to
25 let the witness finish her answer.

---

140

1       Q.  (BY MS. WANG)  You felt that The Children
2  of Ludlow email was different in kind from the other
3  emails; is that fair?
4       A.  Correct.
5       Q.  Okay.  And you didn't take any action in
6  response to any of the other emails, right?
7       A.  No.
8       MS. SCOVILLE:  Liz, before you move on,
9  would this be a good time for a break?
10      MS. WANG:  Sure.
11      (Recess taken, 1:53 p.m. to 2:05 p.m.)
12      Q.  (BY MS. WANG)  If you take a look at
13 Deposition Exhibit -- well, actually, strike that.
14      When did you decide to turn Tim's email
15 back on?
16      A.  Oh, you mean that Friday -- after that
17 Friday?
18      Q.  Yes.
19      A.  Well, that Friday, because I just wanted
20 it off till we got through the speech.  So I wanted it
21 back on as soon as possible.
22      Q.  Okay.  It was not turned back on till the
23 20th; is that right?
24      A.  Correct.
25      Q.  And why wasn't it done until the 20th?

157

1   I will do my best to keep the meeting collegial and
2   constructive."
3           Did you respond to his email at all?
4       A.  I don't recall if I did or not.
5       Q.  Did you go to that faculty meeting?
6       A.  I did.
7       Q.  Okay.  And did you speak with Tim there?
8       A.  I don't remember if I spoke with Tim.
9       Q.  Do you recall seeing him speak there?
10      A.  Honestly, I don't remember.
11      Q.  Did you take him at his word that he was
12  interested in finding a constructive way to move
13  forward?
14      A.  I did.
15      Q.  Okay.  Did you believe that Professor
16  McGettigan could express his disagreement with the cuts
17  that Chancellor Martin had proposed and also want to
18  work constructively with you to the extent that he
19  could?
20          MS. SCOVILLE:  Object to the form.
21      A.  Okay.  I'm sorry.  If you would repeat
22  that one more time.
23      Q.  (BY MS. WANG)  Did you think the
24  sentiment that Tim was expressing in this email that's
25  dated December 20 was consistent with speaking strongly

158

1   out -- speaking strongly in those other emails against
2   the budget cuts?
3           MS. SCOVILLE:  Object to the form.
4       A.  Had the other emails come out already?
5       Q.  (BY MS. WANG)  No.
6       A.  So just in regard to this email, I think
7   he was sincere.
8       Q.  Okay.  Do you think that he had changed
9   his mind once you saw the other emails from him, or do
10  you think that he thought that he could pursue both
11  goals?
12      A.  I honestly don't know how to answer that.
13      Q.  What role did you have in the formation
14  of the new electronic communications policy?
15      A.  In the new one?  Actually, there was a
16  group that created that policy, and it had to be run by
17  legal counsel and myself.  So -- and I forgot who was
18  on that group.  I think it was a group I may have
19  appointed, but it also -- the policy had to comport
20  with the systems policy.
21      Q.  With the CSUS, systems policy?
22      A.  Correct.
23      Q.  Why did that policy take two years to be
24  implemented?
25      A.  Sometimes in higher education, it --

159

1   things take longer than one might expect.  I can't give
2   you the exact reason why.  There was a group that
3   worked on it.
4       Q.  Did you speak with any member of the
5   board of governors about your -- about the grievance
6   that Professor McGettigan had lodged against you?
7       A.  Other than the email that I sent, no, not
8   that I recall.
9       Q.  Which email that you sent?
10      A.  The one that was directed to Bill Mosher,
11  Dorothy Herdeck, and Michael Nosler.  We just read it.
12      Q.  Okay.  And is that -- are there any other
13  emails?
14      A.  Not that I recall.
15      Q.  Did you have any conversation with any
16  member of the board of governors when -- after the
17  grievance committee came down with their decision?
18      A.  No, not that I recall.
19          MS. WANG:  Let's take a five-minute
20  break.
21          (Recess taken, 2:36 a.m. to 2:46 p.m.)
22      Q.  (BY MS. WANG)  Okay.  We talked a little
23  bit before about the disruption to some people's work
24  that you believe that Children of Ludlow email caused,
25  right?  And you said --

160

1       A.  Correct.
2       Q.  -- there were probably a handful of
3   people that you heard about who believed their work was
4   disrupted?
5       A.  Correct.
6       Q.  Okay.  In what specific ways was their
7   work disrupted?
8       A.  As I mentioned before, I believe,
9   basically it was hard for them to concentrate when
10  these emails came forward; they felt that they were
11  just being taken away from their work; and the emails
12  were making them worry more so about the situation.
13      Q.  Okay.  And these -- the people involved
14  are Tanya Baird and some of the other people we talked
15  about before, right?
16      A.  Correct.
17      Q.  Okay.  They're the people we've already
18  talked about?
19      A.  Correct.
20      Q.  Now, are you aware of any classes being
21  canceled as a result of any disruption caused by Tim's
22  Children of Ludlow email?
23      A.  I'm not aware of any classes being --
24  what did you --
25      Q.  Canceled.

LESLEY Di MARE - 10/12/2016
Timothy McGettigan v. Lesley Di Mare

161

1    A.  Canceled, no.
2    Q.  Are you aware of any classes being
3  rescheduled as a result of the Children of Ludlow
4  email?
5    A.  I'm not aware of any.
6    Q.  Are you aware of any campus events being
7  rescheduled or canceled as a result of the Children of
8  Ludlow email?
9    A.  No.
10   Q.  Are you aware of any research or other
11  academic pursuits that any of the faculty members were
12  unable to pursue as a result of The Children of Ludlow
13  email?
14   A.  No.
15   Q.  Are you aware of any specific ways in
16  which Tanya Baird or any of the other individuals
17  you've talked about before were unable to do their work
18  as a result of the Children of Ludlow email?
19   A.  I'm not aware of work that they weren't
20  able to do or accomplish, but it took time away from
21  their work to create the evacuation plan and so forth.
22   Q.  Well, the evacuation plan was created
23  before The Children of Ludlow email was sent, right?
24   A.  Yes, I believe so.
25   Q.  With respect to -- sorry.  Strike that.

162

1    Are you aware of any administrative work
2  that anybody was unable to do as a result of The
3  Children of Ludlow email?
4    A.  No.
5    Q.  With respect to the prior emails that
6  Timothy McGettigan sent to the campus, and that's
7  referring to the ones that were marked Deposition
8  Exhibits 28 through 33, the ones that were sent prior
9  to the 17th of January, are you aware of any classes
10  that were canceled or rescheduled as a result of any of
11  those emails?
12   A.  No.  I believe most of those emails were
13  sent during the holiday break.
14   Q.  Are you aware of any campus events that
15  were rescheduled or postponed or canceled as a result
16  of those pre-Children of Ludlow emails?
17   A.  Not that I'm aware of.
18   Q.  Are you aware of any administrative work
19  that was unable to be completed as result of the
20  pre-Children of Ludlow emails?
21   A.  I'm just aware of more work created that
22  probably slowed down other work that we had to do.
23  Lots of phone calls, meetings, how we should address
24  it.
25   Q.  And that was in response to how to

163

1  address the substance of what Tim was presenting to
2  people in these emails?
3    A.  Uh-huh.  If we needed to, what we should
4  do, what if people asked certain questions, how we
5  would respond.
6    Q.  Are you aware of any work, academic work,
7  or research that faculty members were unable to
8  complete as a result of any of Tim's pre-Children of
9  Ludlow emails?
10   A.  I'm not aware of any, no.
11   MS. WANG:  I have no further questions.
12   MS. SCOVILLE:  So I think there is one
13  thing that we would like to clear up.
14        EXAMINATION
15  BY MS. SCOVILLE:
16   Q.  President Di Mare, you recall this
17  morning being asked about your decision to temporarily
18  disable Professor McGettigan's email, correct?
19   A.  Uh-huh, yes.
20   Q.  Did you also request that his -- all of
21  his electronic access be suspended?
22   A.  No.  I requested that his email be
23  suspended.
24   Q.  All right.  Could you take a look at
25  Exhibit 63, please.

164

1    A.  Yes.  I requested that his email be
2  disabled.
3    Q.  All right.  So the email that appears
4  here at 11:35 accurately reflects your intent to
5  request that only Professor McGettigan's email be
6  suspended; is that right?
7    A.  That's right.
8    Q.  And then did the suspension of his email
9  require suspension also of his E account?
10   A.  That was my understanding after the fact,
11  so -- something about the two being entangled.  I'm
12  really not clear on it.
13   Q.  Okay.  But it was your original direction
14  that only the email be suspended?
15   A.  Correct.
16   MS. WANG:  Okay.  Thank you.
17   MS. SCOVILLE:  All right.
18   THE COURT REPORTER:  If it's transcribed,
19  again the same instructions on signature?
20   MS. SCOVILLE:  Yes.
21   WHEREUPON, the within proceedings were
22  concluded at the approximate hour of 2:54 p.m. on the
23  12th day of October, 2016.
24        *    *    *    *    *
25

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490