IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00097-PAB-KLM

TIMOTHY McGETTIGAN,

     Plaintiff,

v.

LESLEY DI MARE, President of Colorado State University - Pueblo, in her individual capacity,

     Defendant.

---

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Lesley Di Mare, President of Colorado State University-Pueblo (CSU-P) in her individual capacity, moves for summary judgment under Fed. R. Civ. P. 56:

### DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

1.  As a professor at CSU-P, Plaintiff, Dr. Timothy McGettigan, was assigned a CSU-P email address (".edu email"). Exh. A, Pltf. Dep. 8:24-9:1.

2.  University email users were subject to university policies, including the Electronic Communications Policy and the Computing Resource Access Policy. Exh. B, Policies.

3. McGettigan also used at least five personal email accounts, which he found "vastly" more reliable than his .edu email. Exh. A, Pltf. Dep. 9:2-21, 14:20-16:4, 24:1-16.

4.  As a result, he minimized use of his .edu email, and communicated with students using his personal email. *Id.* 13:1-10, 27:24-28:11.

5.  He used his .edu email to receive university mail and to send to university-wide

1

distribution lists. *Id.* 23:10-25.

6.  On December 23, 2013, McGettigan used his .edu email to send an email titled "A Grinchy Christmas Present…" to the university distribution lists in which he sharply criticized university administrators, including CSU-P President Lesley Di Mare, over proposed budget cuts. Exh. C, "Grinchy" Email.

7.  Later that day, McGettigan sent another email to all faculty about the lack of justification for the budget cuts. Exh. D, "Grinchy" Email 2.

8.  On January 14, 2014, McGettigan sent an email to all students titled "Chancellor Martin's Grand Plan to Quit Wasting Money on CSU-Pueblo Students," which was highly critical of university administration and encouraged students to give the Chancellor "the kind of southern Colorado welcome that he so richly deserves" at an upcoming public meeting. Exh. E, Martin's "Grand Plan" Email.

9.  The following day, McGettigan sent all classified staff and students an email entitled "Reclaim USC on Friday – Free at Last!," encouraging people to attend a rally he was organizing and to send the "wantonly-destructive CSU System packing." Exh. F, "Reclaim USC" Email; Exh. A, Pltf. Dep. 87:14-19.

10.  On January 16, 2014, McGettigan sent two mass emails to the distribution lists, one about the rally and one circulating a newspaper article. Exh. G, "Important Events" Email; Exh. H, Today Article.

11.  The campus-wide email distribution lists encompassed approximately 28,000 recipients. Exh. I, Watson Aff. ¶4; Exh. J, Watson Dep. 27:16-20.

12.  The volume of email traffic when multiple campus-wide distribution lists were used

bogged down university servers. Exh. I, Watson Aff. ¶5.

13.   Di Mare and others received reports that McGettigan's emails were disrupting CSU-P employees' work. Exh. K, Di Mare Dep. 29:17-20, 32:1-8, 33:9-20, 55:12-56:8, 58:10-59:1; *see also* Exh. L, Quintana Email.

14.   She had multiple conversations with employees about the emails. Exh. K, Di Mare Dep. 21:3-20; 22:7-15; 24:20-25:11; 27:17-28:1; 33:9-20; 44:5-10; 44:23-45:3.

15.   Community advisors asked her about the emails. *Id.* 53:21-54:6.

16.   She also was contacted by students who were weary of McGettigan's emails or wanted off his distribution lists. Exh. M; Student Complaint Email; Exh. K, Di Mare Dep. 55:12-56:8.

17.   Managing the misinformation and stress created by McGettigan's emails distracted Di Mare from other pressing issues, including how to manage the budget deficit. Exh. N, Di Mare Aff. ¶ 4; Exh. K, Di Mare Dep. 59:23-24; 100:13-102:18.

18.   At a public meeting about CSU-P's budget on January 6, 2014, McGettigan became agitated, raising his voice and pacing. Exh. O, Doyle Dep. 12:1-13:1; Exh. P, Brown Dep. 108:9-11; Exh. Q, Brown Email, p. 1.

19.   Johnna Doyle, Deputy General Counsel for the CSU System, was at the meeting; she became concerned about McGettigan's behavior and called Lt. Bill Brown of the Pueblo County Sheriff's Office to come to the meeting to monitor the situation. Exh. O, Doyle Dep. 12:1-13:19; Exh. Q.

20.   Another public meeting with the Chancellor to discuss the proposed budget cuts was scheduled for Friday afternoon, January 17, 2014 at 3 pm; the rally organized by

McGettigan was scheduled for 2 pm. Exh. R, Operations Plan, p.4.

21.  Di Mare was personally becoming concerned with the escalating tone of McGettigan's campus-wide emails. Exh. N, Di Mare Aff. ¶ 5.

22.  Tanya Baird, assistant to the Provost, relayed concerns from staff and students to Di Mare about the tone of McGettigan's emails and the need for safety on campus. Exh. S, Baird Dep. 18:8-19, 26:5-9, 43:22-44:24.

23.  Lt. Brown, who was stationed on CSU-P's campus, received McGettigan's emails and also became concerned for campus safety. Exh. P, Brown Dep. 7:8-15.

24.  Lt. Brown's supervisor, Captain Dave Lucero, saw the emails and was concerned that the confrontational tone could indirectly encourage civil disorder. Exh. T, Lucero Dep. 5:14-6:24, 20:1-3, 26:15-28:11, 42:25-43:14, 46:9-47:19.

25.  The Sheriff's Office received an email from a CSU-P staff member asking if McGettigan's emails were "a threat of violence for our campus" and whether the Sheriff would have adequate security at the public meeting. Exh. L.

26.  The Sheriff's Office also received phone calls, including one from a staff member concerned that McGettigan's emails were "getting weird" and asking about her safety. Exh. U, Hernandez Dep. 53:2-55:1; Exh. P, Brown Dep. 70:3-17, 72:14-73:1.

27.  Di Mare heard from students, staff, and faculty concerned about the public meeting on January 17. Exh. K, Di Mare Dep. 19:17-20:22, 27:17-28:1, 47:12-17.

28.  She also heard from staff that the atmosphere on campus was increasingly hostile. *Id.* 32:1-11; 37:21-38:3; 39:15-20; 40:10-15; 42:17-43:2; 43:20-44:10.

29.  Multiple faculty members told Di Mare they were worried the public meeting could

4

"get out of hand." *Id.* 49:17-50:22.

30. Baird became concerned enough about the atmosphere on campus that she started exercising her concealed carry permit and reviewed an evacuation plan with staff in the Provost's office. Exh. S, Baird Dep. 27:16-23, 48:21-49:4.

31. The Student Body President told Di Mare that students might blockade the doors to the public meeting and throw onions. Exh. V, Emerson Dep. 8:24-9:2; 35:16-38:11; Exh. K, Di Mare Dep. 16:23-16:9.

32. Based on McGettigan's emails, Lt. Brown developed an Operational Plan for Sheriff's Office for the rally and public meeting. Exh. P, Brown Dep. 47:14-48:3, 56:12-23, 67:12-22, 80:3-11; Exh. T, Lucero Dep. 19:13-21; Exh. R.

33. Due to McGettigan's emails, Lt. Brown believed there was "a strong possibility of civil disorder at the meeting." Exh. Q; Exh. P, Brown Dep. 62:3-10.

34. The emails prompted the Sheriff's Office to add additional resources to the Operational Plan. Exh. T, Lucero Dep. 31:22-32:5.

35. Lt. Brown communicated to Di Mare his concerns that the protest activity on the day of the public meeting may not be peaceful. Exh. P, Brown Dep. 63:1-9.

36. The Operations Plan recommended approximately 14 officers on campus in addition to the usual two to three. Exh. R; Exh. P, Brown Dep. 113:11-22.

37. The Sheriff's Office also recommended having an additional SWAT team in full riot gear on campus. Di Mare declined to have the SWAT team on campus, but agreed to have them stationed immediately off-campus so that they could be called if needed. Exh. N, Di Mare Aff. ¶ 7; Exh. P, Brown Dep. 113:11-115:13.

38.  On the day of the public meeting, January 17, Di Mare felt that things on campus were "extremely tense." Exh. K, Di Mare Dep. 51:12-23.

39.  At 10:45 am, McGettigan sent an email titled "Children of Ludlow" to students, classified staff, faculty-adjunct, faculty, administration, and contract staff from his CSU-P email account. Exh. W, Ludlow Email.

40.  The email likened the CSU Chancellor to "murderous hitmen" who killed women and children in Ludlow, Colorado in 1914. *Id.*

41.  The email compared the Chancellor to hitmen who "massacred those people. Coldly and methodically, the hitmen turned their guns on women and children. … [a]midst the screams of helpless, defenseless souls…" *Id.*

42.  The email accused the Chancellor of "putting a gun to the head" of staff members, and continued in part, "[w]hen the hitman returns today, the Children of Ludlow will once again be called upon to withstand the onslaught of a merciless enemy" and "face the latest in a long history of hitmen who have terrorized southern Colorado." It concluded by asking readers to "lend a hand." *Id.*

43.  Doyle, who acts as in-house counsel at CSU-P, received the Children of Ludlow email and was immediately concerned about the violent rhetoric. Exh. X, Doyle Aff. ¶ 6.

44.  She had received McGettigan's prior emails and been in contact with the Sheriff's Office, so she was aware of law enforcement's concerns and the Operational Plan. Exh. *Id.* ¶ 5; Exh. O, Doyle Dep. 34:24-35:2; 38:9-19, 46:3-47:20; 62:25-63:5.

45.  Doyle likewise observed that tensions were high. *Id.* 38:9-39:20.

46.  Doyle was concerned that the Children of Ludlow email was "portraying what is

already a volatile situation on campus and then turning it into an analogy of a situation where people were murdered…" *Id.* 82:8-16.

47.   Doyle knew that the email had been widely distributed and was concerned that someone could misinterpret the email and come to campus to hurt the Chancellor or someone else. *Id.* 83:16-85:19; 93:16-18.

48.   Late in the morning of January 17, President Di Mare was meeting with Pueblo County Sheriff, Kirk Taylor, as well as Cpt. Lucero and Lt. Brown to discuss security procedures for the public meeting that afternoon. Exh. K, Di Mare Dep. 61:12-21; Exh. P, Brown Dep. 132:1-14; Exh. T, Lucero Dep. 50:1-5.

49.   Doyle interrupted Di Mare's meeting with law enforcement to hand the President the Children of Ludlow email. Exh. K, Di Mare Dep. 60:18-61:4.

50.   Di Mare and Doyle discussed the possibility of violence on campus resulting from the rhetoric in the email. *Id.* 63:6-11.

51.   Di Mare also discussed the Children of Ludlow email with the Sheriff's Officers. *Id.* 74:4-23; Exh. P, Brown Dep. 134:7-10, 135:12-17; Exh. T, Lucero Dep. 48:14-49:25, 53:8-14.

52.   Lt. Brown found the shift in rhetoric to talking about "people dying, killing, massacring" to be "very alarming" and felt that there was a threat to the university. Exh. P, Brown Dep. 95:4-10, 117:21-118:2, 135:12-17; *see also* Exh. Q.

53.   Captain Lucero also felt the email posed a threat. Exh. T, Lucero Dep. 50:22-53:4, 58:8-12. 65:14-66:16.

54.   At least one staff member forwarded the Children of Ludlow email to the Sheriff's

Office to "make some aware, maybe cautious about this email." Exh. Y, Tafoya Email.

55.   Di Mare trusted the experience of the Sheriff's officers in security matters. Exh. N Di Mare Aff. ¶ 12.

56.   Di Mare's executive cabinet members were also present and told her that the campus climate was volatile and that McGettigan's emails were exacerbating the situation. Exh. K, Di Mare Dep. 60:18-24, 78:19-79:21, 80:24-81:5, 83:7-17.

57.   Di Mare describes that morning as pressure-filled and stressful. *Id.* 122:21-123:19.

58.   Doyle recommended that Di Mare temporarily suspend McGettigan's email until after the budget forum was over. *Id.* 62:19-63:5.

59.   Di Mare asked Doyle if the university would be legally covered to take that action, and Doyle replied 'yes.' *Id.* 63:17-64:18; Exh. O, Doyle Dep. 98:22-99:2.

60.   Doyle regularly handled First Amendment issues, and Di Mare relied on her for legal advice on such matters. Exh. X, Doyle Aff. ¶ 2; Exh. N, Di Mare Aff. ¶ 16.

61.   Doyle had been practicing law for more than 20 years, five of those as Deputy General Counsel for CSU-P. Exh. O, Doyle Dep. 8:12-25.

62.   Doyle considered the First Amendment in making her recommendation, concluding that the potential security issues created by the Children of Ludlow email outweighed Plaintiff's interest in speaking. Exh. X, Doyle Aff. ¶ 7; Exh. O, Doyle Dep. 78:5-13.

63.   Doyle also consulted university policies and concluded that the Children of Ludlow email violated them. *Id.* 76:21-24; 77:20-25; 105:9-20.

64.   Doyle consulted her supervisor, CSU System General Counsel, Michael Nosler, who agreed that McGettigan's email should be temporarily suspended. *Id.* 77:2-78:13.

65.  Di Mare felt that the gravity of the situation required her to act immediately and she was the person responsible for ensuring the safety of campus. Exh. N, Di Mare Aff. ¶14.

66.  Di Mare was concerned someone – particularly someone off campus – could misinterpret the email and come to campus to incite violence. *Id.* ¶ 9.

67. The history of campus shootings at Virginia Tech and Arapahoe High, which happened just weeks prior, weighed heavily on her that day. Exh. K, Di Mare Dep. 63:17-64:14; Exh. N, Di Mare Aff. ¶ 10..

68.  She believed little could realistically be done about the Children of Ludlow email, since it had already been widely distributed, but believed that she could prevent additional emails from further exacerbating the situation. *Id.* ¶ 11.

69.  All present agreed that if another email like the Children of Ludlow email went out "that there could be problems on campus that could turn into violence." Exh. K, Di Mare Dep. 116:11-18.

70.  Just two and one-half hours before the rally, in the meeting with Doyle and based on her advice, Di Mare decided to temporarily suspend Plaintiff's email. Exh. N,Di Mare Aff. ¶15.

71.  Meanwhile, Matt Watson, CSU-P's IT security officer, received the Children of Ludlow email and was "shocked" by it, believing that it "crossed the line" and created safety concerns. Exh. J, Watson Dep. 7:8-10, 23:14-21, 26:21-27:25, 37:3-21.

72.  Watson discussed the Children of Ludlow email with Doyle and told her that he believed the email violated university policy. *Id.* 29:20-30:10.

73.  After receiving authorization from Di Mare, Watson proceeded to suspend

McGettigan's email. Exh. Z, Di Mare – Watson Email; Exh. K,Di Mare Dep. 163:16-164:12; Exh. A-1, Doyle Letter.

74.  After the public meeting was over and the crisis had passed, Di Mare decided to restore Plaintiff's email access but without access to university-wide distribution groups. Exh. K, Di Mare Dep. 85:9-17, 140:14-21.

75.  Di Mare decided to continue to restrict McGettigan's access to campus-wide email groups until she could meet with him to discuss appropriate ways for him to use the groups without disrupting campus operations. "I was hopeful he and I could talk about ways in which he could express whatever he wanted to express through that particular mechanism without creating what I thought was a problem on campus." *Id.* 86:24-89:1.

76.  IT worked on this task on Monday, but technical issues complicated the process, which took most of Monday to resolve. Exh. I, Watson Aff. ¶ 7.

77.  McGettigan's email was restored Monday late afternoon. Exh. K, Di Mare Dep. 140:25-141:6; Exh. J, Watson 55:7-16; Exh. A-2, Di Mare-McGettigan Email.

78.  McGettigan was not scheduled to teach on Monday. Exh. A-3, Calhoun-Stuber Email.

79.  Di Mare requested a meeting with McGettigan to discuss the temporary suspension of his email and his continued use of distribution groups. Exh. A-4, Di Mare Invite.

80.  McGettigan refused to attend. Exh. A, Pltf. Dep. 127:14-128:1.

81.  The weekend following the public meeting, McGettigan communicated via email about the suspension of his email with colleagues, his department chair, the American Association of Professors, and the Foundation for Individual Rights in Education (FIRE).

*Id.* 96:22-98:5, 103:17-104:12, Exh. A-5, McGettigan Email.

82.  That weekend, McGettigan also talked with an Inside Higher Ed reporter; he later spoke with the Pueblo Chieftain, Chronicle of Higher Education, and Denver Post. Exh. A, Pltf. Dep. 105:19-106:6, 107:5-108:1, 163:25-164:18.

83.  That weekend, he emailed legislators about the budget cuts. Exh. A-6, McGettigan-Legislators Email.

84.  He communicated on Facebook and tweeted about the suspension of his email. Exh. A-7, McGettigan Twitter; Exh. A-8, McGettigan Facebook.

85.  He also discussed it in his classes. Exh. A, Pltf. Dep. 178:15-18.

86.  In the following weeks, McGettigan spoke before the Faculty Senate in favor of a no-confidence vote in the Chancellor and Di Mare, filed a formal complaint against Di Mare relating to the budget cuts, and spoke to the Chair of CSU Board of Governors. *Id.* 143:17-23; 147:8-149:22; Exh. A-9, Formal Complaint.

87.  He met with legislators and continued to communicate with them about the budget cuts and his criticism of CSU administrators. *See, e.g.*, Exh. A-10, Legislators Email 2; Exh. A-11, JBC Staff Budget 2016-2017; Exh. A-12, JBC Staff Budget 2016-2017-2.

88.  In February 2014, McGettigan created a "Move On" petition, signed by at least 187 people. Exh. A-13, MoveOn Petition.

89.  On March 1, 2014 McGettigan sent an email to the CSU Board of Governors, university administrators, state and federal legislators, media outlets and scores of others about the budget cuts, charging CSU administrators with "reckless, self-destructive and conniving nonsense." Exh. A-14 "A New Beginning" Email, Exh. A-15,

"A New Beginning" -2 Email.

90.  McGettigan also contacted the U.S. Department of Justice Civil Rights Division, the EEOC, and the Attorney General. Exh. A-16, Letter from USDJ; Exh. A-17, Email to AG; Exh. A, Pltf. Dep. 162:5-21.

91.  During the time he was unable to send to distribution groups, McGettigan was able to continue to receive university-wide emails. Exh. A, Pltf. Dep. 188:25-189:12.

92.  McGettigan also created his own email distribution groups of faculty with more than 80 email addresses, which he reused. *Id.* 189:13-190:24, 193:4-19.

93.  He continued to send emails to large groups of recipients, both within and without CSU-P. *See, e.g.*, Exh.A-18, Group Emails.

94.  In February 2015, CSU-P changed its electronic mail policy to end faculty and staff access to university email distribution groups. Exh. X, Doyle Aff. ¶ 8.

## STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates there is no genuine dispute as to any material fact and that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Once the movant meets her initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Summary judgment is not a disfavored procedural shortcut; rather, it is an important

procedure designed to secure the just, speedy and inexpensive determination of every

action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## ARGUMENT

I. **Plaintiff's First Amendment claim fails to satisfy the *Garcetti/Pickering* test.**

As this Court previously determined (Dkt. #34, p.10), Plaintiff's claim must be

assessed under the familiar five-part *Garcetti/Pickering* test, which asks:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). The first three prongs are

issues of law to be decided by the Court; the remaining two are to be decided by a

factfinder. *Id.* Defendant moves for summary judgment on prongs three and four.

### A. Defendant's interests as an employer temporarily outweighed Plaintiff's interest in speaking.

*Garcetti/Pickering*'s third stage requires the Court "to arrive at a balance between

the interests of the [employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S.

563, 568 (1968). This test has been paraphrased as whether the employer had "an

adequate justification for treating the employee differently from any other member of the

public" based on the government's needs as an employer." *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014). (Internal citation omitted.)

The Supreme Court has recognized that public officials have "far broader powers" when regulating employee speech than when regulating speech by the public. *Waters v. Churchill*, 511 U.S. 661, 671 (1994). "[E]ven many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees" and the "verbal tumult, discord, and even offensive utterance, as necessary side effects of the process of open debate" need not be permitted by the government as an employer. *Id.* at 672 (internal citation omitted).

> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.

*Id.* at 675.

Pertinent factors in the analysis include whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, impedes the performance of the speaker's duties, or interferes with the regular operation of the enterprise. *Lytle v. City of Haysville*, 138 F.3d 857, 864 (10th Cir. 1998). (Internal quotation omitted.) "The primary consideration is the impact of the disputed speech on the effective functioning of the public employer's enterprise." *Helget v. City of Hays*, 2017 U.S. App. LEXIS 140, at *11 (10th Cir. Jan. 4, 2017) (internal citation omitted).

Furthermore, in balancing the interests at stake, courts do not consider the employee's speech in a "vacuum." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). A court must consider "the manner, time, and place of the employee's expression," as well as the events leading up to it. *Lytle*, 138 F.3d at 863-64 (citing *Rankin*, 483 U.S. at 388). Additionally, an employee's interest may be diminished when the chosen form of speech is "unnecessarily disruptive." *Helget,* 2017 U.S. App. LEXIS 140, at *12.

Importantly, the government need not "allow events to unfold to the extent that the disruption of the operation and the destruction of working relationships is manifest . . . ." *Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1227-28 (10th Cir. 2001); *see also Kent v. Martin*, 252 F.3d 1141, 1144 (10th Cir. 2001). Rather, courts give "substantial weight" to "reasonable predictions of disruption." *Waters*, 511 U.S. at 673. "Preemptive steps to avoid such an impact can be acceptable," and those decisions are entitled to deference by the courts. *Helget,* 2017 U.S. App. LEXIS 140, at *11 (citing *Rock v. Levinski*, 791 F.3d 1215, 1220 (10th Cir. 2015)). This is particularly true when security concerns are at stake. "[T]he *Pickering* balance tips decidedly towards the interest of the employer in preventing violence, threats, and disruption in the workplace arising from abusive language…" *Johnson v. City of Battle Creek*, 2005 U.S. Dist. LEXIS 40300, at *29 (W.D. Mich. May 10, 2005); *see also Farhat v. Jopke*, 370 F.3d 580, 594 (6th Cir. 2004) (affirming summary judgment at third step because plaintiff's speech led to disruption to the point where staff "feared for their physical safety in the workplace").

15

In its Motion to Dismiss Order, this Court followed the *Dixon* analysis, which directed that a court first consider whether the employer demonstrated that the restrictions on speech were necessary before balancing the interests of the employer and employee. 553 F.3d at 1304. *Dixon*'s formulation of the third prong, however, has not been widely followed by either the Supreme Court's latest pronouncement of the test in *Lane*, or more recent Tenth Circuit cases. *Lane*, 134 S. Ct. at 2381; *Helget*, 2017 U.S. App. LEXIS 140, at *10-11; *Rock*, 791 F.3d at 1219-20; *Trant v. Okla.*, 754 F.3d 1158, 1166 (10th Cir. 2014)[1]. In each of these cases, courts balanced the interests at stake without a predicate finding. *See Lane*, 134 S. Ct. at 2381. Under either formulation of the third prong, however, the undisputed facts demonstrate that Di Mare's actions legitimately advanced the operations of the university and that the university's interests outweighed Plaintiff's interests in speaking.

### B. Under the circumstances, President Di Mare made reasonable predictive judgments.

Di Mare's suspension of Plaintiff's email until after the public meeting concluded was a legitimate response to ensure the safety, and thus efficient operation, of public business on campus. Although the Children of Ludlow email itself reasonably raised security concerns, Di Mare pragmatically recognized that once the email was out, little could be done other than for law enforcement to respond as planned during the

---

[1] *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014) (appeal from summary judgment), is the subsequent opinion of the Tenth Circuit in the case cited by this Court in its order on Defendant's Motion to Dismiss (Doc. 34 at p.14) (citing *Trant v. Okla.*, 426 F. App'x 653 (10th Cir. 2011) (unpub'd) (appeal from motion to dismiss)).

approximately two and one-half hours before the rally. Given that Plaintiff's emails prompted the Sheriff's Operational Plan in the first place[2], Plaintiff organized the upcoming rally, and the tone of his emails steadily escalated, Di Mare's action to prevent further disruptive emails was a reasonable response to the circumstances.

To be sure, Plaintiff had a legitimate interest in speaking about the proposed budget cuts. The record shows that he made ample and repeated use of multiple channels to speak on his chosen topic. CSU-P respected Plaintiff's interest and did not take any action until Plaintiff's language created security concerns. Plaintiff's interest in his speech diminished with the Children of Ludlow email. He sent that email through a university account to approximately 28,000 recipients, the majority of whom were off-campus. It was replete with vivid violent references to a massacre, asserting in part that the Chancellor will be "return[ing] today" and "putting a gun to the heads" of employees.

Di Mare's interests in ensuring security tip the scales in her favor, particularly in light of the facts known to her that day. When she received the Children of Ludlow email, Di Mare was meeting with law enforcement officers to discuss security arrangements, including positioning of SWAT team. Di Mare knew the Sheriff's officers had considerable concerns about safety at the rally and public meeting and that they had exponentially increased the number of uniformed and plainclothes deputies on campus. Di Mare further had been told by the student body president that students may get physical at the meeting by throwing things and barring the entrance. She and others

---

[2] *See* Exh. R ("In summary, if it were not for the actions of McGettigan, the Sheriff's Office would not have deployed the amount of resources we did.").

observed that tension on campus was high; she and others were hearing concerns from employees about their safety. Di Mare considered all these facts against the backdrop of deadly campus shootings.

Di Mare believed that she was primarily responsible for ensuring campus safety. She recognized there was little she could do about the Children of Ludlow email because it had been released, and by the time she could take any steps to recall or counter it, several hours would have passed. Di Mare believed, however, that given the increasing crescendo of Plaintiff's rhetoric, it was important to stop similar emails from going out before the rally and public meeting. Under the circumstances, this was a well-grounded, predictive judgment made under time pressure about the potential impact to university operations, including the public meeting that afternoon.

The balance of interests also tips in Di Mare's favor as to her decision that Plaintiff's access to the email distribution groups should continue to be limited until he met with her to discuss the use of campus-wide distribution lists. The undisputed facts are that Plaintiff's use of the email groups had caused disruption. Staff reported being distracted from their work. The emails distracted Di Mare herself from pressing tasks at hand. On the other side of the balancing scales, Plaintiff's interest was not significant. Plaintiff's use of the groups on the university's email system was not for university-related business, but for speech on extraneous topics. His use of the groups in these circumstances was outweighed by the university's interests in its efficient operation.

**II.    Plaintiff cannot satisfy the fourth prong of the *Garcetti/Pickering* test because he did not suffer an adverse employment action.**

Plaintiff's First Amendment claim further fails because he cannot satisfy the fourth *Garcetti/Pickering* prong. "Implicit in the *Pickering* test is a requirement that the public employer have taken some adverse employment action against the employee." *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003). At the fourth stage, Plaintiff must prove that his "speech was a substantial factor or a motivating factor in a detrimental employment decision." *Couch v. Bd. of Trs. of the Mem. Hosp.*, 587 F.3d 1223, 1235 (10th Cir. 2009) (internal citation omitted). This question is appropriate for summary judgment when there is no evidence in the record from which a trier of fact could reasonably conclude either that 1) an adverse action occurred, or 2) his protected speech caused the action. *See Couch*, 587 F.3d at 1236. The undisputed facts do not show that Di Mare's actions satisfy the first of those elements.

Plaintiff must show Di Mare's actions "would deter a reasonable person from exercising his First Amendment rights." *Id* at 1238; *Hook v. Regents of Univ. of Cal.*, 394 Fed. Appx. 522, 535 (10th Cir. 2010). This standard has been widely applied in the context of other employment statutes, in which court have concluded that actions resulting in only de minimis harm to or impact upon an employee are not actionable. *Duvall v. Putnam City Sch. Dist.*, 530 Fed. Appx. 804, 811 (10th Cir. 2013) (applying standard on a Rehabilitation Act claim).

A "mere inconvenience or an alteration of job responsibilities" is insufficient to satisfy the standard. *Reinhardt v. Albuquerque Pub. Schs.*, 595 F.3d 1126, 1133 (10th

Cir. 2010) (internal citation omitted). Nor is a transfer which has the effect of increasing commute time. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531-32 (10th Cir. 1998). Similarly, a partially negative work evaluation and disconnection from a color printer are not adverse actions. *Hook,* 394 Fed. Appx. at 525-26. A reasonable person would not be deterred from engaging in protected activity due to a reassignment of duties, *Chung v. El Paso Cnty./Colorado Springs Sch. Dist. #11*, 115 F. Supp. 3d 1242, 1254-55 (D. Colo. 2015), or withdrawal of a company cell phone and indoor parking spot, *Whitcomb v. First Am. Nationwide Documents*, 2006 U.S. Dist. LEXIS 5423, at *20 (D. Colo. 2006).

Di Mare's decisions would not deter a reasonable person from exercising his First Amendment rights. The decision to temporarily suspend Plaintiff's email access left him without access to university email only over a weekend and on a Monday when he taught no classes. Plaintiff already used his personal email to communicate with students and colleagues. Plaintiff demonstrated that he had other channels of communication open to him. As a result, the temporary suspension resulted in only de minimus harm.

Similarly, Di Mare's decision to continue to restrict Plaintiff's access to five campus-wide distribution groups amounted to no more than a mere inconvenience. Plaintiff could continue to receive campus-wide email. He also created his own large email lists, which he reused. Furthermore, he could have resolved the issue by meeting with the President. The restriction from the campus-wide groups is akin to losing professional privileges, which falls short of an adverse employment action.

Finally, a reasonable person would not be deterred from speaking because Plaintiff himself was not deterred. "[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the actions are sufficiently material and adverse to be actionable." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008). The weekend after the public meeting, Plaintiff communicated extensively – including continuing his criticism of CSU administrators – through email, phone, and social media. That weekend, he spoke with reporters and contacted the legislature. In the following weeks and months, he remained undeterred from expressing his views to administrators, the Board of Governors, federal and state legislators, elected officials, administrative agencies, faculty at other institutions, the media, and his colleagues. His continued speech indicates that a reasonable person would not find Di Mare's actions a deterrent to exercising one's First Amendment rights.

### III.    President Di Mare is entitled to qualified immunity because the law did not clearly established her actions as unconstitutional.

Qualified immunity shields state officials from liability for civil damages if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A public official acting in her individual capacity is presumed to be immune from liability. *Medina v. Cram*, 252 F.3d 1124, 1129 (10th Cir. 2001). "[Q]ualified immunity represents the norm," *Harlow*, 457 U.S. at 807, and a public employee is entitled to qualified immunity under "all but the most exceptional cases." *Tonkovich v. Kan. Bd. of Regents*,

159 F.3d 504, 516 (10th Cir. 1998) (internal citation omitted).

Once a public official raises a qualified immunity defense, a "heavy two-part burden" shifts to Plaintiff to prove: 1) Defendant's conduct violated a constitutional right; and 2) the relevant law was clearly established at the time. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). The factors may be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation and citation omitted). This presents a question of law. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). To be clearly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Moreover, the right must have been clearly established in the context in which the claim arose. *Scott v. Harris*, 550 U.S. 372, 377 (2007). The United States Supreme Court repeatedly has directed that clearly established law should not be defined with "a high level of generality." *Ashcroft*, 563 U.S. at 742.

If there is a reasonable difference of opinion as to whether an action was constitutionally prohibited, state officials are entitled to qualified immunity. *Gomes v. Wood*, 451 F.3d 1122, 1136 (10th Cir. 2006). Even officials who are mistaken about the lawfulness of their conduct may be entitled to qualified immunity if the mistake is reasonable in light of the applicable law and facts known at the time. *Id.* In fact, the

22

doctrine is specifically intended to give "ample room for mistaken judgments," and it

protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*,

475 U.S. 335, 341, 343 (1986).

Defense counsel's research revealed no cases in this Circuit in which a public

employer failed to clear *Garcetti/Pickering*'s third prong for curtailing speech that could

pose a safety or security concern or in which a public official was presented with

remotely similar circumstances. As a result, the law did not clearly establish that Di

Mare's actions violated the First Amendment. The Tenth Circuit has directed courts to

bear in mind that "allegations of constitutional violations that require courts to balance

competing interests may make it more difficult to find the law 'clearly established' when

assessing claims of qualified immunity." *Walker v. City of Orem*, 451 F.3d 1139, 1151

(10th Cir. 2006) (internal citation omitted); *Schalk v. Gallemore*, 906 F.2d 491, 499 (10th

Cir. 1990). Because precedent in this Circuit did not clearly establish that her actions

were unconstitutional, Di Mare is entitled to qualified immunity.

**IV.  President Di Mare's reliance on advice of counsel entitles her to qualified immunity on her decision to temporarily suspend Plaintiff's email.**

Even if the law were clearly established that Di Mare's conduct violated the First

Amendment, she may nonetheless be entitled to qualified immunity if "'extraordinary

circumstances' – such as reliance on the advice of counsel or on a statute— 'so

prevented [the official] from knowing that [her] actions were unconstitutional that [she]

should not be imputed with knowledge of a clearly established right.'" *Gomes*, 451 F.3d

at 1134 (internal citation omitted). Whether reliance on legal advice rises to the level of

23

extraordinary circumstances depends on the circumstances of each case. *V-1 Oil Co. v. Wyo., Dep't of Env't Quality*, 902 F.2d 1482, 1489 (10th Cir. 1990). Relevant factors include: 1) whether the advice was unequivocal and specifically tailored to the facts; 2) whether the attorney giving the advice had complete information; 3) the prominence and competence of the attorney; and 4) how soon the defendant took action after receiving the advice. *Id. at* 1489. "The advice need not be couched in certain precise legal terms before the official is entitled to rely upon it." *Mitchell v. Coffey Cty. Hosp.*, 903 F. Supp. 1415, 1426 (D. Kan. 1995). The exceptional circumstances doctrine protects officials who "did not have the benefit of [] constitutional hindsight" and who reasonably rely on legal counsel to make difficult and immediate decisions. *Hollingsworth v. Hill*, 110 F.3d 733, 742 (10th Cir. 1997).

Undisputed facts demonstrate that Di Mare was justified in her reliance on Doyle's advice that Plaintiff's email be temporarily suspended. This advice was unequivocal – Doyle recommended immediate suspension. The legal advice was also specifically tailored to the facts. Doyle brought the Children of Ludlow email to the President and her advice was based on that email and the concerns it created.

Second, Doyle had complete information. She not only had the email itself, she knew it was being received by many thousands of individuals. She was aware that Plaintiff organized a rally to take place within several hours, and she had been in close contact with the Sheriff's Office about their security concerns.

Third, Doyle was a prominent and competent attorney. She was Deputy General Counsel for the CSU System who had been advising CSU-P for five years. *See*

24

*Hollingsworth*, 110 F.3d at 741 (finding sheriff's deputy entitled to qualified immunity when relying on advice of assistant district attorney, who had "the prominence of a county officer who was charged by statute to advise the Sheriff's Department."). She had training and experience with First Amendment issues. Moreover, she considered the relevant test and consulted with General Counsel for the CSU System before offering her advice to the President.

Finally, Di Mare acted immediately upon receiving the legal advice in circumstances that required a quick decision. *See id.* (granting immunity to officer who acted "immediately" after receiving advice). Di Mare, therefore, is entitled to qualified immunity on her decision to temporarily suspend Plaintiff's email.

Respectfully submitted this 27th day of January, 2017.

CYNTHIA H. COFFMAN, Attorney General

*s/ Stephanie Lindquist Scoville*

STEPHANIE LINDQUIST SCOVILLE*
Senior Assistant Attorney General
Civil Litigation & Employment Law Section
Attorneys for Defendant
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  (720) 508-6573
FAX:  (720) 508-6032
E-Mail:  stephanie.scoville@coag.gov
*Counsel of Record

<u>CERTIFICATE OF SERVICE</u>

I certify that I served the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** upon all parties herein by e-filing with the CM/ECF system maintained by the court or by depositing copies of same in the United State mail, first-class postage prepaid, at Denver, Colorado, this 27th day of January, 2017 addressed as follows:

Daniel M. Twetten
Elizabeth Wang
Loevy & Loevy
2060 Broadway, Suite 460
Boulder, CO  80302
dan@loevy.com
elizabethw@loevy.com

*s/ Stephanie Lindquist Scoville*

1